## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

**MICHAEL SIZEMORE**, *et al.,* on behalf of
themselves and all others similarly situated,

                *Plaintiffs,*

*v.*

**CHANGPENG ZHAO,** *et al.*,

                *Defendants.*

_____/

CASE NO.

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs file this Complaint on behalf of themselves, and all other similarly situated Binance consumers, against Defendants, the world's largest cryptocurrency exchange, Binance, its CEO, and various "Influencers" who promoted, assisted in, and/or actively participated in Binance's offer and sale of unregistered securities.

## INTRODUCTION

1.    Binance is the world's largest centralized, web-based crypto-products platform, offering its customers in the United States the ability to buy, loan, and trade (including spot and margin) digital assets, including cryptocurrency and tokens, including their own native token, called BNB. In the simplest terms, the value of the BNB token is based on the total number of existing BNB coins and the profits of the Binance exchange, all actions which depend "upon the actions of others" and are thus "securities" under the *Howey* test. In fact, unlike other crypto tokens which are traded on an open market, the number of existing BNB coins all depend upon the "burn rate" of the token by Binance's Founder and Chief Executive Officer, Defendant Changpeng Zhao.

This is a classic example of a centralized exchange, which is promoting the sale of an unregistered security.

2.     Undersigned Counsel brought the first-class action in the country against cryptocurrency platform Voyager Digital, alleging, in part, that they sold unregistered securities in the form of crypto tokens and interest-bearing cryptocurrency accounts. Voyager subsequently declared bankruptcy and litigation is currently proceeding in this District against various aiders and abettors who promoted the unregistered Voyager products. Voyager was supposed to be rescued in bankruptcy by their competitor, FTX, who entered into an asset purchase agreement with Voyager in the Voyager bankruptcy proceedings.

3.     But that sale never transpired because FTX subsequently also declared bankruptcy, after a bank run on the FTX platform that resulted from Zhao disclosing to the public that FTX was itself in dire financial straits and was propping itself up in part through its own native cryptocurrency token, FTT. Undersigned Counsel next brought a class action against FTX for *their* sale of unregistered securities, and litigation is currently proceeding against in this District against those who aided and abetted FTX in the sale of unregistered securities. After FTX declared bankruptcy, Voyager conducted a second auction, and after spending over $100 million dollars of additional investor funds on a second auction, Binance was announced as the second "rescuer" of Voyager. The SEC voiced an objection to the Binance purchase of Voyager and that sale has been stayed by the federal appeals court.

4.     Undersigned Counsel now represents Plaintiffs and the Classes as defined below in this class action against Binance, because it, too, has offered and sold unregistered securities to investors throughout the country. According to the platform's website, Binance has an average daily trade volume of $65 billion and facilitated 300 billion spot transactions in 2022. Binance

allows users to trade more than 350 cryptocurrencies, and has 120 million registered users. Binance was founded by its current Chief Executive Officer, Changpeng Zhao, and certain other Defendants, on or about July 14, 2017, shortly after making an Initial Coin Offering ("ICO") for the Binance Coin ("BNB").

5.     In late 2020, Binance's U.S. affiliate decided to take Florida off its cryptocurrency trading "no-fly list" and opened for business here in the Sunshine State. The expansion into America's third-most populous state follows Binance.US's procurement of a Floridian money transmitter license under the name "BAM TRADING SERVICES INC." Florida was one of the 13 states not included in Binance.US's original game plan. When the exchange launched in 37 states in September 2019, Binance.US avoided states whose licensure regimes required additional vetting.

6.     Binance's former U.S. Chief Catherine Coley, who grew up in Orlando, said that the two-year Florida license grants her exchange access to what is now its second-largest potential market: 12 million eligible traders. "We're well aware that not every single person above the age of 18 is going to download Binance.US tomorrow, but it is a huge population that is ripe for understanding how digital assets work," she said.

7.     Binance serves over 100 million customers throughout the world. Much of its trading volume and profit arises specifically from its extensive solicitation within the United States, including in this District. Binance holds itself out as the world's "largest crypto exchange by trade volume" and is reported to have amassed over half the global market share for digital asset exchange activity as of the end of 2022.

8.     Binance offers a unique VIP program that gives many additional benefits to traders who have more than 25 BNBs in any Binance wallet and trade over a certain threshold during a

30-day period. There are four levels of Binance VIP: Trader VIP, Holder VIP, Investor VIP and Borrower VIP. These members enjoy reduced fees, lower interest rates, higher borrowing limits and other benefits. This is a great competitive advantage that Binance has used against its crypto competitors.

9.      Binance issues a native token BNB, and, at least until February 2023, a USD backed stablecoin, BUSD. In February 2023, the U.S. Securities and Exchange Commission ("SEC") told Binance that BUSD should have been registered as a security under federal regulations. The SEC was considering taking legal action against Binance for the alleged unregistered token. Paxos Trust Company, the firm behind BUSD, disagreed with those claims. Paxos ceased issuing BUSD tokens on February 21, 2023 following action from the New York Department of Financial Services (NYDFS).

10.      Earlier this week, on March 27, 2023, the Commodity Futures Trading Commission ("CFTC") sued Binance, alleging that the crypto trader violated U.S. trading laws by trading unregistered crypto derivatives. The regulator also claimed that Binance coached its employees and VIP members on how to circumvent regulations and compliance controls to maximize their profits. "For years, Binance knew they were violating CFTC rules, working actively to both keep the money flowing and avoid compliance," CFTC Chairman Rostin Behnam said in a statement. "This should be a warning to anyone in the digital asset world that the CFTC will not tolerate willful avoidance of U.S. law."

11.      Officials from the Department of Justice have been investigating Binance for many years. The investigation also involves the IRS and is focused on both Binance's compliance with anti-money laundering laws and potential tax offenses, according to a May 2021 report from Bloomberg. In December 2022, the Justice Department announced they were deciding whether to

aggressively pursue the exchange, and Reuters reported that the exchange's defense attorneys met with DOJ officials and discussed potential plea deals.

12.     Despite Binance's solicitation of and reliance on customers located in the United States to generate revenue and provide liquidity for its various markets, it has admittedly failed to register with any federal regulatory body or with any individual state to do business in the United States, and has failed to follow U.S. laws, including those designed to prevent money laundering and financing of terrorists, to the detriment of its customers.

13.     During the class period, Binance partnered with Defendants to promote Binance and solicit new customers, including through traditional advertisements on television and social media with contracting with nationally recognized "Brand Ambassadors," such as Miami Heat's Jimmy Butler. The Binance Affiliate Program allows partners from across the globe, to receive kickbacks and commissions based specifically on fees earned from promoting the sale of unregistered securities to individuals who enroll through their Affiliate links. Binance hosts an annual ceremony honoring the "Best Influencers" from each area across the Globe.

14.     With the rise to prominence of the internet and social media, a new multi-billion-dollar cottage industry of "Influencers" has been created. Evidence has now been uncovered that reveals Influencers played a major role in the rise of Binance and in fact, Binance could not have arisen to such great heights without the massive impact of these Influencers, who hyped these unregistered securities for payments of multimillion dollars.

15.     According to a recent investigative analysis by Shawn Tully, reporting for *Fortune*:

> The bigger plan is the one officially tagged the Affiliate Program, which enlists prominent names in social media. Binance's website provides a list of who's eligible. It includes influencers with over 5,000 followers; financial and opinion leaders with communities of 500-plus members on groups such as Facebook, Reddit, or QQ; analyst-gurus getting over 5,000 daily visits; and crypto funds. The hosts pocket 41% kickbacks on recruits' spot trades if they start with fewer than

500 referrals; at over 500, their take hits a stunning 50%. Binance provides strong incentives for those hosts to keep building their clubs. To keep the 41% kickbacks, an inviter must attract at least 10 new customers every 90 days that together generate at least the equivalent of 50 Bitcoin, or around $1 million, in new trades.[1]

16.     It is paramount to understand that the state law claims asserted in this action do not require "reliance" or "deceit." The law merely requires the named Plaintiffs (and eventually the certified class) to have suffered damages as a result of: (a) purchasing an "unregistered security," and (b) that was sold or promoted by the Defendants for their financial benefit and/or the financial benefit of Binance.

17.     State and federal regulators have been required to quickly modify and adjust to all of the changing sources of promoters and marketers. Starting with sponsors on radio, to television and motion pictures, to now, with the exponential growth and pace of the internet, the number of companies specializing in promoting on social media have skyrocketed. Studies have shown that those aged 18 to 34 are more likely to build an interest in an investment specifically from social media as opposed to traditional news websites.

18.     Both the Eleventh and Ninth Circuits have already recently entered opinions that specifically social media posts and mass communications (in the cryptocurrency context) disseminated through the internet, exactly like the ones at issue in the claims against some of these Defendants, are sufficient to state a claim for soliciting the sale of unregistered securities. *Pino v. Cardone Capital,* LLC, 55 F.4th 1253 (9th Cir. 2022); *Wildes v. BitConnect Int'l PLC, 25 F.4th 1341* (11th Cir. 2022), *cert. denied sub nom. Arcaro v. Parks*, 214 L. Ed. 2d 235 (2022).

19.     Numerous state courts have also interpreted their own state securities laws to go even further and provide broader protection for investors from aiding and abetting the sale of

---

[1]     *See Fortune,* https://fortune.com/2023/03/28/binance-cftc-lawsuit-bnb-coin-social-media-influencers/?utm_source=Iterable&utm_medium=email&utm_campaign=campaign_2886032&tpcc=dailydigest (accessed March 31, 2023).

unregistered securities, such as these YBAs, because the FSIPA, "as its title makes clear, [was designed] to protect the public from fraudulent and deceptive practices in the sale and marketing of securities." *Mehl v. Office of Financial Regulation,* 859 So.2d 1260, 1264–65 (Fla. 1st DCA 2003) (quoting *Arthur Young & Co. v. Mariner Corp.,* 630 So.2d 1199, 1203 (Fla. 4th DCA 1994).

<u>**PARTIES**</u>

20.     Plaintiff Michael Sizemore is a citizen and resident of the State of California. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Sizemore purchased, repurchased, invested, and/or reinvested unregistered securities from the Binance Entities. Plaintiff Sizemore did so after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Binance Platform as detailed in this complaint, and executed trades on the Binance Platform after those misrepresentations and omissions were made. As a result, Plaintiff Sizemore has sustained damages for which Defendants are liable.

21.     Plaintiff Rudy Vazquez is a citizen and resident of the State of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Vazquez purchased, repurchased, invested, and/or reinvested unregistered securities from the Binance Entities. Plaintiff Vazquez did so after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Binance Platform as detailed in this complaint, and executed trades on the Binance Platform after those misrepresentations and omissions were made. As a result, Plaintiff Vazquez has sustained damages for which Defendants are liable.

22.     Plaintiff Mikey Vongdara is a citizen and resident of the State of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Vongdara purchased, repurchased, invested, and/or reinvested unregistered securities from the Binance Entities. Plaintiff Vongdara did so after being exposed to some or all of Defendants' misrepresentations and

omissions regarding the Binance Platform as detailed in this complaint, and executed trades on the Binance Platform after those misrepresentations and omissions were made. As a result, Plaintiff Vongdara has sustained damages for which Defendants are liable.

23.     Defendant Changpeng Zhao is the founder and Chief Executive Officer ("CEO") of Binance. Zhao launched Binance in 2017 from Shanghai, China and has ultimately controlled all of Binance's business activities at all times. Zhao is a Canadian citizen who, based on recent media reports, currently resides in Dubai, United Arab Emirates. Zhao has directly or indirectly owned the scores of entities that collectively operate the Binance platform. In addition to the entities that operate the Binance platform, Zhao is the direct or indirect owner of entities that have engaged in proprietary trading activity on the Binance platform, including Merit Peak Limited and Sigma Chain AG, and Zhao is also the direct or indirect owner of approximately 300 separate Binance accounts that have engaged in proprietary trading activity on the Binance trading platform. Zhao has never been registered in the United States in any securities-related capacity, state or federal.

24.     Defendant Binance Holdings Limited ("Binance Holdings") is incorporated in the Cayman Islands and directly or indirectly owned by Zhao. Binance Holdings has held intellectual property for Binance, including trademarks and domain names, and has employed at least certain individuals who perform work for or on behalf of the Binance platform. Binance Holdings has never been registered in the United States in any securities-related capacity, state or federal.

25.     Defendant Binance Holdings (IE) Limited ("Binance IE") is incorporated in Ireland and directly or indirectly owned by Zhao. Binance IE is a holding company that has directly or indirectly owned at least 24 corporate entities that have acted as Binance's digital asset and virtual asset service providers in a variety of jurisdictions and held Binance's non- U.S. regulatory

licenses. Binance IE has never been registered in the United States in any securities-related capacity, state or federal.

26.     Defendant Binance (Services) Holdings Limited ("Binance Services") is incorporated in Ireland and directly or indirectly owned by Zhao. Binance Services is a holding company that has directly or indirectly owned at least 43 different corporate entities, including companies that conduct technology and operations services for Binance, hold the intellectual property related to Binance's matching engines and financial products, and enter into contracts with vendors, as well as a company called Ality Technologies DE LLC that functions as Binance's " U.S. Tech/Ops Hub." Binance Services owns Binance Holdings. Binance Services has never been registered in the United States in any securities-related capacity, state or federal.

27.     BAM Trading Services Inc. ("BAM Trading") is a Delaware company with its principal address in Palo Alto, California. BAM Trading operates Binance.US, a spot digital asset trading platform that offers its services to U.S. residents and relies on Binance's services and technology, obtained through intercompany agreements, to operate. BAM Trading is directly or indirectly majority owned and controlled by Zhao, and Zhao has been a director of BAM Trading at all relevant times. BAM Trading has never been registered in the United States in any securities-related capacity, state or federal.

28.     Defendant, Jimmy Butler, a star basketball player for the Miami Heat, was a paid spokesperson for Binance, and is a citizen and resident of Florida.

29.     Defendant, Graham Stephan, a YouTube star with over 4.1 million subscribers to his YouTube pages, received kickbacks for promoting and endorsing Binance, and is a citizen and resident of Las Vegas, Nevada.

30.     Defendant, Ben Armstrong, a YouTuber with more than 1.5 million subscribers to his YouTube page, received kickbacks for promoting and endorsing Binance, and is a citizen and resident of Atlanta, Georgia.

## JURISDICTION AND VENUE

31.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A) because this is a class action for a sum exceeding $1,000,000,000.00 (one billion dollars), exclusive of interest and costs, and in which at least one class member is a citizen of a state different than the Defendants.

32.     This Court has personal jurisdiction against Defendants because they conduct substantial and not isolated business in Florida, and/or have otherwise intentionally availed themselves of the Florida consumer market through the promotion, marketing, and sale of unregistered securities in Florida — including to Plaintiffs in this case — which constitutes committing a tortious act within the state of Florida. Defendants have also marketed and participated and/or assisted in the sale of Binance's unregistered securities to consumers in Florida. Further, Defendants have engaged in a conspiracy in which some of the co-conspirators— including some who are Defendants in this action—committed overt acts in furtherance of the conspiracy in the State of Florida. This purposeful availment renders the exercise of jurisdiction by this Court over Defendants permissible under traditional notions of fair play and substantial justice.

33.     Venue is proper in this District under 28 U.S.C. § 1391 because thousands of Class Members either reside in this District; Defendants engaged in business in this District; a substantial part of the events or omissions giving rise to the claims at issue occurred in this District; and because Defendants entered into transactions and/or received substantial profits from Class Members who reside in this District.

34. All conditions precedent to the institution and maintenance of this action have been performed, excused, waived, or have otherwise occurred.

## FACTUAL ALLEGATIONS

**I. Background on Cryptocurrency Litigation Relating to the Promotion of YBAs**

    **A.**     **The Binance Platform – An Overview**

35. Binance is the world's largest centralized, web-based crypto-products platform, offering its customers the ability to, among other things, buy, hold, loan, pledge, and trade (including spot and margin) digital assets including cryptocurrency and related financial products and derivatives. According to the platform's website, Binance boasts an average daily trade volume of $65 billion and facilitated 300 billion spot transactions in 2022.



Binance allows users to trade more than 350 cryptocurrencies, and has 120 million registered users.



36.    Binance was founded by its current Chief Executive Officer, Changpeng Zhao, and certain other Defendants, on or about July 14, 2017, shortly after making an Initial Coin Offering ("ICO") for the Binance Coin ("BNB") from June 26 through July 3, 2017.

37.    Binance serves over 100 million customers throughout the world. Much of its trading volume and profit arises from its extensive solicitation within the United States, including in this District. Binance holds itself out as the world's "largest crypto exchange by trade volume" and is reported to have amassed over half the global market share for digital asset exchange activity as of the end of 2022.

38.    Binance offers a VIP program that gives additional benefits to traders who have more than 25 Binance Coins in any Binance wallet and trade over a certain threshold during a 30-day period. There are four levels of Binance VIP: Trader VIP, Holder VIP, Investor VIP and Borrower VIP. These members enjoy reduced fees, lower interest rates, higher borrowing limits and other benefits.

39.     Binance issues a native token, BNB, and, at least until February 2023, a USD backed stablecoin, BUSD. In February 2023, the U.S. Securities and Exchange Commission ("SEC") reportedly told Binance that BUSD should have been registered as a security under federal regulations. According to Reuters, the SEC was considering taking legal action against Binance for the alleged unregistered token. Paxos Trust Company, the firm behind Binance USD, disagreed with those claims. Paxos ceased issuing BUSD tokens on February 21, 2023 following action from the New York Department of Financial Services (NYDFS).

40.     On March 27, 2023, the Commodity Futures Trading Commission ("CFTC") sued Binance, alleging that the crypto trader violated U.S. trading laws by trading unregistered crypto derivatives. The regulator also claimed that Binance coached its employees and VIP members on how to circumvent regulations and compliance controls to maximize their profits. "For years, Binance knew they were violating CFTC rules, working actively to both keep the money flowing and avoid compliance," CFTC Chairman Rostin Behnam said in a statement. "This should be a warning to anyone in the digital asset world that the CFTC will not tolerate willful avoidance of U.S. law."

41.     Despite Binance's solicitation of and reliance on customers located in the United States to generate revenue and provide liquidity for its various markets, it has failed to register with any federal regulatory body or with any individual state to do business in the United States, and has failed to follow U.S. laws, including those designed to prevent money laundering and financing of terrorists, to the detriment of its customers.

42.     Binance has partnered with Defendants to promote Binance and solicit new customers, including through traditional advertisements on television and social media, and

through an Affiliate Program whereby partners receive kick-backs or commissions based on fees earned from individuals who enroll through their Affilliate links.

B. <u>Binance's Corporate Structure</u>

43.    Binance is not a single corporate entity, but rather an opaque web of corporate entities, all of which are ultimately controlled by Zhao. Though started from China, Binance has routinely moved its offices and changed entities to uphold its corporate policy of avoiding regulation. Binance chooses not to disclose the location of its executive offices, instead claiming that the headquarters is wherever Zhao is located at any point in time. Zhao explained this strategy during a June 2019 internal meeting, stating that Binance conducts its operations through various entities incorporated in numerous jurisdictions to "keep countries clean [of violations of law]" by "not landing .com anywhere.  This is the main reason .com does not land anywhere." Binance has had operations in at least the following places: China, Singapore, Malta, Dubai, Tokyo, Bermuda, Jersey, Cayman Islands, and the United States.

44.    Zhao has directly or indirectly owned and controlled all of the corporate entities, including Binance Holdings, Binance IE, Binance Services and dozens of other corporate vehicles included in the Binance ecosystem that operate the Binance platform together as a common enterprise. Binance's corporate organizational chart includes over 120 entities incorporated in numerous jurisdictions around the world. At times, at least certain of those entities, including Binance Holdings, Binance IE, and Binance Services have commingled funds, relied on shared technical infrastructure, and engaged in activities to collectively advertise and promote the Binance brand.

45.    Binance's reliance on a maze of corporate entities to operate the Binance platform is deliberate; it is designed to obscure the ownership, control, and location of the Binance

platform. Consistent with this design, Binance's enigmatic Terms of Use define "Binance" as "an ecosystem comprising Binance websites (whose domain names include but are not limited to https://www.binance.com/en), mobile applications, clients, applets and other applications that are developed to offer Binance Services, and includes independently-operated platforms, websites and clients within the ecosystem" and the "Binance Operators" to include "all parties that run Binance, including but not limited to legal persons (including Binance UAB), unincorporated organizations and teams that provide Binance Services and are responsible for such services." The Terms of Use also state that Binance Operators and Binance are the same thing and the composition of the Binance Operators may change at any time.

46.     Binance is so effective at obfuscating its location and the identities of its operating companies that it has even confused its own Chief Strategy Officer. For example, in September 2022 he was quoted as saying that "Binance is a Canadian company." The Chief Strategy Officer's statement was quickly corrected by a Binance spokesperson, who clarified that Binance is an "international company."

47.     As founder and CEO of Binance, Zhao has been responsible for all major strategic decisions, business development, and management of the Binance enterprise. Zhao also involves himself in the minutiae of Binance's operations. For example, Zhao personally approved an approximately $60 expense related to office furniture in January 2021, a month in which Binance earned over $700 million in revenue.

48.     Zhao has been responsible for directing and overseeing the creation and operation of Binance's trade matching engines, website, API functionalities, and order entry system. Zhao is also the public face of Binance; he represents Binance in public speaking engagements and

appearances, gives interviews to magazines and other news media, and frequently authors Tweets and blog posts related to Binance business.

49.     Over time, Zhao hired a senior management team that included Lim. However, Zhao has been involved in and ultimately retained control over all critical decisions for the enterprise, including which products to offer and whether and how to implement and enforce anti-money laundering ("AML") controls and Know Your Customer ("KYC") procedures. Zhao is ultimately responsible for evaluating the legal and regulatory risks associated with Binance's business activities, including those related to the launch of Binance.US, and has been directly involved in discussions with compliance consultants and lawyers concerning legal and regulatory issues implicated by Binance's business activities. Zhao answers to no one but himself as Binance does not have a board of directors. The "Binance Entities" include but are not limited to the following:

50.     Binance Holdings has held intellectual property for Binance, including trademarks and domain names, and has employed at least certain individuals who perform work for or on behalf of the Binance platform.

51.     Binance IE is a holding company that has directly or indirectly owned at least 24 corporate entities that have acted as Binance's digital asset and virtual asset service providers in a variety of jurisdictions and held Binance's non- U.S. regulatory licenses.

52.     Binance Services is a holding company that has directly or indirectly owned at least 43 different corporate entities, including companies that conduct technology and operations services for Binance, hold the intellectual property related to Binance's matching engines and financial products, and enter into contracts with vendors, as well as a company called Ality Technologies DE LLC that functions as Binance's " U.S. Tech/Ops Hub."

53.     Binance UAB is incorporated in Lithuania and directly or indirectly owned by Zhao. Binance UAB is the only entity specifically identified as one of the indeterminate group of "Binance Operators" referenced in Binance's Terms of Use.

54.     Merit Peak Limited ("Merit Peak") is incorporated in the Cayman Islands and directly or indirectly owned by Zhao. Merit Peak has primarily engaged in over the counter ("OTC") transactions with institutional counterparties.

55.     Sigma Chain AG ("Sigma Chain") is incorporated in Switzerland and directly or indirectly owned by Zhao. It has engaged in proprietary trading in Binance's various markets, including its markets for digital asset derivatives.

56.     BAM Trading Services Inc. ("BAM Trading") is a Delaware company with its principal address in Palo Alto, California. BAM Trading operates Binance.US, a spot digital asset trading platform that offers its services to U.S. residents and relies on Binance's services and technology, obtained through intercompany agreements, to operate.

57.     Many other Binance entities are owned or controlled by Zhao, including but not limited to Binance.US (United States), Binance Europe (Malta), Binance Marketing Services (Malta), Binance Digital (UK), Binance Ltd., Binance Markets Limited, Binance Capital Management (British Virgin Islands), and Binance Investments Company (Seychelles).

**C.    Binance's Profit Sources**

58.     At its core, Binance facilitates trades between market participants by transmitting orders to buy or sell into what Binance calls order books. Binance's order book-based markets execute transactions based generally on price-time priority pursuant to non-discretionary order matching methodology.

59.     Customers may also purchase and trade digital assets on Binance through other trading protocols, including bilateral transactions (also called "OTC") in which Binance acts as one counterparty to the trade.  Binance customers can also acquire digital assets directly from Binance through Binance's "Buy Crypto" functionality.

60.     Binance customers may place orders through the user interface available at www.binance.com, through the Binance mobile application, and by direct connection to Binance's matching engines via the Binance application programming interface ("API").  API connections are generally used by more technologically sophisticated customers, such as proprietary trading firms or other institutional market participants.

61.     By 2018, Binance had become the world's largest exchange by trading volume with a market cap exceeding $1.3 billion.

62.     Binance's primary source of revenue is the fees it charges for these transactions. Transaction fees vary based on the product and the customer's trading volume.  In a December 2022 interview, Zhao estimated that transaction revenue accounts for approximately 90 percent of Binance's revenue.  A meaningful percentage of that revenue has been and continues to be derived from digital asset derivative transactions entered into by U.S. customers, including customers in this District.

63.     According to Binance's own documents for the month of August 2020 the platform earned $63 million in fees from derivatives transactions and approximately 16% of its accounts were held by customers Binance identified as being located in the United States. By May 2021, Binance's monthly revenue earned from derivatives transactions increased to $1.14 billion.

64.     Binance encourages users to hold BNB, including by providing discounts to customers who pay their transaction fees in BNB. BNB holdings are one criterion for customers to gain VIP status, which as described below confers benefits on the customer including lower transaction fees.

65.     Also on or about September 2019, Binance launched a USD-backed stablecoin ("BUSD") and migrated its BNB token from the Ethereum platform to its new Binance Chain, which resulted in its centralization, with power over BNB consolidated in Zhao. At least prior to February 21, 2023, it did so through a contract with Paxos Trust Company LLC ("Paxos"), a New York trust company.  Binance has represented that BUSD is "compliant with [] strict regulatory standards."

### D.     **Binance Targets U.S. Customers**

66.     Binance purposefully grew, maintained, and simultaneously concealed its U.S. customer base while also failing to implement an effective AML program that is required of financial institutions such as FCMs to detect and prevent terrorist financing or other criminal activity, among other things. One component of this failure to implement an effective AML program is Binance's ongoing lack of effective KYC procedures or a CIP that would enable it to determine the true identity of its customers, whether from the United States or elsewhere. Further, as of at least May 2022, Binance had not filed a single suspicious activity report ("SAR") in the United States despite having filed such reports in other jurisdictions.

67.     For approximately the first two years of its operations, Binance did not take any steps to limit or restrict the ability of U.S. customers to trade on the platform.

### E.     **Binance Concocts a Plan to Solicit U.S. Customers While Avoiding U.S. Regulation**

68.     In order to avoid the application of U.S. law, Binance set up a façade, purporting to segregate U.S. customers into a separate entity with strict compliance measures in place, while simultaneously knowing and actively facilitating U.S. customers' unregulated use of the main Binance international platform.

69.     Beginning no later than July 2019 and continuing through the present, Binance, under Zhao's direction and control and with Lim's willful and substantial assistance, has solicited and accepted orders, accepted property to margin, and operated a facility for the trading of futures, options, swaps, and leveraged retail commodity transactions involving digital assets that are commodities including bitcoin (BTC), ether (ETH), and litecoin (LTC) for persons in the United States.

70.     Forbes first broke the story on October 29, 2020, writing:

The 2018 document details plans for a yet-unnamed U.S. company dubbed the "Tai Chi entity," in an allusion to the Chinese martial art whose approach is built around the principle of "yield and overcome," or using an opponent's own weight against him. While Binance appears to have gone out of its way to submit to U.S. regulations by establishing a compliant subsidiary, Binance.US, an ulterior motive is now apparent. Unlike its creator Binance, Binance.US, which is open to American investors, does not allow highly leveraged crypto-derivatives trading, which is regulated in the U.S.

The leaked Tai Chi document, a slideshow believed to have been seen by senior Binance executives, is a strategic plan to execute a bait and switch. While the then-unnamed entity set up operations in the United States to distract regulators with feigned interest in compliance, measures would be put in place to move revenue in the form of licensing fees and more to the parent company, Binance. All the while, potential customers would be taught how to evade geographic restrictions while technological work-arounds were put in place.

71.     Binance.US is in fact everything that the article alleged – a shell set up to feign compliance with U.S. laws and distract from reality.

72.     Zhao, Samuel Lim (Binance's first Chief Compliance Officer from April 2018 to at least January 2022), and other members of Binance's senior management have failed to properly

supervise Binance's activities and, indeed, have actively facilitated violations of U.S. law, including by assisting and instructing customers located in the United States to evade the compliance controls Binance purported to implement to prevent and detect violations of U.S. law. Binance and its officers, employees, and agents have instructed U.S. customers to use virtual private networks ("VPNs") to obscure their location; allowed customers that had not submitted proof of their identity and location to continue to trade on the platform long after announcing such conduct was prohibited; and directed VIP customers with ultimate beneficial owners, key employees who control trading decisions, trading algorithms, and other assets all located in the United States to open Binance accounts under the name of newly incorporated shell companies to evade Binance's compliance controls.

F. **Binance Begins to Erect Barriers to U.S. Residents That It Knows Will Be Ineffective**

73.     Even after Binance began to purportedly restrict access to its platform from certain jurisdictions in mid-2019, it left open a loophole for customers to sign up, deposit assets, trade, and make withdrawals without submitting to any KYC procedures as long as the customer withdrew less than the value of two BTC in one day. Binance has referred to this two BTC-no KYC loophole by various labels, including "email registration," and "tier 1" customers. The two BTC withdrawal limit was effectively meaningless—the notional value of two BTC in July 2019 was more than $22,000 and in March 2021 was more than $100,000.

74.     Even before Binance made any attempts to restrict access to the platform by U.S. customers, Lim privately explained to Zhao that the two BTC-no KYC loophole would continue to allow U.S. customers to access the platform. In February 2019, Lim chatted to Zhao: "a huge number" of Binance's "TIER 1 [meaning customers trading via the two BTC-no KYC loophole]

could be U.S. citizens in reality. They have to get smarter and VPN through non- U.S. IP." And Zhao stated during a management meeting in June 2019 that the "under 2 BTC users is [sic] a very large portion of our volume, so we don't want to lose that," although he also understood that due to "very clear precedents," Binance's policy of allowing "those two BTCs without KYC, this is definitely not possible in the United States."

75.     In June 2019, around the same time Binance announced a "partnership" with BAM Trading to launch what would become the Binance.US platform, Binance updated its Terms of Use to state for the first time that "Binance is unable to provide services to any U.S. person." Binance also announced that "[a]fter 90 days, effective on 2019/09/12, users who are not in accordance with Binance's Terms of Use will continue to have access to their wallets and funds, but will no longer be able to trade or deposit on Binance.com."

76.     In September 2019, Binance claimed it had begun to block customers based on their internet protocol ("IP") address. In reality, Binance simply added a pop-up window on its website that appeared when customers attempted to log in from an IP address associated with the United States. The pop-up did not block customers from logging in to their account, depositing assets, or trading on the platform, it just asked them to self-certify that they were not a U.S. person before accessing the platform by clicking a button on the pop-up.

77.     Notwithstanding the pop-up compliance control, Binance knew that U.S. customers continued to comprise a substantial proportion of Binance's customer base even after September 2019 because, among other reasons, Binance's internal reporting told them so. According to periodic revenue reports prepared for and sent to Zhao every month, as of January 2020 approximately 19.9% of Binance's customers were located in the United States, and as of June

2020—about a year after Binance amended its Terms of Use as alleged above—approximately 17.8% of Binance's customers were located in the United States.

78.     In keeping with Binance and Zhao's ethos of prioritizing profits over legal compliance, they knowingly allowed the two BTC-no KYC loophole to persist. In an October 2020 chat between Lim and a Binance colleague, Lim explained:

> [Because you attended a telephone conference on which Zhao participated] then you will also know that as a company, we are probably not going to remove no kyc (email registration) because its too painful . . . i think cz understands that there is risk in doing so, but I believe this is something which concerns our firm and its survivability. If Binance forces mandatory KYC, then [competing digital asset exchanges] will be VERY VERY happy.

79.     Binance senior management, including Zhao, continued to be aware of and discuss the two BTC-no KYC loophole. For example, in a March 2021 Signal message group that included multiple senior managers, Zhao asked: "Who was in the 2BTC limit meeting last time?"

80.     And on August 20, 2021, Binance announced that "all Binance users are required to verify their accounts," meaning that all new customers would be required to complete "Intermediate Verification" and provide a government issued identification evidencing their geographic location. Binance also announced that existing customers that had not yet completed Intermediate Verification would have their account changed to "withdrawal only" status by October 19, 2021. Binance did not limit the ability of unverified customers to deposit funds and trade on the platform by October 19, 2021 as represented. In February 2022, Binance testified that the identities of approximately only 30–40% of its customers had been verified though KYC documentation.

81.     Binance has been aware that its compliance controls have been ineffective. As Lim—at the time Binance's CCO—recognized in an October 2020 chat with other Binance

compliance personnel, Binance's compliance environment has amounted to "email sending and no action . . . for media pickup . . . I guess you can say its 'fo sho.'"

82.     Zhao's strategy of refusing to implement effective compliance controls at Binance was widely known within Binance. In a January 2019 chat between Lim and a senior member of the compliance team discussing their plan to "clean up" the presence of U.S. customers on Binance, Lim explained: "Cz doesn't wanna do us kyc on .com." And Lim acknowledged in February 2020 that Binance had a financial incentive to avoid subjecting customers to meaningful KYC procedures, as Zhao believed that if Binance's compliance controls were "too stringent" then "[n]o users will come."

83.     Despite their awareness of Binance's compliance failures, Zhao, Lim, and others acting on behalf of Binance publicly represented that the platform had effective compliance controls. For example, in an August 14, 2019, letter sent on Binance letterhead, Lim assured a state financial regulator in the United States that

> [O]ur [compliance] program provides for AML/CFT controls to ensure the safe and legitimate use of our platforms       Binance screens all its customers prior to the establishment of a business relations or undertaking a transaction against OFAC, EU, UK and Hong Kong sanctions   Binance performs customer due diligence (CDD) anytime the company establishes a customer relationship with all customers engaged in crypto-fiat activity, where there is suspicion of money laundering or terrorism financing . . . .

84.     Four months later, in an internal December 2019 message to a colleague, Lim admitted that ".com doesn't even do AML namescreening/sanctions screening."

85.     Binance also intentionally tried to hide the scope of its compliance program's ineffectiveness from its business partners. For example, in or around October 2020, Binance underwent a compliance audit to satisfy a request from Paxos. But according to Lim, Binance purposely engaged a compliance auditor that would "just do a half assed individual sub audit on

geo[fencing]" to "buy us more time." As part of this audit, the Binance employee who held the title of Money Laundering Reporting Officer ("MLRO") lamented that she "need[ed] to write a fake annual MLRO report to Binance board of directors wtf." Lim, who was aware that Binance did not have a board of directors, nevertheless assured her, "yea its fine I can get mgmt. to sign" off on the fake report. Around the same time as the referenced "half assed" compliance audit, in November 2020 the MLRO exclaimed to Lim in a chat, "I HAZ NO CONFIDENCE IN OUR GEOFENCING."

86.     Internally, Binance officers, employees, and agents have acknowledged that the Binance platform has facilitated potentially illegal activities. For example, in February 2019, after receiving information "regarding HAMAS transactions" on Binance, Lim explained to a colleague that terrorists usually send "small sums" as "large sums constitute money laundering." Lim's colleague replied: "can barely buy an AK47 with 600 bucks." And with regard to certain Binance customers, including customers from Russia, Lim acknowledged in a February 2020 chat: "Like come on. They are here for crime." Binance's MLRO agreed that "we see the bad, but we close 2 eyes."

87.     Lim's internal discussions with compliance colleagues illustrate that Binance has tolerated Binance customers' use of the platform to facilitate "illicit activity." For example, in July 2020, a Binance employee wrote to Lim and another colleague asking if a customer whose recent transactions "were very closely associated with illicit activity" and "over 5m USD worth of his transactions were indirectly sourced from questionable services" should be off-boarded or if it was in the class of cases "where we would want to advise the user that they can make a new account." Lim chatted in response:

> Can let him know to be careful with his flow of funds, especially from darknet like hydra

> He can come back with a new account
> But this current one has to go, it's tainted

88.     Lim's instruction to allow a customer "very closely associated with illicit activity" to open a new account and continue trading on the platform is consistent with Zhao's business strategy, which has counseled against off-boarding customers even if they presented regulatory risk. For example, in a September 2020 chat Lim explained to Binance employees that they

> Don't need to be so strict.
> Offboarding = bad in cz's eyes.

89.     Binance's corporate communications strategy has attempted to publicly portray that Binance has not targeted the United States at the same time Binance executives acknowledge behind closed doors that the opposite is true. For example, on June 9, 2019, around the time Zhao and Binance hatched their secret plot to retain U.S. customers even after the launch of Binance.US, Binance's Chief Financial Officer stated during a meeting with senior management including Zhao:

> [S]ort of, the messaging, I think would develop it as we go along is rather than saying we're blocking the US, is that we're preparing to launch Binance US. So, we would never admit it publicly or privately anywhere that we serve U.S. customers in the first place because we don't. So, it just so happens we have a website and people sign up and we have no control over [access by U.S. customers]
>        [B]ut we will never admit that we openly serve U.S. clients. That's why the PR messaging piece is very, very critical

90.     Zhao agreed that Binance's "PR messaging" was critical, explaining in a meeting the next day that "we need to, we need to finesse the message a little bit    And  the  message  is never about Binance blocking U.S. users, because our public stance is we never had any U.S. users. So, we never targeted the US. We never had U.S. users." But during the June 9, 2019 meeting, Zhao himself stated that "20% to 30% of our traffic comes from the US," and Binance's "July [2019 Financial] Reporting Package," which was emailed directly to Zhao, attributes approximately 22% of Binance's revenue for June 2019 to U.S. customers.

**G.**     **Binance Knowingly Ignored United States Regulatory Requirements**

91.     Defendants have been aware of the regulatory regime that applies to U.S. financial institutions such as FCMs, and exchanges such as DCMs and SEFs, but have made deliberate, strategic decisions to evade federal law.

92.     Internal messages among Zhao, Lim, and other Binance senior managers document that Binance was aware of the applicability of U.S. regulatory and legal requirements since its early days. For example, in October 2018, Lim wrote to Zhao:

> Cz I know it's a pain in the ass but its my duty to constantly remind you
> 1. We have made no mention of sanctions/or support of sanctions on our platform already (done, cleaned up)
> 2. Are we going to proceed to block sanction countries ip addresses (we currently have users from sanction countries on .com)
> Or do you want to adopt a clearer strategy after we engaged and finalised our USA strategy?
> Downside risk is if fincen or ofac has concrete evidence we have sanction users, they might try to investigate or blow it up big on worldstage

93.     Two months later, in a December 2018 chat, Lim acknowledged that Binance was operating "in the USA" and advised his colleagues that "there is no fking way in hell I am signing off as the cco for the ofac shit." In that same chat, Lim recognized that Binance's customer support was "teaching ppl how to circumvent sanctions." And Lim stated in an October 2019 chat: "the ofac regulation clearly states U.S. persons, doing biz with OFAC is wrong," but clarified that Zhao desired to place competitive advantage over compliance: "thing is [Zhao] will only agree to block U.S. on .com once U.S. exchange has gotten all [money transmitter licenses] (to match [a U.S. - based digital asset exchange])."

94.     In December 2019, approximately three months after Binance began offering quarterly futures and perpetual contracts, Lim wrote to a colleague in a chat:

1. We still have U.S. users on our platform (regulatory risk) 2. We do not perform Worldcheck on .com (sanctions risk) 3. We do not perform [transaction monitoring] on .com (sanctions risk).

95.     Lim has displayed a nuanced understanding of applicable regulatory requirements and the potential individual liability that may accompany a failure to comply with U.S. law. For example, in October 2020 Lim chatted to a colleague:

> US users = CFTC = civil case can pay fine and settle
> no kyc = BSA act [sic] = criminal case have to go [to] jail

96.     Zhao has also been keenly aware of U.S. laws that apply to Binance's activities. For example, Zhao explained during a June 9, 2019 management meeting:

> [T]here are a bunch of laws in the U.S. that prevent Americans from having any kind of transaction with any terrorist, and then in order to achieve that, if you serve U.S. or U.S. sanctioned countries there are about 28 sanctioned countries in the U.S. you would need to submit all relevant documents for review [but that is not] very suitable for our company structure to do so. So, we don't want to do that and it is very simple if you don't want to do that: you can't have American users. Honestly it is not reasonable for the U.S. to do this
> . . . .
> [ U.S. regulators] can't make a special case for us. We are already doing a lot of things that are obviously not in line with the United States.

97.     Zhao has kept information reflecting Binance's U.S. customer base secret even from certain senior managers and has been cautious in circulating internal materials to a broad audience due, at least in part, to the risk that inculpatory information could be leaked to regulators or other law enforcement personnel. On information and belief, Binance refers to this type of risk as "leak risk." For example, in a March 2019 discussion regarding the circulation of data that categorized Binance users by geographic location, Zhao said "Let me see it first then, and not distribute it, especially guys who have to deal with U.S. regulators." And in an August 2020 chat, Zhao instructed a Binance employee that transaction volume data concerning U.S. API customers should not be published to a group; rather, such data should be sent only to Zhao.

**H.        Binance Has Guided United States Customers to Evade Its Compliance Controls Through the Use of VPNs and Other Creative Means**

98.     Binance implemented IP address-based compliance controls that collect a customer's IP address and compare it to the list of countries Binance has purported to "restrict" from its platform. At least as of September 2019, the list of "restricted" jurisdictions included the United States. Nonetheless, Binance's IP address-based compliance controls, sometimes called "geofencing," have not been effective at preventing customers from "restricted" jurisdictions including the United States from accessing and trading on the Binance platform.

99.     One reason Binance's IP address-based compliance controls have not been effective is that Binance has instructed U.S. customers to evade such controls by using VPNs to conceal their true location. VPNs have the effect of masking an internet user's true IP address. VPN use by customers to access and trade on the Binance platform has been an open secret, and Binance has consistently been aware of and encouraged the use of VPNs by U.S. customers.

100.    At least as early as April 2019, Binance published a guide on the "Binance Academy" section of its website titled "A Beginner's Guide to VPNs." Binance's VPN guide explained to Binance customers that "[i]f you want to be private about the websites you visit – and your location – you should use a VPN." Binance's VPN guide also hints: "you might want to use a VPN to unlock sites that are restricted in your country."

101.    Binance's senior management, including Zhao, knew the Binance VPN guide was used to teach U.S. customers to circumvent Binance's IP address-based compliance controls. In a March 2019 chat, Lim explained to his colleagues that "CZ wants people to have a way to know how to vpn to use [a Binance functionality] . . . it's a biz decision." And in an April 2019

conversation between Binance's Chief Financial Officer and Lim regarding Zhao's reaction to controls that purported to block customers attempting to access Binance from U.S. -based IP addresses, Lim said: "We are actually pretty explicit about [encouraged VPN use] already – even got a fking guide. Hence CZ is ok with blocking even usa."

102.     Binance senior management, including Lim, have used other workarounds to indirectly instruct Binance customers to evade Binance's IP address-based compliance controls. For example, in a July 8, 2019, conversation regarding customers that ought to have been "restricted" from accessing the Binance platform, Lim explained to a subordinate: "they can use vpn but we are not supposed to tell them that . . . it cannot come from us . . . but we can always inform our friends/third parties to post (not under the umbrella of Binance) hahah."

103.     Lim continued his crafty efforts to assist Binance customers in circumventing Binance's compliance controls, as documented in a February 12, 2020 chat:

> Employee: hi Samuel, we are helping [an intermediary] to integrate with us to introduce new users and trade liquidity, but find most of their users are from US. Now Binance.com block U.S. IP from registration. May I ask whether it is still a hard requirement nowadays?

> Lim: Yes, it still is. Because if U.S. users get on .com we become subjected to the following U.S. regulators, fincen ofac and SEC. But as best we can we try to ask our users to use VPN or ask them to provide (if there are an entity) non-US documents. On the surface we cannot be seen to have U.S. users but in reality we should get them through other creative means.

104.     Binance's use of creative workarounds to its compliance controls is further documented in a July 17, 2020 chat in which Lim clarified to a colleague:

> No we cannot change their status to non us if they are us
> Thats fraud
> But we can encourage them to be a non kyc account Or use a vpn
> . . .
> Yea can bypass [limitations on non-KYC accounts, such as withdrawal limits], give a little hand that you guys can work something out
> please be clear we only do this for our biggest traders/VIPs
> . . .

this is SPECIAL treatment

105.    Lim also used Binance.US as a laboratory to identify important U.S. customers that could be prioritized for expedited on-boarding to the Binance platform. In a July 15, 2020 chat, Lim explained to a Binance employee that he should first ask a prospective customer "to onboard with US, then if their volume is really very big we will push hard on .com to accept it on an exceptional basis . . . CZ will definitely agree to this lol." Lim continued: "but they need to really be doing sick ass volumes . . . we always have a way for whales." Lim reiterated this procedure in a July 27, 2020 chat, explaining that "getting on .com" would be "an issue" for a prospective customer with "US beneficial owners" but that the prospective customer could "of course get on Binance U.S. and then if the volumes are good, we can find a way to backdoor them to .com."

106.    As demonstrated below, Binance apparently enlisted the help of its affiliates, such as Defendant Ben Armstrong, to not only hype the Binance Platform and its unregistered security offerings, but also separately to hype affiliate links for VPN providers in order to guide his followers to circumvent U.S. regulations and to backdoor them into the international Binance exchange.

I.    **Binance Has Directed Its VIP Customers to Evade Compliance Controls, Including Through Submission of "New" KYC Documents**

107.    In addition to instructing retail customers located in the United States to use VPNs to avoid IP address-based compliance controls, Binance has also created special policies and procedures to help its VIP customers evade Binance's compliance controls so Binance could continue to access and derive profits from U.S. customers. Binance designed these special policies and procedures to help VIP customers evade both IP address-based compliance controls and KYC documentation-based compliance controls.

108.     In February 2019, Lim and Zhao met in person to discuss how to address the regulatory risk stemming from Binance's U.S. customers that access Binance via API. These customers are generally institutional market participants and include VIPs. In advance of their meeting, Lim sent Zhao a numbered list of "Compliance parameters," including that "US API users (identified through IP) will have 2 options. They can remain on main exchange or move over to U.S. exchange," while "US API users (identified through KYC) have to move over to U.S. exchange, they don't have a choice. We will notify them through Email."

109.     Right after meeting with Lim, Zhao sent the compliance parameters to other senior managers, one of whom replied to Zhao that "[US users, with US, non international KYC] is [where] we will get nailed." The senior manager asked Zhao if Binance had to "enforce" the contemplated block of U.S. API users identified through KYC "in the matching engine? That's the only way to guarantee this doesn't break. [It] is not a hard thing to enforce in the matching engine." Zhao replied: "let's worry about enforcement in a later stage, think we may have to do it by users."

110.     On June 13, 2019, Binance released a press release that "announced its partnership with BAM Trading Services Inc. to begin preparation to launch trading services for users in the United States." While outwardly preparing for the launch of Binance.US, internally, Zhao, Lim, and other key Binance personnel remained focused on retaining U.S. VIP customers, and the liquidity and revenue they supplied, on Binance.

111.     In and around June 2019, Zhao, Lim, and other key Binance personnel engaged in a series of strategy sessions concerning the retention of U.S. VIPs on the Binance platform. One method discussed was to instruct U.S. VIP customers to submit "new" KYC documentation in connection with a "new" account. This approach would allow VIP customers to continue to trade on Binance and maintain their preferential VIP status and benefits that resulted from their historical

trading activity on Binance. During one meeting that Binance recorded, a senior employee proposed that Binance instruct U.S. customers to submit "new" KYC documentation over social media—but Lim corrected the employee and mandated that such instructions should only occur in secret.

112.    Binance's plan to instruct U.S. VIP customers to submit "new" KYC documentation was devised by Zhao. During a June 24, 2019 meeting with senior management, Zhao stated: "We do need to let users know that they can change their KYC on Binance.com and continue to use it. But the message, the message needs to be finessed very carefully because whatever we send will be public. We cannot be held accountable for it." In a meeting the next day, a senior VIP team member and Zhao engaged in the following colloquy:

> VIP team member: We don't tell them explicitly because that's marketing. But they [referring to U.S. VIP customers] understand . . . they know to send [their digital assets] the blockchain, then that's their own control. And then so they send it to themselves, but we just help them expedite. As we speed up the account of the corporate account of the BVI or Cayman entity.

> Zhao: Okay, so is this them creating a new account, but we talked about having them change KYC has that ever been done?

> . . . .

> VIP team member: We quietly mentioned to them that, you know, US, you know, it could be an issue and you know, if they have any offshore entities, maybe they should open another one as well for their offshore entities. That's how, that's how we, that's how we've been telling them. We haven't really sent anything blasting because that's, that's sensitive. That's marketing. I mean, [a U.S.-based compliance consultant] can comment on that.

113.    Binance personnel began assisting U.S. VIP customers in creating "new" accounts using "new" KYC documentation as early as June 2019, and reported directly to Zhao on their efforts. For example, in a Binance group chat dated June 12, 2019, a Binance employee directed the following message to "@czhao," which is a handle used by Zhao:

> Today our VIP team talked with three VIP8 users, we didn't talk too much details and
> they all satisfied that we can help them onboarding their new non-US corporate
> accounts. That's a good start, we'll contact more VIPs tmr.

Zhao responded in the same chat: "cool."

114.    At some point before October 2020, Binance formalized its processes for instructing U.S. VIP customers on the best methods to evade Binance's compliance controls in a corporate policy titled "VIP Handling." Zhao contributed ideas that were incorporated into the VIP Handling policy. Pursuant to the VIP Handling policy, once a customer service representative "hands the affected user over to VIP," the VIP team would "[m]ake sure the user has completed his/her new account creation with no U.S. documents allowed." U.S. VIP customers often followed these instructions by submitting "new" KYC documentation associated with a shell company incorporated in a jurisdiction other than the United States, such as the British Virgin Islands, to act as the nominee for the "new" account.

115.    Acting pursuant to the VIP Handling policy, Binance's VIP team would then "coordinate the transfer" of the VIP customer's "Referral Bonuses, VIP level, Withdrawal Limits etc." to the "new" account from the VIP customer's pre-existing account. Thus, if the VIP team followed the VIP Handing policy correctly, from the customer's perspective nothing about their trading on Binance would be disrupted—the "new" account would be the same as the old account with the exception of the name of the accountholder.

116.    Recognizing the evasive nature of the procedures and strategies memorialized in the VIP Handling policy, the document required Binance employees to "[m]ake sure to inform user to keep this confidential." In line with the intent to keep any "new account creations" by U.S. VIPs a secret, Zhao instructed during his October 13, 2020 "daily call" that any communications about the "US ban" should be done over the Signal messaging application. Thereafter, Lim

circulated Zhao's directive to a senior compliance staff member in a chat, explaining: "we do all U.S. comms via signal as mandated by cz."

117.    Binance's VIP Handling policy also established methods for Binance personnel to troubleshoot for U.S. customers that were identified as such through their IP address (as opposed to KYC documentation). For these customers, Binance instructed its personnel to "[i]nform the user that the reason why he/she cant use our www.binance.com is because his/her IP is detected as U.S. IP. If user doesn't get the hint, indicate that IP is the sole reason why he/she can't use .com" [emphasis in original]. Lim flagged a passage in the VIP Handling policy for his colleagues that further explained: "We cannot teach users how to circumvent the controls. If they figure it out on their own, its fine."

118.    Displaying the ecosystem's tone at the top, Zhao helped manage the implementation of Binance's VIP Handling policy. On October 9, 2020, around the time Binance began sending emails to U.S. customers pursuant to the policy, Zhao had the following exchange with an employee who would ultimately become Binance's head of institutional sales:

> VIP team member: Hi CZ . . . I went through list of affected API clients, it includes a number of large strategic accounts including [a Chicago-headquartered trading firm] who is currently is a top 5 client and 12% of our volume
>
> Zhao: Give them a heads up to ensure they don't connect from a us Ip. Don't leave anything in writing. They have non us entities. Let's also make sure we don't hit the biggest market makers with that email first. Do you have signal?

119.    At least until August 2021, over two years after Binance updated its Terms of Use to "restrict" U.S. customers, Binance employees continued to observe customers they had previously identified as U.S. VIPs trading on the platform. In an August 14, 2021 chat, members of the VIP and Compliance teams discussed the issue:

> Compliance employee: We have two corporate clients . . . which were detected as U.S. nexus (US UBOs > 50%). Considering they are big clients, our compliance

team wants to further check with you if we need to talk with the clients and give them a period before going offboard. Please advise. Thank you.

VIP team member 1: we've gone through multiple offboarding exercises how is this coming up again?

VIP team member 2: I guess because they're a big client so there were delays here and there previously . . . there are still transactions going on during the month of august hahaha scary indeed.

120.    Binance's efforts to hold itself out as "compliant" while at the same time taking steps to assist customers in submitting "new" KYC documents has continued. For example, on August 5, 2021, Binance posted an announcement to Binance.com titled "Updates to API Services" that states:

> To ensure a safe and fair trading environment for all users and remain compliant with the latest industry requirements, Binance is updating its API services to limit new API key creation by accounts that have only completed basic account verification. This update is effective starting 2021-08-09 03:00 (UTC).
>
> For accounts that have not completed intermediate verification, any existing API keys will be changed to "read only" after 2021-08-23 00:00 AM (UTC). Trading functions via relevant API keys will be deactivated. Users can complete intermediate verification to reset API access and resume trading functions.

But internal documents confirm that Binance was still up to its old tricks as of August 5, 2021. In a presentation concerning business operations that occurred during the week of August 9 through August 15, 2021, Binance personnel noted that they had made progress "Follow[ing] up [with high] value users KYC projuect [sic]."

## J.   Binance Knowingly Concealed the Presence of United States Customers In Internal Documents and Data and Maintains its Own Presence in the United States

121.    Since at least 2019, Binance has maintained significant ties to the U.S. financial system and economy and has actively solicited customers in the United States through its marketing efforts including on numerous social media applications such as Twitter.

122.    Binance has employed at least 60 people in the United States, and that number continues to increase. Among Binance's U.S.-based employees are compliance and investigations personnel; personnel involved with Binance's private equity arm, known as "Binance Labs"; a key employee who managed the business unit that was responsible for "Binance's official crypto wallet," a product Binance has offered called "Trust Wallet"; in-house lawyers; and Binance's current "Chief Strategy Officer."

123.    Binance has enlisted U.S. residents to act as "Binance Angels" to solicit and interact with U.S. customers. Generally, Binance Angels attempt to recruit new customers to Binance, answer questions from customers and prospective customers, and test new Binance features. In return, Binance Angels receive benefits such as invitations to events and Binance swag.

124.    From Binance's early days, Zhao has known that U.S. customers trade on the platform. Zhao has personally interacted with Binance's U.S. customers. For example, in 2017, and in connection with Binance's early phase of targeting U.S. customers, Zhao provided instructions to a U.S. resident with respect to an English-language customer support channel over the Telegram messaging application.

125.    Later, on January 8, 2018, a U.S. trading firm emailed Zhao directly to onboard to Binance, identified the owner of the company as a U.S. citizen, and provided the company's owner's U.S. passport and Illinois driver's license to Zhao.

126.    Zhao, Lim, and other Binance senior management have known that U.S. customers trade on Binance and have tracked and monitored their activities for multiple purposes. For example, Zhao has received periodic reports concerning the nature and geographic location of Binance's customers as well as the sources of Binance's revenue. These reports contain

information about Binance's U.S. customers and the effectiveness of Binance's efforts to capture the U.S. market.

127.    An example of a periodic report that contains information about Binance's sources of revenue is titled August [2019] Financial Reporting Package. The August Financial Reporting Package breaks downs Binance's trading revenue by base asset (with BTC-related transactions comprising 44% of Binance's revenue for that month), and trading volume, among other metrics. One slide on the August Financial Reporting Package is titled "Trading Revenue by Country" and displays Binance's focus on the geographic sources of its revenue, including the 16% for that month (and 19% for July 2019) that Binance attributed to customers located in the "US."

128.    Zhao wanted U.S. customers, including VIP customers, to transact on Binance because it was profitable for Binance to retain those customers. Binance has tracked the sources of its revenues by customers' geographic location, among other analytical methods. Zhao routinely received reporting that unambiguously demonstrated that U.S. customers contributed a substantial amount of Binance's revenues. While Binance originally expressly tracked revenues derived from U.S. customers and summarized that information in the Binance monthly revenue reports, after the CFTC sued Binance rival BitMEX in October 2020 for illegally selling derivatives to U.S. investors and AML violations, Binance changed its internal reports to call U.S. customers "UNKWN," which was thereafter in fact known internally at Binance to refer to customers in the United States.

129.    Binance officers, employees, and agents have interacted with U.S.-based institutional customers at Binance-hosted networking and social events in the United States at various times, including an April 2022 party in Las Vegas to which Binance invited its "largest accounts" such as "top heavy weights of hfts, prime brokerage, [and] vcs," and a networking event

in Austin, Texas. Binance and Zhao have also participated in numerous digital asset industry conferences in the United States.

130.    Binance has procured professional services from U.S. -based law firms, compliance consultants, and other vendors concerning various aspects of its business operations. For example, Binance relies on the Google suite of products for information management and email services. Binance uses Webex for its internal messaging functionality. Binance leases office space from WeWork that it makes available to its U.S. - based employees and other personnel. Binance has entered into long term contracts with Amazon Web Services, a United States company headquartered in Washington. Among the services Binance purchases from Amazon Web Services that are provided to Binance in the United States is "AWS CloudFront," which according to Amazon Web Services is a "Global content delivery network." Zhao has paid for certain of Binance's Amazon Web Services accounts using his personal credit card.

131.    Binance avails itself of the U.S. legal system to seek protection for its intellectual property. For example, Binance Holdings filed trademark applications for "Binance"; "Binance Chain"; and "Binance DEX" with the assistance of U.S. attorneys. These U.S. trademarks remain active.

132.    In 2019, Zhao and BAM Trading launched Binance.US, a digital asset spot market trading platform that offers its services to U.S. customers. When he hired BAM Trading's first CEO, Zhao described Binance as a pirate ship and explained that he wished for Binance.US to be a navy boat. BAM Trading is under common ownership and control with Binance and continues to operate the Binance.US spot platform. Binance personnel, including Zhao, have dictated Binance.US's corporate strategy, launch, and early operations. At Zhao's direction, Binance.US's marketing and branding has mirrored that of Binance.com. BAM Trading has licensed Binance's

trademarks to advertise in the United States. Binance.US has also relied on one of Binance's matching engines through a software licensing agreement.

**K.  The VIP Program**

133.   Binance refers to its important customers as VIPs. Binance's VIP customers are often institutional market participants. VIP customers are important to Binance because they provide liquidity to Binance's markets and pay Binance a lot of fees. Binance is aware of its VIPs' identities and geographic locations because Binance monitors its sources of transaction volume and fee-based revenue as a matter of course in conducting its operations.

134.   Binance's VIP program rewards important customers by providing reduced rates for transaction fees and white-glove customer service, as well as exceptions to Binance's trading rules including order messaging limits. Higher status VIPs also receive preferential access to Binance's matching engines, among other benefits. Binance categorizes its VIPs into levels one to nine, with VIP 9 being the highest level occupied by the most important Binance customers. A customer's VIP level is determined by, among other things, their 30-day trading volume and BNB holdings. For example, in December 2021, a customer could maintain a VIP 9 level by engaging in "futures trading" volume of 25,000,000,000 (as measured by BUSD) and maintaining a 5,500 BNB balance over a 30-day period.

135.   Binance has relied on a dedicated team of employees and other agents to provide personalized service to its VIP customers. These personnel have been known by various labels including the VIP team, Key Account Managers, and institutional sales representatives.

136.   Another important benefit that Binance has provided its VIP customers is prompt notification of any law enforcement inquiry concerning their account. According to a policy titled "For management of LE requests for information and funds transfer," created by Lim based on

directions from Zhao, Binance instructed its VIP team to notify a customer "[A]t point of [account] freeze [based on a request from a law enforcement agency] and immediately after the unfreeze [which would occur 24 hours after the account freeze]. VIP team is to contact the user through all available means (text, phone) to inform him/her that his account has been frozen or unfrozen. Do not directly tell the user to run, just tell them their account has been unfrozen and it was investigated by XXX. If the user is a big trader, or a smart one, he/she will get the hint."

137.    Binance officers, employees, and agents have used numerous messaging applications for business communications. In addition to email and internal messaging applications, Binance's personnel have also used at least Telegram, WeChat, and Signal to communicate internally and with Binance customers.

138.    The Signal messaging application allows a user to enable an auto-delete functionality to cover their tracks after communicating about inculpatory matters. Zhao and others acting on behalf of Binance have used Signal—with its auto-delete functionality enabled—to engage in business communications, even after Binance received document requests from the CFTC and after Binance purportedly distributed document preservation notices to its personnel.

139.    Zhao has communicated over Signal with the auto-delete functionality enabled with numerous Binance officers, employees, and agents for widely varying purposes. For example, the following Signal text chains or group chats collected from Zhao's telephone were among those set to auto-delete:

    a.    a group chat between Zhao, Binance's then-head of institutional sales, and Binance's head of "Big Data," which is the operational group responsible for creating and maintaining Binance's data and databases including the database that contains customer- and transaction-related information;

    b.    a text chain with a senior member of Binance's VIP team;

  c. a text chain with a compliance consultant who participated in the creation of the strategy concerning the launch of Binance.US and Binance's attendant efforts to retain U.S. customers;

  d. a text chain with an accounting employee who participated in the preparation of Binance's monthly revenue reports for Zhao;

  e. text chains with senior operations personnel; and

  f. group chats titled "Finance," "HR," "Mkt hr," and "CEO office."

  140. Zhao has also instructed Binance officers, employees, and agents to use Signal to communicate with U.S. customers.  On information and belief, Binance does not have a corporate communications policy and continues to use Signal for business communications.

**L.** **Binance's Worldwide Marketing Targets U.S. Customers**

  141. Because of Zhao's "biz decision" to target U.S. customers for its main international Binance platform, Binance's international marketing efforts were also targeted specifically at the United States, and residents of this District.

  142. Since the launch of its platform in 2017, Binance has taken a calculated, phased approach to increase its United States presence despite publicly stating its purported intent to "block" or "restrict" customers located in the United States from accessing its platform. Binance's initial phase of strategically targeting the United States focused on soliciting retail customers.  In a later phase, Binance increasingly relied on personnel and vendors in the United States and actively cultivated lucrative and commercially important "VIP" customers, including institutional customers, located in the United States.  All the while, Binance, Zhao, and Lim, the platform's former Chief Compliance Officer ("CCO"), have each known that Binance's solicitation of customers located in the United States subjected Binance to registration and regulatory requirements under U.S. law.  But Binance, Zhao, and Lim have all chosen to ignore those

requirements and undermined Binance's ineffective compliance program by taking steps to help customers evade Binance's access controls.

143.    In a March 2019 chat, Lim explained to his colleagues that "CZ wants people to have a way to know how to vpn to use [a Binance functionality] . . . it's a biz decision." And in an April 2019 conversation between Binance's Chief Financial Officer and Lim regarding Zhao's reaction to controls that purported to block customers attempting to access Binance from U.S.-based IP addresses, Lim said: "We are actually pretty explicit about [encouraged VPN use] already – even got a fking guide. Hence CZ is ok with blocking even usa." Binance's decision to prioritize commercial success over compliance with U.S. law has been, as Lim paraphrased Zhao's position on the matter, a "biz decision."

## M. **The Affiliate Program**

144.    Through its Affiliate Program, Binance paid kick-backs of up to 50% of fees to affiliates who solicited new users through their personal referral links.



> ⊖ **What is the Binance Affiliate Program?**
>
> The Binance Affiliate Program allows you to create unique referral links that invite your community to register and trade on Binance. If anyone clicks the link and registers, they'll be automatically attributed as your referral. You'll receive a commission on every trade they make, whether it's on Binance Spot, Futures, or Margin trading or even Binance Pool.

145.    In order to join the Affiliate Program and obtain a referral link, advertisers submit an application during which Binance screens them using some of the following criteria:

> ⊖ **What are the requirements to be a Binance Affiliate?**
>
> Individual
>
> Social media influencer with 5,000+ followers or subscribers on one or more social media platforms (Youtube, Twitter, Facebook, Instagram)
>
> Crypto Communities
>
> Financial leaders or opinion leaders with a community of 500+ members on one or more community groups (Telegram, Facebook, WeChat, Reddit, QQ, VK)
>
> Business/Organization
>
> User base of 2,000+
>
> Market analysis platform with 5,000+ daily visits
>
> Industry Media Platform
>
> Crypto Fund
>
> Aggregate Trading Platform

146.    The compensation paid to Affiliates includes:

## Earn more affiliate incentives

| | |
|---|---|
| Spot commission | Up to 50% |
| Futures commission | 30% |
| Binance pool commission | 30% |
| Sign-up bonus package | Share up to a $600 new user sign-up bonus package with your community. |
| Minimum requirements | Must have more than 5000 followers on social media or more than 500 members in a trading community. |
| Eligibility | Only eligible users can participate after submitting an application |

**How do I earn a bonus of up to $72,000 every month?**

In addition to earning 30% commission, Affiliates that promote Futures trading can now earn a bonus of up to $72,000 based on the fees paid by their referrals over a period of 1 month. For example, if your referrals generate the equivalent of $15,000 in trading fees over a period of 1 month, then in addition to your standard referral commission, you will receive a bonus of $1,500. The more trading fees generated by referrals, the bigger the bonus you will receive.

147.    Commissions are paid into Affiliate's Binance wallets, and are issued cryptocurrency, including BNB.

148.    Binance offers a Binance Affiliate Rewards Bootcamp for aspiring crypto influencers, which also includes sign-up bonuses, BUSD rewards, and extra commissions.

## Discover our Binance Affiliate Rewards Bootcamp

Watch our video to learn more about the program



**Do you have what it takes to become a crypto influencer?**

Through a 7-class series, we'll help transform you into a top-performing Binance Affiliate. And as you progress through each class, you'll unlock exclusive Affiliate rewards and benefits, including extra commission, BUSD rewards and sign-up bonuses.

Join Now

## Course Curriculum

With each class, get one step closer to becoming a crypto influencer



**Class 1: What does it mean to become a crypto influencer**

Discover all the incentives you'll unlock as a Binance influencer

**Class 2: Introduction to Binance Trading Products**

Learn how to use and promote commission-generating Binance features

**Class 3: How to create quality and compelling content**

Master the art of crypto content creation for different social channels

**Class 4: User-generated content for Non-trading Binance Products**

Learn how to generate UGC content for Binance non-trading products

**Class 5: How to effectively attract and invite new users**

Learn techniques to garner more sign-ups with your referral link

**Class 6: How to transform your invitees into active users**

Learn how to encourage your invitees to use the Binance platform

**Class 7: Tips and tricks from a top Affiliate**

Get top insights and tips from an experienced Binance affiliate

149.     In order to access all seven crypto influencer classes, users must enroll in the exclusivity pathway, which obligates them to promote Binance for a three-month period.

46

⊖ **What is the exclusivity pathway?**

In order to access all seven class videos, users must agree to promote Binance for a three-month period. If you do not want to go through the exclusivity pathway, you will only have access to class one, two, and four with fewer reward options. Moreover, the maximum reward will only be 500 BUSD.

150.    Affiliate payments were substantial. In October 2019, a Binance Twitter post referenced a then-all-time-high affiliate payment of 1146.82 BTC (~$10.5 million USD).



151.    Defendants Stephan and Armstrong were Binance Affiliates, and earned kickbacks and commissions through the Affiliate program by promoting Binance and soliciting individuals to click through their link to register for Binance services.

152.    Armstrong, who goes by "BitBoy Crypto" online, promoted Binance across his media platforms and directed his followers to Binance through his affiliate link. These promotions emphasize the perks of the platform as well as the discounts available through the link. However, Defendant Armstrong has hidden the substantial kickbacks he stood to gain from successful solicitations— referral incentives that could last through the lifetime of a customers' use of Binance.

153.    Defendant Armstrong, as he has been exposed for doing numerous times, has also taken to hiding his extensive participation in affiliate marketing with Binance. His bitboycrypto.com webpage used to contain dozens of links to crypto exchanges and products, but within the last year he has wiped the referral page of his website.

154.    As shown in the below screenshot from the Wayback Machine, the domain: https://bitboycrypto.com/deals/ on May 19, 2022, at 22:45:54, contained affiliate links to Binance and Binance.US:



155.    That same domain on March 31, 2023 at 17:00:20 has been scrubbed:



156.    On top of Armstrong's previous, shameless promotion of his affiliate links, he also problematically advertised VPNs like his affiliate link to "VPN unlimited" shown below,[2] right next to crypto exchanges like Binance and BinanceUS, in order to help Binance further its goal of enabling U.S. investors to trade on the international Binance exchange, aiding Binance in its effort to circumvent U.S. regulations. These crypto exchanges are subject to strict Know Your Customer rules and geofencing customer limitations, which, as explained above, can be bypassed by such VPNs.



157.    Defendant Graham Stephan participated in the same affiliate programs as Defendant Armstrong. He received substantial kickbacks from directing his followers to sign up for Binance as a part of his "not investment advice" affiliate marketing. His endorsement drove

---

[2] The domain: https://bitboycrypto.com/deals/ on the Wayback Machine as of May 19, 2022 at 22:45:54.

traffic to the platform and helped perpetuate the illegal sale of unregistered securities to customers who were bypassing the KYC laws in place to protect the American market and consumer.

Worlds Collide: Bitboy Crypto interviewing Graham Stephan



Bitboy Crypto ✔    Follow    Up next

158.    US customers, including in this District, saw those promotions, clicked on Affiliate links, and registered with Binance as a result.

### N.  **Traditional Advertisements**

159.    While comparatively small in relation to its Affiliate Program, Binance also engaged in traditional advertisements, including on television and in social media.

160.    For example, Defendant Butler partnered with Binance to promote the platform through these channels and received substantial payments for doing so. Binance paid Defendant Jimmy Butler to appear in an advertisement mocking the celebrity endorsements put out by Binance competitors. Defendant Butler lent his celebrity and credibility to the crypto platform and

promoted the platform to his followers through the social media post. Defendant Butler's NFT tie-ins drove traffic to the website targeting his audience and followers comprised of American professional sports fans.



161.   U.S. customers, including in this District, actually saw those advertisements prior to signing up with Binance.

II.   **The SEC's Consistent Approach to Cryptocurrency**

A.  **Overview**

162.    The SEC's stance on cryptocurrency has been clear and consistent from the beginning. The Securities and Exchange Acts intentionally are drafted to apply to a broad range of securities. As such, the definitions of "security" in Section 2(a)(1) of the Securities Act of 1933 (Securities Act), 15 U.S. C. 77b(a)(1), and Section 3(a)(10) of the Securities Exchange Act of 1934 (Exchange Act), 15 U.S. C. 78c(a)(10), include not only conventional securities, such as "stock[s]" and "bond[s]," but also the more general term "investment contract."

163.    Along these lines, in *Reves v. Ernst & Young*, the Supreme Court stated that:

> The fundamental purpose undergirding the Securities Acts is 'to eliminate serious abuses in a largely unregulated securities market.' *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 421 U.S. 849 (1975). **In defining the scope of the market that it wished to regulate, Congress painted with a broad brush. It recognized the virtually limitless scope of human ingenuity, especially in the creation of 'countless and variable schemes devised by those who seek the use of the money of others on the promise of profits**, *SEC v. W.J. Howey Co.*, 328 U.S. 293, 328 U.S. 299 (1946), and determined that the best way to achieve its goal of protecting investors was 'to define the term "security" in sufficiently broad and general terms so as to include within that definition the many types of instruments that in our commercial world fall within the ordinary concept of a security.' . . . Congress therefore did not attempt precisely to cabin the scope of the Securities Acts . . . Rather, it enacted a definition of 'security' sufficiently broad to encompass virtually any instrument that might be sold as an investment." (emphasis added)[3]

164.    Crafted to contemplate not only known securities arrangements at the time, but also any prospective instruments created by those who seek the use of others' money on the promise of profits, the definition of "security" is broad, sweeping, and designed to be flexible to capture

---

[3] https://scholar.google.com/scholar_case?case=18068523124125938239&q=Reves+v.+Ernst+%26+Young&hl=en&as_sdt=400006&as_vis=1 (accessed March 31, 2023).

new instruments that share the common characteristics of stocks and bonds. As Supreme Court

Justice (and former SEC Commissioner (1935) and Chair (1936-37)) William O. Douglas opined

in *Superintendent of Insurance v. Bankers Life and Casualty Co.*:

> We believe that section 10(b) and Rule 10b-5 prohibit all fraudulent
> schemes in connection with the purchase or sale of securities,
> whether the artifices employed involve a garden type variety fraud,
> or present a unique form of deception. Novel or atypical methods
> should not provide immunity from the securities laws.

165.    Federal courts have already confirmed the SEC's jurisdiction in numerous crypto-

related emergency asset freeze hearings where the issue is always considered and affirmed, same

as it has been by hundreds of federal courts across the country since the *Howey* Decision, which

the Supreme Court adopted over 75 years ago.[4] That decision resulted in the *Howey* Test, which is

used to determine the presence of an investment contract. The *Howey* Test provides that an

investment contract exists if there is an "investment of money in a common enterprise with a

reasonable expectation of profits to be derived from the efforts of others."[5] The *Howey* Test is the

principal method used by the SEC to determine if a given cryptocurrency is a security.

166.    The SEC has used multiple distribution channels to share its message and concerns

regarding crypto, digital trading platforms, initial coin offerings, and other digital asset products

and services over the past decade. The SEC first made investors aware of the dangers of investing

in cryptocurrency in 2013 when the Office of Investor Education and Advocacy issued an Investor

Alert on "Ponzi Schemes Using Virtual Currencies."[6]

---

[4] https://supreme.justia.com/cases/federal/us/328/293/ (accessed March 31, 2023).

[5] *Id.*

[6] ia_virtualcurrencies.pdf (sec.gov) (accessed March 31, 2023).

167.     A year later, the same office issued an Investor Alert on "Bitcoin and Other Virtual Currency-Related Investments."[7] In 2017, the Commission took the rare step of releasing a Section 21(a) Report of Investigation that looked at the facts and circumstances of The DAO, which offered and sold approximately 1.15 billion DAO Tokens in exchange for a total of approximately 12 million Ether ("ETH") over a one-month period in 2016.[8] The SEC applied the *Howey* Test to the DAO tokens and concluded they were securities under the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act"). While The DAO, and DAO tokens, were no longer operational at the time due to a high-profile hack that resulted in the theft of most DAO tokens, the Commission chose to release the report so as "to advise those who would use a Decentralized Autonomous Organization ("DAO Entity"), or other distributed ledger or blockchain-enabled means for capital raising, to take appropriate steps to ensure compliance with the U.S. federal securities laws."[9]

168.     In 2019, the SEC released a "Framework for 'Investment Contract' Analysis of Digital Assets" which provided additional details on when a digital asset has the characteristics of an investment contract and "whether offers and sales of a digital asset are securities transactions."[10]

---

[7] Investor Alert: Bitcoin and Other Virtual Currency-Related Investments | Investor.gov (accessed March 31, 2023).

[8] https://www.sec.gov/litigation/investreport/34-81207.pdf (accessed March 31, 2023).

[9] Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO (accessed March 31, 2023).

[10] SEC.gov | Framework for "Investment Contract" Analysis of Digital Assets (accessed March 31, 2023).

169.    In addition, the SEC has publicized its position on cryptocurrency in countless enforcement actions,[11] multiple speeches,[12] Congressional testimony,[13] and several official SEC statements[14] and proclamations.[15] Current SEC Chairman, Gary Gensler, has spoken frequently about the perils and illegality of crypto lending platforms and decentralized finance,[16] warning that their failure to register with the SEC may violate U.S. securities laws.[17] In one interview, Gensler said:

> The law is clear, it's not about waving a wand. Congress spoke about this in 1934 . . . When a [digital] platform has securities on it, it is an exchange, and it's a question of whether they're registered or they're operating outside of the law and I'll leave it at that.[18]

170.    On September 8, 2022, Chair Gensler gave a speech reflecting on the flexibility of the securities laws and the SEC's consistency in applying these laws to cryptocurrency.[19] Gensler noted that of the 10,000 different cryptocurrencies in the market, "the vast majority are securities," a position that was also held by his predecessor, Jay Clayton.[20] Gensler went on to note that the

---

[11] SEC.gov | Crypto Assets and Cyber Enforcement Actions (accessed March 31, 2023).

[12] https://www.sec.gov/news/speech/gensler-aspen-security-forum-2021-08-03 (accessed March 31, 2023).

[13] https://www.sec.gov/news/testimony/gensler-2021-05-26 (accessed March 31, 2023).

[14] https://www.sec.gov/news/public-statement/statement-clayton-2017-12-11(accessed March 31, 2023).

[15]https://www.sec.gov/news/public-statement/enforcement-tm-statement-potentially-unlawful-online-platforms-trading (accessed March 31, 2023).

[16] https://www.theblock.co/post/113416/gensler-speech-crypto-defi-lending-sec(accessed March 31, 2023).

[17]https://ca.finance.yahoo.com/news/crypto-platforms-dont-register-with-sec-outside-the-law-gensler- 164215740.html (accessed March 31, 2023).

[18] https://www.theblock.co/post/113416/gensler-speech-crypto-defi-lending-sec(accessed March 31, 2023).

[19] SEC.gov | Kennedy and Crypto (accessed March 31, 2023).

[20] *Id.*

SEC has spoken with a "pretty clear voice" when it comes to cryptocurrency "through the DAO Report, the Munchee Order, and dozens of Enforcement actions, all voted on by the Commission" and that "[n]ot liking the message isn't the same thing as not receiving it."[21]

171.    The judicial record supports Chair Gensler's assertions. The SEC has taken over 100 crypto-related enforcement actions and has not lost a single case.[22]

172.    What follows are summaries of five cases that will help inform this litigation.

**B.  SEC v. KIK**

173.    In Kik[23], the SEC's complaint[24], filed in the U.S. District Court for the Southern District of New York on June 4, 2019, alleged that Kik sold digital asset securities to U.S. investors without registering their offer and sale as required by the U.S. securities laws. Kik argued that the SEC's lawsuit against it should be considered "void for vagueness."[25]

174.    The court granted the SEC's motion for summary judgment on September 30, 2020, finding that undisputed facts established that Kik's sales of "Kin" tokens were sales of investment contracts (and therefore of securities) and that Kik violated the federal securities laws when it conducted an unregistered offering of securities that did not qualify for any exemption from registration requirements. The court further found that Kik's private and public token sales were a single integrated offering.

---

[21] *Id.*

[22] SEC Cryptocurrency Enforcement: 2021 Update (cornerstone.com) (accessed March 31, 2023).

[23] https://www.sec.gov/news/press-release/2020-262 (accessed March 31, 2023).

[24] https://www.sec.gov/news/press-release/2019-87 (accessed March 31, 2023).

[25] https://www.financemagnates.com/cryptocurrency/news/sec-seeks-to-block-kik-subpoenas-refutes-void-for-vagueness-claim/ (accessed March 31, 2023).

### C. *SEC v. Telegram*

175.    In Telegram,[26] the SEC filed a complaint[27] on October 11, 2019, alleging that the company had raised capital to finance its business by selling approximately 2.9 billion "Grams" to 171 initial purchasers worldwide. The SEC sought to preliminarily enjoin Telegram from delivering the Grams it sold, which the SEC alleged were securities that had been offered and sold in violation of the registration requirements of the federal securities laws.

176.    Telegram argued[28] that the SEC has "engaged in improper 'regulation by enforcement' in this nascent area of the law, failed to provide clear guidance and fair notice of its views as to what conduct constitutes a violation of the federal securities laws, and has now adopted an ad hoc legal position that is contrary to judicial precedent and the publicly expressed views of its own high-ranking officials."

177.    On March 24, 2020, the U.S. District Court for the Southern District of New York issued a preliminary injunction[29] barring the delivery of Grams and finding that the SEC had shown a substantial likelihood of proving that Telegram's sales were part of a larger scheme to distribute the Grams to the secondary public market unlawfully.

178.    Without admitting or denying the allegations in the SEC's complaint, the defendants consented to the entry of a final judgment enjoining them from violating the registration provisions of Sections 5(a) and 5(c) of the Securities Act of 1933. The judgment ordered the

---

[26] https://www.sec.gov/news/press-release/2020-146 (accessed March 31, 2023).

[27] https://www.sec.gov/news/press-release/2019-212 (accessed March 31, 2023).

[28] https://www.financemagnates.com/cryptocurrency/news/sec-vs-telegram-will-gram-tokens-ever-be-distributed/ (accessed March 31, 2023).

[29] SEC v. Telegram: A Groundbreaking Decision in Cryptocurrency Enforcement? | Insights | Greenberg Traurig LLP (gtlaw.com) (accessed March 31, 2023).

defendants to disgorge, on a joint and several basis, $1,224,000,000.00 in ill-gotten gains from the sale of Grams, with credit for the amounts Telegram pays back to initial purchasers of Grams. It also ordered Telegram Group Inc. to pay a civil penalty of $18,500,000. For the next three years, Telegram is further required to give notice to the SEC staff before participating in the issuance of any digital assets.

### D. SEC v. BlockFi

179.    In BlockFi Lending LLC, the first SEC case ever involving a crypto-lending program, on February 22, 2022, the SEC charged BlockFi [30] with failing to register the offers and sales of its retail crypto-lending product and also charged BlockFi with violating the registration provisions of the Investment Company Act of 1940.

180.    BlockFi argued for "increased regulatory clarity" but lost. [31]

181.    To settle the SEC's charges, BlockFi agreed to pay a $50 million penalty, cease its unregistered offers and sales of the lending product, BlockFi Interest Accounts (BIAs), and bring its business within the provisions of the Investment Company Act within 60 days. BlockFi's parent company also announced that it intends to register under the Securities Act of 1933 the offer and sale of a new lending product. In parallel actions, BlockFi agreed to pay an additional $50 million in fines to 32 states to settle similar charges.

### E. SEC Wells Notice to Coinbase

182.    In 2021, Coinbase began marketing a cryptocurrency lending product called Lend. The Lend program purported to allow some Coinbase customers to "earn interest on select assets

---

[30] https://lnkd.in/d-Xy45ec (accessed March 31, 2023).

[31] https://blockfi.com/pioneering-regulatory-clarity (accessed March 31, 2023).

on Coinbase, starting with 4% APY on USD Coin (USDC)."[32] According to Coinbase, its lawyers reached out to the SEC to discuss its Lend product, at which point SEC staff instead served Coinbase with a *Wells* Notice, informing Coinbase of their intention to seek approval from the SEC Commissioners to file a civil enforcement action against Coinbase for violating the federal securities laws.

183.    According to Coinbase, the SEC issued the Wells Notice because of Coinbase's failure to file a registration statement with the SEC for the offering of its Lend product, which the SEC believed was a security.[33]

184.    The two cases that Coinbase claims the SEC cites as support for its *Wells* Notice are *SEC v. Howey* and *Reves v. Ernst & Young*. *Reves* addressed the question of whether a product is a "note" and hence a security (applying the so-called "Family Resemblance Test").

185.    Under the Lend program, Coinbase customers were clearly investing "money" at Coinbase and placing their faith in Coinbase to generate a profit for them. Lend investors would have no say in how Coinbase runs the Lend program and Coinbase was not going to permit Lend investors to participant in Lend-related decisions. Given these facts, Lend was clearly an investment contract.

186.    Under *Reves*, Lend may have also been a "note" and hence a security. Although the term "note" is included in the statutory definition of a security, case law has determined that not every "note" is a security. The definition specifically excludes notes with a term of less than nine months and courts have carved out a range of exemptions over the years for commercial paper-type notes such as purchase money loans and privately negotiated bank loans. To reconcile these

---

[32] [The SEC has told us it wants to sue us over Lend. We don't know why. - Blog (coinbase.com)](coinbase.com) (accessed March 31, 2023).

[33] *Id*.

varying cases, the U.S. Supreme Court in *Reves* established the "family resemblance test," to determine whether a note is a security.

187. Per the "family resemblance test," a presumption that a note is a security can only be rebutted if the note bears a resemblance to one of the enumerated categories on a judicially developed list of exceptions, as follows: 1) a note delivered in consumer financing; 2) a note secured by a mortgage on a home; 3) a short-term note secured by a lien on a small business or some of its assets; 4) a note evidencing a character loan to a bank customer; 5) a short-term note secured by an assignment of accounts receivable; 6) a note which simply formalizes an open-account debt incurred in the ordinary course of business (such as a trade payable for office supplies); and 7) a note evidencing loans by commercial banks for current operations.

188. The "family resemblance" analysis requires:

- A consideration of the motivation of the seller and buyer (e.g. is the seller looking for investment and the buyer looking for profit?);

- The plan of distribution of the note (e.g. is the product being marketed as an investment?);

- The expectation of the creditor/investor (e.g. would the investing public reasonably expect the application of the securities laws to the product); and

- The presence of an alternative regulation (e.g. will the product be registered as a banking product and the offered registered as a bank?).

189. Applying the family resemblance test to Lend reveals the presence of a note. First, Coinbase likened the Lend program to that of a savings account, where the Lend customer is looking for a profitable investment and Coinbase is looking for investors. Second, Coinbase marketed the Lend program as an investment. Third, investors would expect that securities regulation applies. Fourth, Coinbase is not a bank, so their so-called savings account falls under no other regulatory jurisdiction and protection.

190.     Given the clear facts of the case, Coinbase decided to cancel the Lend program.[34]

## CLASS ACTION ALLEGATIONS

191.     As detailed below in the individual counts, Plaintiffs bring this lawsuit on behalf of themselves and all others similarly situated, pursuant to Rule 23(a), (b)(2), (b)(3), and/or (c)(4) of the Federal Rules of Civil Procedure.

### I.   Class Definitions

192.     Plaintiffs seek to represent the following Global Class, Nationwide Class, and Florida and California Subclasses (collectively, the "Classes"):

(1) **Global Class:** All persons and entities residing outside of the United States who, within the applicable limitations period, purchased, repurchased, invested, and/or reinvested cryptocurrency coins or tokens offered and/or sold by the Binance Entities.

(2) **Nationwide Class:** All persons or entities in the United States who, within the applicable limitations period, purchased, repurchased, invested, and/or reinvested cryptocurrency coins or tokens offered and/or sold by the Binance Entities.

(3) **Florida Subclass:** All persons or entities in the state of Florida who, within the applicable limitations period, purchased, repurchased, invested, and/or reinvested cryptocurrency coins or tokens offered and/or sold by the Binance Entities.

---

[34] Coinbase cancels Lend program launch after SEC fight - The Verge (accessed March 31, 2023).

> (4) **California Subclass:** All persons or entities in the state of California who, within the applicable limitations period, purchased, repurchased, invested, and/or reinvested cryptocurrency coins or tokens offered and/or sold by the Binance Entities.

Excluded from the Classes are Defendants and their officers, directors, affiliates, legal representatives, and employees, the Binance Entities and their officers, directors, affiliates, legal representatives, and employees, any governmental entities, any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

193.    Plaintiffs reserve the right to modify or amend the definition of the proposed Classes, or to include additional classes or subclasses, before or after the Court determines whether such certification is appropriate as discovery progresses.

## II.  Numerosity

194.    The Classes are comprised of thousands, if not millions, of consumers globally, to whom Binance offered and/or sold unregistered securities. Moreover, thousands, if not millions, of consumers worldwide have executed trades on the Binance Platform and purchased unregistered securities within the applicable limitations period. Membership in the Classes are thus so numerous that joinder of all members is impracticable. The precise number of class members is currently unknown to Plaintiffs but is easily identifiable through other means, such as through Binance's corporate records or self-identification.

## III.  Commonality/Predominance

195.    This action involves common questions of law and fact, which predominate over any questions affecting individual class members. These common legal and factual questions include, but are not limited to, the following:

(a)  whether Defendants offered and sold unregistered securities under applicable law;

(b)  whether Defendants' participation and/or actions in Binance's offerings and sales of unregistered securities violate the provisions of applicable securities law.

(c)  the type and measure of damages suffered by Plaintiffs and the Class.

(a)  whether Defendants' practices violate state consumer protection statutes;

(b)  whether Plaintiffs and Class members have sustained monetary loss and the proper measure of that loss;

(c)  whether Plaintiffs and Class members are entitled to injunctive relief;

(d)  whether Plaintiffs and Class members are entitled to declaratory relief; and

(e)  whether Plaintiffs and Class members are entitled to consequential damages, punitive damages, statutory damages, disgorgement, and/or other legal or equitable appropriate remedies as a result of Defendants' conduct.

## IV.  Typicality

196.   Plaintiffs' claims are typical of the claims of the members of the Classes because all members were injured through the uniform misconduct described above, namely that Plaintiffs and all class members were offered and/or sold Binance's unregistered securities because of Defendants' actions and/or participation in the offering and sale of these unregistered securities, and Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all such members. Further, there are no defenses available to any Defendant that are unique to Plaintiffs.

## V.  Adequacy of Representation

197.   Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained counsel experienced in complex consumer class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no adverse or antagonistic

interests to those of the Classes. Plaintiffs anticipate no difficulty in the management of this litigation as a class action. To prosecute this case, Plaintiffs have chosen the undersigned law firms, which have the financial and legal resources to meet the substantial costs and legal issues associated with this type of consumer class litigation.

## VI.   Requirements of Fed. R. Civ. P. 23(b)(3)

198.   The questions of law or fact common to Plaintiffs' and each Class member's claims predominate over any questions of law or fact affecting only individual members of the Classes. All claims by Plaintiffs and the unnamed members of the Classes are based on the common course of conduct by Defendants (1) in marketing, offering, and/or selling unregistered securities, and/or (2) in receiving secret undisclosed compensation for their promotion of the Binance Platform.

199.   Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

200.   As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the Classes as is in the case at bar, common questions will be held to predominate over individual questions.

### A.   Superiority

201.   A class action is superior to individual actions for the proposed Classes, in part because of the non-exhaustive factors listed below:

(a) Joinder of all Class members would create extreme hardship and inconvenience for the affected customers as they reside nationwide and throughout the state;

(b) Individual claims by Class members are impracticable because the costs to pursue individual claims exceed the value of what any one Class member has at stake. As a result, individual Class members have no interest in prosecuting and controlling separate actions;

(c) There are no known individual Class members who are interested in individually controlling the prosecution of separate actions;

(d) The interests of justice will be well served by resolving the common disputes of potential Class members in one forum;

(e) Individual suits would not be cost effective or economically maintainable as individual actions; and

(f) The action is manageable as a class action.

## VII.   Requirements of Fed. R. Civ. P. 23(b)(2)

202.    Defendants have acted and refused to act on grounds generally applicable to the Classes by engaging in a common course of conduct of offering and/or selling, and/or aiding and abetting the offering and/or selling of unregistered securities, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

203.    Defendants have acted and refused to act on grounds generally applicable to the Classes by engaging in a common course of conduct of uniformly identical and uniform misrepresentations and omissions in receiving secret undisclosed compensation for their promotion of the Binance Platform, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

## VIII.   Requirements of Fed. R. Civ. P. 23(c)(4)

204.    As it is clear that one of the predominant issues regarding Defendants' liability is whether the assets Binance and Defendants offered and/or sold are unregistered securities, utilizing Rule 23(c)(4) to certify the Class for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

205.    As it is clear that another predominant issue regarding Defendants' liability is whether they have violated state consumer protection and securities laws in making identical and

uniform misrepresentations and omissions regarding the functionality of the Binance Platform, and/or in receiving secret undisclosed compensation for their promotion of the Binance Platform, utilizing Rule 23(c)(4) to certify the Classes for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

### IX.    Nature of Notice to the Proposed Class.

206.    The names and addresses of all Class Members are contained in the business records maintained by Binance and are readily available to Binance. The Class Members are readily and objectively identifiable. Plaintiffs contemplate that notice will be provided to Class Members by e-mail, mail, and published notice.

**COUNT ONE**
**Violations of the Florida Statute Section 517.07,**
**The Florida Securities and Investor Protection Act**
**(Plaintiffs Vazquez and Vongdara Individually and on behalf of the Classes)**

207.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–206 above, as if fully set forth herein.

208.    Section 517.07(1), Fla. Stat., provides that it is unlawful and a violation for any person to sell or offer to sell a security within the State of Florida unless the security is exempt under Fla. Stat. § 517.051, is sold in a transaction exempt under Fla. Stat. § 517.061, is a federally covered security, or is registered pursuant to Ch. 517, Fla. Stat.

209.    Section 517.211 extends liability to any "director, officer, partner, or agent of or for the seller, if the director, officer, partner, or agent has personally participated or aided in making the sale, is jointly and severally liable to the purchaser in an action for rescission, if the purchaser still owns the security, or for damages, if the purchaser has sold the security."

210.    The Binance Entities offered and sold securities on the Binance Platform pursuant to Fla. Stat. § 517.021(22)(a).

211.    The securities sold and offered for sale to Plaintiff and Class members on the Binance Platform were not:

      a.    exempt from registration under Fla. Stat. § 517.051;

      b.    a federal covered security;

      c.    registered with the Office of Financial Regulations (OFR); or

      d.    sold in a transaction exempt under Fla. Stat. § 517.061.

212.    The Binance Entities sold and offered to sell the unregistered securities to Plaintiffs and the members of the Class.

213.    Defendants are issuers, sellers, and/or agents of the Binance Entities pursuant to Fla. Stat. § 517.211.

214.    The Binance Entities, with the Defendants' material assistance, offered and sold the unregistered securities to Plaintiffs and the members of the Class. As a result of this assistance, the Defendants violated Fla. Stat. § 517.07 et seq. and Plaintiffs and members of the Class sustained damages as herein described.

**COUNT TWO**
**For Violations of the Florida Deceptive and Unfair Trade Practices Act,**
**§ 501.201, Florida Statutes, *et seq.***
**(Plaintiffs Vazquez and Vongdara Individually and on behalf of the Classes)**

215.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–206 above, as if fully set forth herein.

216.    This cause of action is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act, section 501.201, Fla. Stat., *et seq*. ("FDUTPA"). The stated purpose of the FDUTPA is to "protect the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202(2), Fla. Stat.

217. Plaintiffs and Class members are consumers as defined by section 501.203, Fla. Stat. Defendants are engaged in trade or commerce within the meaning of the FDUTPA.

218. Florida Statute section 501.204(1) declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

219. The Defendants' unfair and deceptive practices as described herein were consumer-oriented and are objectively materially likely to mislead – and have materially misled – consumers acting reasonably in the circumstances.

220. The Defendants have violated the FDUTPA by engaging in the unfair and deceptive practices as described herein, which offend public policies and are immoral, unethical, unscrupulous and injurious to consumers.

221. Plaintiffs and consumers in the Classes have been aggrieved by the Defendants' unfair and deceptive practices and acts, as more fully described herein.

222. The harm suffered by Plaintiffs and consumers in the Classes was directly and proximately caused by the deceptive and unfair practices of the Defendants, as more fully described herein.

223. Pursuant to sections 501.211(2) and 501.2105, Fla. Stat., Plaintiffs and consumers in the Classes make claims for actual damages, attorneys' fees and costs.

224. The Defendants still utilize many of the deceptive acts and practices described above. Plaintiffs and the other members of the Classes have suffered and will continue to suffer irreparable harm if the Defendants continue to engage in such deceptive, unfair, and unreasonable practices. Section 501.211(1) entitles Plaintiffs and the Classes to obtain both declaratory or injunctive relief to put an end to the Defendants' unfair and deceptive scheme.

## COUNT THREE

### Violations of the CSL

### (Plaintiff Sizemore Individually and on behalf of the Classes)

225.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–206 above, as if fully set forth herein.

226.     California Corp. Code § 25110 prohibits the offer or sale by any person in California of securities that are not qualified through registration. California Corp. Code § 25503 affords a statutory cause of action to victimized investors for violations of Section 25110. Finally, California Corp. Code § 25504.1 extends liability under Section 25503 to any person who materially assists in a violation of Section 25110 and makes them jointly and severally liable with any other person liable under Section 25503.

227.     The Binance Entities, with Defendants' material assistance, offered and sold securities in California without being properly registered or qualified for offer or sale either with any federal or California regulator.

228.     Plaintiffs contend that secondary liability for materially assisting a strict liability violation of the qualification requirements of Section 25110 does not require proof that Defendants intended "to deceive or defraud." However, Plaintiffs in the alternative contend that even if so, Defendants' knowledge of and participation in Binance's non-compliance with the CSL establishes their intent to deceive investors regarding the unregistered.

229.     California Corp. Code § 25210(b) provides: No person shall, … on behalf of an issuer, effect any transaction in, or induce or attempt to induce the purchase or sale of, any security in this state unless [a licensed] broker-dealer and agent have complied with any rules as the commissioner may adopt for the qualification and employment of those agents.

230.     Defendants breached Section 25210(b) by encouraging Binance to offer and sell securities despite the fact that such securities were not qualified under the CSL.

231.     California Corp. Code § 25501.5 affords a statutory cause of action to victimized investors for violations of Section 25210(b).

232.     California Corp. Code § 25401 prohibits fraud in the offer or sale by any person in California of securities. California Corp. Code § 25501 affords a statutory cause of action to victimized investors for violations of Section 25401. Finally, California Corp. Code § 25504.1 extends liability under Section 25503 to any person who materially assists in a violation of Section 25401 with the intent to deceive or defraud, and makes them jointly and severally liable with any other person liable under Section 25503.

233.     The Binance Entities, with Defendants' material assistance, offered and sold Securities in California by means of any written or oral communication that includes an untrue statement of a material fact or omits to state a material fact necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading.

234.     Defendants are accordingly joint and severally liable to Plaintiffs for rescissionary damages under Cal. Corp. Code. § 25504.1.

235.     Plaintiffs hereby conditionally tender their Voyager Securities in accordance with Cal. Corp. Code § 25503.

## **COUNT FOUR**

**For Violations of the Unfair Competition Law Business & Professions Code § 17200, et seq.**
**(Plaintiff Sizemore Individually and on behalf of the Classes)**

236.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–206 above, as if fully set forth herein.

237.     California's Unfair Competition Law, Business & Professions Code §§ 17200 *et seq*. (the "UCL") prohibits acts of unlawful and unfair competition, including any "unlawful, unfair or fraudulent business act or practice," any "unfair, deceptive, untrue or misleading advertising" and any act prohibited by Business & Profession Code §17500.

238.     Defendants have committed business acts and practices that violate the UCL by aiding and abetting the breaches of fiduciary duties, fraudulent and unfair conduct and unlawful conduct. Defendants' conduct as alleged above constitutes unlawful competition in that, for the reasons set forth above, said acts and practices violate the Corporations Code.

239.     The conduct of Defendants as alleged above also constitutes unfair competition in that, for the reasons set forth above, the acts and practices offend public policy and are unethical, oppressive, and unscrupulous, and are substantially injurious to the public.

240.     Defendants' conduct was a proximate cause of the injuries to Plaintiffs and the Classes alleged herein, and it caused and continues to cause substantial injury to Plaintiffs and the members of the Classes. By reason of the foregoing, Defendants should be required to pay restitution to Plaintiffs and members of the Classes.

**COUNT FIVE**
**Civil Conspiracy**
**(Plaintiffs Individually and on behalf of the Classes)**

241.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–206 above, as if fully set forth herein.

242.     Defendants made numerous misrepresentations and omissions to Plaintiffs and Class Members about the Binance Platform to induce confidence and to drive consumers to invest in Binance's unregistered securities offerings and to utilize Binance for cryptocurrency trading,

misleading customers with the false impression that any cryptocurrency assets held on the Binance Platform were safe and were not being invested in unregistered securities.

243.    The Binance Entities entered into one or more agreements with the other Defendants with the purpose of making these misrepresentations and/or omissions to induce Plaintiff and consumers to invest in the unregistered securities and/or use the Binance Platform.

244.    The Defendants engaged in unlawful acts, namely, the misrepresentations and omissions made to Plaintiffs and the Classes and the sale of unregistered securities.

245.    The Defendants' conspiracy substantially assisted or encouraged the wrongdoing conducted by the Binance Entities; further, the Defendants had knowledge of such fraud and/or wrongdoing, because of their experience and relationship with the Binance Entities, as described above and as such, knew that the representations made to Plaintiffs were deceitful and fraudulent.

246.    The Defendants' conspiracy with the Binance Entities caused damages to Plaintiffs and the Classes in the amount of their lost investments.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs pray for a judgment on behalf of themselves and the Classes:

a.    Certifying the Classes as requested herein;

b.    Awarding actual, direct and compensatory damages;

c.    Awarding restitution and disgorgement of revenues if warranted;

d.    Awarding declaratory relief as permitted by law or equity, including declaring the Defendants' practices as set forth herein to be unlawful;

e.    Awarding injunctive relief as permitted by law or equity, including enjoining the Defendants from continuing those unlawful practices as set forth herein, and directing the Defendants to identify, with Court supervision, victims of their conduct and pay them all money they are required to pay;

f.   Awarding statutory and multiple damages, as appropriate;

g.   Awarding attorneys' fees and costs; and

h.   Providing such further relief as may be just and proper.

**<u>DEMAND FOR JURY TRIAL</u>**

Plaintiffs hereby demand a jury trial as to all claims so triable.

Dated: March 31, 2023                                  Respectfully submitted,

**By: */s/ Adam Moskowitz***
Adam M. Moskowitz
Florida Bar No. 984280
adam@moskowitz-law.com
Joseph M. Kaye
Florida Bar No. 117520
joseph@moskowitz-law.com
**THE MOSKOWITZ LAW FIRM, PLLC**
2 Alhambra Plaza, Suite 601
Coral Gables, FL 33134
Telephone: (305) 740-1423

Brooke Alexander
(*Pro Hac Vice* Application Forthcoming)
**BOIES SCHILLER FLEXNER LLP**
333 Main Street
Armonk, NY 10504
Phone: (914) 749–8200
balexander@bsfllp.com

Stephen Neal Zack
Florida Bar No. 145215
Tyler Ulrich
Florida Bar No. 94705
**BOIES SCHILLER FLEXNER LLP**
100 SE 2nd St., Suite 2800
Miami, FL 33131
Office: 305-539-8400
szack@bsfllp.com
tulrich@bsfllp.com

*Co-Counsel for Plaintiffs and the Class*