# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

**MICHAEL SIZEMORE**, *et al.,* on behalf of
themselves and all others similarly situated,

CASE NO. 1:23-cv-21261

*Plaintiffs,*

*v.*

**FIRST AMENDED CLASS
ACTION COMPLAINT**

**CHANGPENG ZHAO, BINANCE
HOLDINGS LIMITED, BAM TRADING
SERVICES INC., BAM MANAGEMENT
US HOLDINGS INC., BINANCE
HOLDINGS (IE) LIMITED, BINANCE
(SERVICES) HOLDINGS LIMITED,
PAXOS TRUST COMPANY, LLC, JIMMY
BUTLER, AND BEN ARMSTRONG,**

**JURY TRIAL DEMANDED**

*Defendants.*

_____/

Plaintiffs file this Complaint on behalf of themselves, and all other similarly situated

consumers who purchased unregistered securities offered or sold by Binance,[1] against Defendants,

including many of the related Binance entities that helped run the world's largest cryptocurrency

exchange and/or issued unregistered securities, the founder of the Binance enterprise, and

"Influencers" who promoted, assisted in, and/or actively participated in the offer and sale of

unregistered securities in coordination with Binance.

## INTRODUCTION

1.     Binance Holdings Limited d/b/a Binance.com ("Binance.com") directly oversees the

world's largest centralized, web-based crypto-products platform, offering its customers in the United

_____

[1] Binance is not a single corporate entity, but rather an opaque web of corporate entities, all of which
are ultimately controlled by Defendant Changpeng Zhao. Accordingly, the term "Binance" as used
herein refers to the entire corporate enterprise, including Binance Holdings Limited d/b/a
Binance.com, Binance Holdings (IE) Limited, Binance (Services) Holdings Limited, BAM
Management U.S. Holdings, Inc., and BAM Trading Services Inc. d/b/a Binance.US.

States the ability to buy, loan, and trade digital assets, including cryptocurrency and tokens, such as their own native token, "BNB" and their own stablecoin pegged to the U.S. Dollar, "BUSD."[2]

2.      In simplified terms, the value of the BNB token is based on the total number of existing BNB coins and the profits of the Binance exchange, all of which depend "upon the actions of others." The BNB token, therefore, is a "security" under the *Howey* test. In fact, unlike other crypto tokens which are traded on an open market, the number of existing BNB coins all depends upon the "burn rate" of the token, which is established by Binance's Founder and Binance.com's Chief Executive Officer, Defendant Changpeng Zhao ("Zhao"). This is, accordingly, a classic example of a centralized exchange that is promoting the sale of an unregistered security. As explained herein, for similar reasons, tokens including BUSD, SOL, ADA, MATIC, FIL, ATOM, SAND, MANA, ALGO, AXS, and COTI, as well as Binance programs like the "BNB Vault," "Simple Earn," and certain staking programs are also unregistered securities that Binance offered through one or both of the Binance platforms.

3.      Binance has enormous reach that has enabled it to sell these unregistered securities in massive volumes, both through its exchanges and separately through listing on other centralized exchanges such as Crypto.com. According to the platform's website, Binance.com had a yearly trading volume of $9.58 trillion in 2021 and facilitated 300 billion spot transactions in 2022. Binance.com allows users to trade more than 350 cryptocurrencies and has 120 million registered users. Much of its trading volume and profit arises specifically from its extensive solicitation within the United States, earning at least $11.6 billion in revenue from U.S. customers between 2018 and 2021. Binance's U.S. website describes BNB as having "its own living, breathing ecosystem" and states that Binance's "vision is that one day everyone will own BNB[.]" Binance.com holds itself out as the world's "largest

---

[2] According to Binance, "BNB" stands for "Build and Build" and was formerly called "Binance Coin."

crypto exchange by trade volume" and is reported to have amassed over half the global market share for digital asset exchange activity as of the end of 2022.

4.      Binance's reach—and its unlawful conduct—extends directly to Florida, the location of its domestic headquarters. In late 2020, Binance's U.S. affiliate, Binance.US, decided to take Florida off its cryptocurrency trading "no-fly list" and opened its Binance.US platform for business here in the Sunshine State. The expansion into America's third-most populous state followed the procurement of a Floridian money transmitter license under the name "BAM TRADING SERVICES INC."

5.      Binance.US's former U.S. Chief, Catherine Coley, who grew up in Orlando, said that the two-year Florida license granted Binance access to what is now its second-largest potential market: 12 million eligible traders. "We're well aware that not every single person above the age of 18 is going to download Binance.US tomorrow, but it is a huge population that is ripe for understanding how digital assets work," she said.

6.      In addition to Binance's own unlawful activity, during the class period, Binance partnered with promoters (including Defendants Armstrong and Butler) to publicly promote Binance and solicit new customers, including through traditional advertisements on television and social media. These partnerships put promoters from across the globe in the position to receive kickbacks and commissions based on their promotion and sale of unregistered securities to investors. Binance hosts an annual ceremony honoring the "Best Influencers" from each area across the Globe.

7.      With the rise to prominence of the internet and social media, a new multi-billion-dollar cottage industry of "influencers" has been created. Influencers played a major role in Binance's rise by hyping these unregistered securities in exchange for multimillion-dollar payouts.

8.      Indeed, according to a recent investigative analysis by Shawn Tully, reporting for *Fortune*:

The bigger plan is the one officially tagged the Affiliate Program, which enlists prominent names in social media. Binance's website provides a list of who's eligible. It includes influencers with over 5,000 followers; financial and opinion leaders with communities of 500-plus members on groups such as Facebook, Reddit, or QQ; analyst-gurus getting over 5,000 daily visits; and crypto funds. The hosts pocket 41% kickbacks on recruits' spot trades if they start with fewer than 500 referrals; at over 500, their take hits a stunning 50%. Binance provides strong incentives for those hosts to keep building their clubs. To keep the 41% kickbacks, an inviter must attract at least 10 new customers every 90 days that together generate at least the equivalent of 50 Bitcoin, or around $1 million, in new trades.[3]

9.     These promoters—including Defendants Armstrong and Butler—thus engaged in the mass solicitation of investments in unregistered securities on behalf of Binance. These are exactly the types of solicitations that courts repeatedly have found to be actionable under the analogous Section 12 of the 1933 Act. *Wildes v. BitConnect Int'l PLC*, 25 F.4th 1341 (11th Cir. 2022), *cert. denied sub nom. Arcaro v. Parks*, 214 L. Ed. 2d 235 (2022); *Pino v. Cardone Capital,* LLC, 55 F.4th 1253 (9th Cir. 2022).

10.     As the events of 2022 demonstrated, the illicit activities of Binance and its promoters were, unfortunately, commonplace in the cryptocurrency exchange market. Indeed, undersigned counsel has already brought the first class action in the country against cryptocurrency platform Voyager Digital and affiliated promoters, alleging, in part, that they sold unregistered securities in the form of crypto tokens and interest-bearing cryptocurrency accounts. Voyager subsequently declared bankruptcy and the litigation is currently proceeding in this District against the various aiders and abettors who promoted the unregistered Voyager products.

11.     Voyager was supposed to be rescued in bankruptcy by their competitor, FTX, which entered into an asset purchase agreement with Voyager in the Voyager bankruptcy proceedings. But that potential transaction fell through when FTX itself subsequently declared bankruptcy, after a bank

---

[3]     *See Fortune*, https://fortune.com/2023/03/28/binance-cftc-lawsuit-bnb-coin-social-media-influencers/?utm_source=Iterable&utm_medium=email&utm_campaign=campaign_2886032&tpcc=dailydigest (accessed June 27, 2023).

run on the FTX platform that resulted from Zhao publicly disclosing that FTX was in dire financial straits.

12.     Undersigned counsel then brought a class action against certain FTX insiders and affiliated promoters for their promotion and sale of unregistered securities, and that litigation has been consolidated into a Multidistrict Litigation pending in this District, over which Undersigned counsel have been appointed Co-Lead Counsel. After FTX declared bankruptcy, Binance was announced as the second would-be "rescuer" of Voyager. The SEC objected to Binance's proposed purchase of Voyager and that sale has been stayed by the federal appeals court.

13.     Undersigned counsel now represents Plaintiffs and the putative class members in this class action against Binance because it, too, has offered and sold unregistered securities to investors throughout the country while operating as an unregistered national exchange and clearing agency.

14.     The Commodity Futures Trading Commission ("CFTC") agrees. On March 27, 2023, the CFTC sued Binance, alleging that the crypto trader violated U.S. trading laws by trading unregistered crypto derivatives. The CFTC also alleged that Binance coached its employees and VIP members on how to circumvent regulations and compliance controls to maximize their profits. "For years, Binance knew they were violating CFTC rules, working actively to both keep the money flowing and avoid compliance," CFTC Chairman Rostin Behnam said in a statement. "This should be a warning to anyone in the digital asset world that the CFTC will not tolerate willful avoidance of U.S. law."

15.     The SEC also agrees. On June 5, 2023, the SEC sued Zhao, Binance.com, and its U.S.-based affiliates, BAM Management U.S. Holdings, Inc. ("BAM Management") and BAM Trading Services Inc. d/b/a Binance.US ("Binance.US"), asserting thirteen violations of federal securities law. Complaint, *SEC v. Binance Holdings Ltd.*, No. 23-cv-01599, Dkt. No. 1 (D.D.C. June 5, 2023). The SEC alleges that Binance unlawfully offered and sold various unregistered securities, including BNB,

BUSD, several crypto-lending products, and a staking-as-a-service program. The SEC also alleges that defendants operate as an unregistered exchange, broker-dealer, and clearing agency for U.S. citizens by bringing together interstate orders of multiple buyers and sellers of securities through a trading facility.

16.     The SEC also alleged that, to further evade securities laws, Binance (i) surreptitiously controls U.S.-based Binance.US despite its public claims to the contrary and (ii) employs "sham" measures to purportedly block U.S. user access to Binance.com when, in fact, it enables high-value U.S. VIP members to continue to invest on that platform; and (iii) commingles or diverts billions of dollars of U.S.-based Binance.US assets to two Zhao-owned entities: Sigma Chain AG ("Sigma Chain") and Merit Peak Limited ("Merit Peak").

17.     Consistent with those allegations, Binance.com's Chief Compliance Officer stated "we do not want [Binance].com to be regulated ever" in one email, and admitted in another that "we are operating a fking unlicensed securities exchange in the USA bro."

18.     To summarize, as SEC Chair Gary Gensler stated: "Zhao and Binance entities engaged in an extensive web of deception, conflicts of interest, lack of disclosure, and calculated evasion of law."

19.     Plaintiffs thus bring this action to hold Binance and its affiliated promoters accountable for their flagrant sale and promotion of unregistered securities in violation of the securities laws.

**PARTIES**

a.     Plaintiffs

20.     Plaintiff Michael Sizemore is a citizen and resident of the State of California. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Sizemore purchased, repurchased, invested, and/or reinvested unregistered securities from Binance. Plaintiff Sizemore did so after being

exposed to some or all of Defendants' misrepresentations and omissions regarding the Binance platforms as detailed in this complaint, and executed trades on the Binance platforms after those misrepresentations and omissions were made. As a result, Plaintiff Sizemore has sustained damages for which Defendants are liable.

21.     Plaintiff Rudy Vazquez is a citizen and resident of the State of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Vazquez purchased, repurchased, invested, and/or reinvested unregistered securities from Binance. Plaintiff Vazquez did so after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Binance platforms as detailed in this complaint, and executed trades on the Binance platform after those misrepresentations and omissions were made. As a result, Plaintiff Vazquez has sustained damages for which Defendants are liable.

22.     Plaintiff Mikey Vongdara is a citizen and resident of the State of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Vongdara purchased, repurchased, invested, and/or reinvested unregistered securities from Binance. Plaintiff Vongdara did so after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Binance platforms as detailed in this complaint, and executed trades on the Binance platform after those misrepresentations and omissions were made. As a result, Plaintiff Vongdara has sustained damages for which Defendants are liable.

23.     Plaintiff Gordon Lewis is a citizen and resident of the State of Colorado. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Lewis purchased, repurchased, invested, and/or reinvested unregistered securities that were offered or sold by Binance, including BNB from the Crypto.com platform. Plaintiff Lewis did so after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Binance platforms as detailed in this complaint, and purchased, repurchased, invested, and/or reinvested unregistered securities offered or sold by

Binance, including BNB, after those misrepresentations and omissions were made. As a result, Plaintiff Lewis has sustained damages for which Defendants are liable.

b.    Defendants

24.    The platforms available at Binance.com and Binance.US were founded by, and are maintained and operated by, an opaque web of corporate entities, including those identified below, all of which are beneficially owned and controlled by Zhao. All the entities were co-mingling funds and operating as a single enterprise in operating the Binance platforms.

25.    Defendant Changpeng Zhao ("Zhao"), commonly known as CZ, is the founder of Binance and CEO of Binance.com, and through at least March 2022, the Chairman of the Board of Directors for both BAM Management and Binance.US. Zhao launched the Binance.com platform in 2017 from Shanghai, China and has, at all times, controlled all of Binance's business activities. Zhao is a Canadian citizen who, based on recent media reports, currently resides in Dubai, United Arab Emirates. Zhao has directly or indirectly owned the scores of entities that collectively operate the Binance platforms. In addition to the entities that operate the Binance platforms, Zhao is the direct or indirect owner of entities that have engaged in proprietary trading activity on the Binance platforms, including Merit Peak Limited and Sigma Chain AG, and Zhao is also the direct or indirect owner of approximately 300 separate Binance accounts that have engaged in proprietary trading activity on the Binance trading platforms. Between October 2022 and January 2023, Zhao personally received $62.5 million from one of the Binance bank accounts. Zhao has never been registered in the United States in any securities-related capacity, state or federal.

26.    Defendant Binance Holdings Limited ("Binance.com") d/b/a Binance.com is incorporated in the Cayman Islands and founded and owned by Zhao. Through its Binance.com platform, Binance.com offers trading with 350 crypto assets and various other crypto-related securities in 100 countries. Binance.com operates through a number of subordinate or affiliated entities, in

multiple jurisdictions, all tied to Zhao as the beneficial owner. Binance and Zhao deny the existence of a true Binance or Binance.com headquarters; however, billions of dollars from the Binance platforms flowed through dozens of Binance and Zhao-owned U.S.-based bank accounts. Binance.com has never been registered in the United States in any securities-related capacity, state or federal.

27.     Defendant Binance Holdings (IE) Limited ("Binance IE") is incorporated in Ireland and directly or indirectly owned by Zhao. Binance IE is a holding company that has directly or indirectly owned at least 24 corporate entities that have acted as Binance's digital asset and virtual asset service providers in a variety of jurisdictions and held Binance's non-U.S. regulatory licenses. Binance IE has never been registered in the United States in any securities-related capacity, state or federal.

28.     Defendant Binance (Services) Holdings Limited ("Binance Services") is incorporated in Ireland and directly or indirectly owned by Zhao. Binance Services is a holding company that has directly or indirectly owned at least 43 different corporate entities, including companies that conduct technology and operations services for Binance, hold the intellectual property related to Binance's matching engines and financial products, and enter into contracts with vendors, as well as a company called Ality Technologies DE LLC that functions as Binance's "U.S. Tech/Ops Hub." Binance Services owns Binance.com. Binance Services has never been registered in the United States in any securities-related capacity, state or federal.

29.     Defendant BAM Management U.S. Holdings, Inc. ("BAM Management") is a Delaware corporation which owns Defendant Binance.US. BAM Management is part of a series of shell corporations which ultimately leads back to Zhao. When the Binance.US platform launched in 2019, BAM Management was wholly owned by BAM Management Company Limited, a Cayman Islands company, which in turn was wholly owned by CPZ Holdings Limited, a British Virgin Islands company that was owned and controlled by Zhao. In concert with their subsidiary, BAM Management

raised $200 million for itself by misrepresenting to investors trading volume estimates, and the existence of manipulative trading controls on Binance.US. In addition, BAM Management receives money from other Zhao-backed entities such as $16 million from Merit Peak in 2020.

30.    Defendant BAM Trading Services Inc. ("Binance.US"), d/b/a Binance.US is a Delaware corporation, wholly owned by BAM Management. Binance.US has its headquarters and principal place of business within this District, in Miami, Florida. Binance.US, under the name "BAM TRADING SERVICES INC.," has a money transmission license in Florida and is registered in Florida as a foreign profit corporation. Binance.US operates its own platform, a top five spot digital asset trading platform, that offers its services to U.S. residents in 46 states and 8 U.S. territories. However, Binance.US relies on Binance's services and technology, obtained through intercompany agreements, to operate. Binance.US offers the purchase and sale of crypto securities, along with services including OTC and Convert Trading, and One Click Buy Sell through its platform with an average monthly trading volume of $24 billion in early 2022. In 2019, Zhao and Binance launched both BAM Management and Binance.US, with Zhao as the Chairman of their Boards of Directors until March 2022 and who remains a beneficial owner directly or indirectly owning between 81% and 100% of their equity. Binance.US employees referred to Zhao and Binance's control as "shackles" that often-prevented Binance.US from freely operating its platform. One former CEO felt that she and her team had been turned into puppets, while a second found the "level of connection" to be a substantial "problem." The second Binance.US CEO testified, "[W]hat became clear to me at a certain point was CZ was the CEO of BAM Trading [(Binance.US)], not me."

31.    Defendant Paxos Trust Company, LLC ("Paxos") is a New York limited purpose trust company. Beginning in September 2019, pursuant to a "Stablecoin as a Service" agreement with a Binance affiliate, Paxos issued in partnership with Binance.US the crypto asset BUSD, which was approved by and under the supervision of the New York Department of Financial Services

("NYDFS"). BUSD is a Binance-branded U.S. Dollar denominated crypto asset on the Ethereum blockchain. In December 2019, Binance.US entered into a partnership with Paxos, whereby Paxos provided certain services with respect to BUSD purchases and sales on the Binance.US platform. Effective February 21, 2023, Paxos ceased issuing new BUSD pursuant to an NYDFS order.

32.   Defendant Jimmy Butler is a star basketball player for the Miami Heat and is a citizen and resident of Florida. Butler was a paid spokesperson for Binance.

33.   Defendant, Ben Armstrong, a YouTuber with more than 1.5 million subscribers to his YouTube page, was a Binance Affiliate who received kickbacks for promoting and endorsing Binance, and is a citizen and resident of Atlanta, Georgia. Mr. Armstrong's promotions were published on public social media accounts accessible to plaintiffs nationwide, including in Florida. Mr. Armstrong has made various appearances in the State of Florida throughout the applicable time period, and has on information and belief promoted Binance and its unregistered offerings and conducted crypto related activities in the State of Florida during those appearances, including at the Bitcoin conferences in Miami in 2021, 2022 and 2023, DCentral Miami on November 28–November 29, 2022, the Web3 Summit in Miami on November 30–December 1 2022, as well as the Ben Armstrong Book Tour X Quantum in Miami in January 2023.

## JURISDICTION AND VENUE

34.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A) because this is a class action for a sum exceeding $1,000,000,000.00 (one billion dollars), exclusive of interest and costs, and in which at least one class member is a citizen of a state different than the Defendants.

35.   This Court has personal jurisdiction over Defendants because they conduct substantial and not isolated business in Florida, and/or have otherwise intentionally availed themselves of the Florida consumer market through the promotion, marketing, and sale of unregistered securities in

Florida—including to Plaintiffs in this case—which constitutes committing a tortious act within the state of Florida. Defendants have also marketed and participated and/or assisted in the sale of Binance's unregistered securities to consumers in Florida. Further, Defendants have engaged in a conspiracy in which some of the co-conspirators—including some who are Defendants in this action—committed overt acts in furtherance of the conspiracy in the State of Florida. This purposeful availment renders the exercise of jurisdiction by this Court over Defendants permissible under traditional notions of fair play and substantial justice.

36.     Defendant Binance.US (under Zhao's and Binance's control) obtained Florida business licenses and transacted business in this District, including through the operation of the Binance.US platform, which was accessed by individuals in Florida.

37.     Until September 2019, Binance (as controlled by Zhao) made the Binance.com platform publicly and readily available for trading to customers in Florida. After that time, as further alleged herein, Binance feigned efforts to exclude U.S. customers from Binance.com but knowingly and intentionally permitted and even encouraged certain U.S.-based customers to use the Binance.com platform after that date.

38.     Binance and Zhao actively solicited U.S. investors to trade on the Binance platforms. Binance and Zhao, for example, regularly solicited U.S. investors via their social media and other internet postings to trade on both Binance platforms. Zhao also directed other Binance employees to actively solicit and take other steps to retain U.S. investors on the Binance.com platform, even after Binance publicly announced in June 2019 that it would no longer serve U.S. investors. By then, Binance estimated that it had over 1.47 million U.S.-based investors on the Binance.com platform, and it continued to maintain a substantial U.S. customer base for several years thereafter. Many of these customers are located within the District. In addition, Binance has employees located in the

United States, and residents of this District invested in schemes Binance offered and sold as securities including BUSD and the Simple Earn program.

39.     Moreover, until at least the end of 2022, Binance, at Zhao's direction, maintained custody and control of the crypto assets deposited, held, traded, and/or accrued by customers on the Binance.US platform.

40.     Venue is proper in this District under 28 U.S.C. § 1391 because thousands of Class Members reside in this District; Defendants engaged in business in this District; a substantial part of the events or omissions giving rise to the claims at issue occurred in this District; this District is where Defendant Butler resides and where Binance has its domestic headquarters; and because Defendants entered into transactions and/or received substantial profits from Class Members who reside in this District.

41.     All conditions precedent to the institution and maintenance of this action have been performed, excused, waived, or have otherwise occurred.

## FACTUAL ALLEGATIONS

### I.  The Binance.com Platform

42.     Binance helps run and support the Binance.com platform, the world's largest centralized, web-based crypto-products platform, which offers its customers the ability to, among other things, buy, hold, loan, pledge, and trade digital assets including cryptocurrency and related financial products and derivatives. According to the platform's website, it boasts an average daily trade volume of $65 billion and facilitated 300 billion spot transactions in 2022.



43.     The Binance.com platform allows users to trade more than 350 cryptocurrencies and

has 120 million registered users.



44.     Binance.com was founded by its current CEO, Changpeng Zhao, and certain other

Defendants, on or about July 14, 2017.

45.     At its core, the Binance.com platform facilitates trades between market participants by

transmitting orders through an internal automated matching engine to buy or sell into what Binance

calls order books. These order book-based markets execute transactions based generally on price-time priority pursuant to non-discretionary order matching methodology.

46.     The Binance.com platform offers "spot" (immediate) market trading through an order-matching functionality similar to that of a traditional securities exchange. According to Binance, when an investor places an order on the Binance.com platform, the order enters an internal automated matching engine, called "MatchBox," which matches buy-and-sell orders based on programmed, non-discretionary rules that govern how orders will interact. When separate customers' buy and sell orders have prices that overlap, MatchBox executes the trade and removes the orders from the order book. Orders that do not execute immediately are typically ranked and displayed in price-time priority, meaning that orders placed earlier in time are prioritized for any given price. MatchBox does not indicate to one party the identity of the other party to a trade. Upon execution of a trade, other functionality in the Binance.com platform settles the trade.

47.     Customers may also purchase and trade digital assets on Binance.com through other trading protocols, including bilateral transactions (also called "OTC") in which Binance.com acts as one counterparty to the trade, profiting from the spread between their bid to the initial party and ask quotations to other third parties. Binance.com customers can also acquire digital assets directly from Binance.com through its "Buy Crypto" functionality.

48.     In marketing Binance OTC, Binance has touted "a number of advantages to trading with us," including "Fast Settlement" and a "Simple Process – The trading discussion happens on chat, and a trade can be confirmed in as quickly as 1-2 minutes from the time you reach out to us for a price. Once we agree on a price, we fully take care of the settlement process by moving the coins you're selling out of your Binance account and the coins you're buying in . . . you don't need to send coins anywhere."

49.     Since the launch of the Binance.com platform, Binance provided OTC trading services through Merit Peak—a Zhou-owned entity—serving as the counterparty to customers on the Binance.com platform, and Merit Peak also provided market making services on the Binance.US platform.

50.     In part to fund the creation of the platform, from approximately June 26 to July 3, 2017, Zhao and Binance conducted an Initial Coin Offering ("ICO") of BNB that raised approximately $15 million from investors globally, including U.S. investors, by selling 100 million BNB tokens at an average price of $0.15 per token. As of June 27, 2023, BNB was trading as high as $239.16 and reached an all-time high of $676.32 on May 3, 2021.

51.     To promote the BNB ICO, Binance published a "Binance Exchange" whitepaper (the "Binance Whitepaper") announcing Binance's ambition to build "a world-class crypto exchange, powering the future of crypto finance," in which BNB would play an integral role as a so-called "exchange token"—i.e., a crypto asset associated by its issuer with a crypto asset trading platform that the issuer markets as an investment in the success of the platform itself. Central to the Binance Whitepaper's proposal was the "Binance Exchange Matching Engine" that would match crypto asset buy and sell orders and be "capable of sustaining 1,400,000 orders/second, making Binance one of the fastest exchanges in the market."

52.     Since BNB's inception, it has been offered and sold as an investment contract and thus, a security, due to Binance stating that purchasing BNB was an investment in Binance and its goal of creating a successful crypto asset trading platform. Moreover, Binance directly ties the success of BNB to the success of the Binance platforms using multiple maneuvers including using Binance profits to buy and destroy an increasing amount of BNB to create scarcity. As of June 2023, BNB is one of the top five most valuable crypto assets, by market cap, in the world.

53. According to the SEC, from the time it launched the Binance.com platform, Binance, under Zhao's control, has acted as an exchange, clearing agency, and broker-dealer in crypto asset securities without registering in those capacities.

54. Since Binance's inception and the launch of Binance.com, Zhao has been Binance's ultimate decision maker and Binance.com's CEO. All Binance employees directly or indirectly report to him. He had and continues to have the ability to exercise control—and does in fact exercise such control—over all aspects of Binance's business, including the operation of the Binance.com platform, and he directs and oversees the platform's various functions and services.

55. Binance, through the Binance.com platform, serves over 100 million customers throughout the world, and had an estimated 1.47 million U.S.-based investors in 2019. Much of its trading volume and profit arises from its extensive solicitation within the United States, including in this District. Binance holds itself out as operating the world's "largest crypto exchange by trade volume" and is reported to have amassed over half the global market share for digital asset exchange activity as of the end of 2022.

56. Binance.com offers a VIP program that gives additional benefits to traders who have more than 25 Binance Coins in any Binance.com wallet and trade over a certain threshold during a 30-day period. There are four levels of Binance VIP: Trader VIP, Holder VIP, Investor VIP and Borrower VIP. These members enjoy reduced fees, lower interest rates, higher borrowing limits and other benefits.

57. Binance has partnered with individuals such as Defendants Butler and Armstrong to publicly promote Binance and solicit new customers, including through traditional advertisements and through its "Affiliate Program" whereby partners receive kickbacks or commissions based on fees earned from individuals who enroll through their "Affiliate" links.

## II. Corporate Structure

58.    The SEC provided the following "high-level graphical representation of a certain limited number of relationships and entities" in the Binance enterprise, including the percentages owned by Zhao:



Complaint, *SEC v. Binance Holdings Ltd.*, No. 23-cv-01599, Dkt. No. 1 (D.D.C. June 5, 2023).

59.    As depicted in the chart above, Binance is not a single corporate entity, but rather an opaque web of corporate entities, all of which are ultimately controlled by Zhao. Though started from China, Binance has routinely moved its offices and changed entities to uphold its corporate policy of avoiding regulation. Binance chooses not to disclose the location of its executive offices, instead claiming that the headquarters is wherever Zhao is located at any point in time. Zhao explained this strategy during a June 2019 internal meeting, stating that Binance conducts its operations through various entities incorporated in numerous jurisdictions to "keep countries clean [of violations of law]" by "not landing .com anywhere. This is the main reason .com does not land anywhere." Binance has

had operations in at least the following places: China, Singapore, Malta, Dubai, Tokyo, Bermuda, Jersey, Cayman Islands, and the United States.

60.     Zhao directly or indirectly owns and controls all the corporate entities, including Binance.com, Binance IE, Binance Services, and dozens of other corporate vehicles included in the Binance ecosystem, that operate the Binance platforms together as a common enterprise. Binance's corporate organizational chart includes over 120 entities incorporated in numerous jurisdictions around the world. At times, at least some of those entities, including Binance, Binance IE, and Binance Services, have commingled or diverted funds, relied on shared technical infrastructure, and engaged in activities to collectively advertise and promote the Binance brand.

61.     Binance's reliance on a maze of corporate entities to operate the Binance platforms is deliberate; it is designed to obscure the ownership, control, and location of the Binance platforms. Consistent with this design, Binance.com's enigmatic Terms of Use define "Binance" as "an ecosystem comprising Binance websites (whose domain names include but are not limited to https://www.binance.com/en), mobile applications, clients, applets and other applications that are developed to offer Binance Services, and includes independently-operated platforms, websites and clients within the ecosystem" and the "Binance Operators" to include "all parties that run Binance, including but not limited to legal persons (including Binance UAB), unincorporated organizations and teams that provide Binance Services and are responsible for such services." The Terms of Use also state that Binance Operators and Binance are the same thing and the composition of the Binance Operators may change at any time.

62.     Binance is so effective at obfuscating its location and the identities of its operating companies that it has even confused the Chief Strategy Officer of Binance.com. For example, in September 2022 he was quoted as saying that "Binance is a Canadian company." The Chief Strategy

Officer's statement was quickly corrected by a Binance spokesperson, who clarified that Binance.com is an "international company."

      a.    <u>Zhao's Control over Binance</u>

63.    As founder of Binance and CEO of Binance.com, Zhao has been responsible for all major strategic decisions, business development, and management of the Binance enterprise. Zhao also involves himself in the minutiae of Binance.com's operations. For example, Zhao personally approved an approximately $60 expense related to office furniture in January 2021, a month in which Binance.com earned over $700 million in revenue.

64.    Zhao has been responsible for directing and overseeing the creation and operation of Binance's trade matching engines, websites, interface functionalities, and order entry system, all of which are tools designed to facilitate sales and solicitations of unregistered crypto-related securities. Zhao is also the public face of Binance; he represents Binance in public speaking engagements and appearances, gives interviews to magazines and other news media, and frequently authors Tweets and blog posts related to Binance business. Zhao possesses the power to direct the management and policies of the Binance entities, whether through the ownership of voting securities, by contract, or otherwise. There is effectively no genuine separateness between Zhao and Binance and as it relates to the management and policies of the entities, such that Zhao and Binance are practically synonymous.

65.    Over time, Zhao hired a senior management team that included Samuel Lim (Binance.com's first CCO from April 2018 to at least January 2022). However, Zhao has been involved in and ultimately retained control over all critical decisions for the enterprise, including which products to offer and whether and how to implement and enforce anti-money laundering ("AML") controls and Know Your Customer ("KYC") procedures. Zhao is ultimately responsible for evaluating the legal and regulatory risks associated with Binance's business activities, including those related to the launch of Binance.US, and has been directly involved in discussions with compliance consultants and

lawyers concerning legal and regulatory issues implicated by Binance's business activities. Zhao answers to no one but himself since neither Binance.com nor Binance has a board of directors.

b.   <u>Binance.com and the Binance.com Platform</u>

66.   Binance.com is the corporate entity which, since at least July 2017, has operated the Binance.com platform, an international crypto asset trading platform. In that time, Binance, under Zhao's control, acted as an exchange, clearing agency, and broker-dealer in crypto asset securities without registering in those capacities. The Binance.com platform markets itself as being available to customers in more than 100 countries; however, Defendants consistently and misleadingly claimed that Binance and the Binance.com trading platform did not serve U.S. customers.

c.   <u>Binance.US</u>

67.   In 2019, the Binance.US platform was launched to serve U.S. based customers, in contrast to the Binance.com platform. The Binance.US platform is ostensibly controlled by BAM Management and Binance.US. Zhao has claimed that these entities independently control the operation of the Binance.US platform; however, Zhao and Binance have maintained control over Binance.US throughout its existence.

d.   <u>Other Binance Entities</u>

68.   Binance IE is a holding company that has directly or indirectly owned at least 24 corporate entities that have acted as Binance's digital asset and virtual asset service providers in a variety of jurisdictions and held Binance's non-U.S. regulatory licenses.

69.   Binance Services is a holding company that has directly or indirectly owned at least 43 different corporate entities, including companies that conduct technology and operations services for Binance, hold the intellectual property related to Binance's matching engines and financial products, and enter into contracts with vendors, as well as a company called Ality Technologies DE LLC that functions as Binance's "U.S. Tech/Ops Hub."

70.     Binance UAB is incorporated in Lithuania and directly or indirectly owned by Zhao. Binance UAB is the only entity specifically identified as one of the indeterminate groups of "Binance Operators" referenced in Binance's Terms of Use.

71.     Merit Peak is incorporated in the British Virgin Islands where Zhao is a beneficial owner and several Binance employees conducted its operations. Merit Peak has primarily engaged in over the counter ("OTC") transactions with institutional counterparties, serving as an undisclosed intermediary to transfer customer money. It was also one of the early market makers on the Binance.US platform and diverted $16 million to BAM Management to fund Binance.US. Since the launch of Binance.US, Merit Peak's bank account has received over $20 billion of customer funds from both Binance platforms as a "pass through" to trust entities.

72.     Sigma Chain is incorporated in Switzerland where Zhao is a beneficial owner and several Binance employees conducted its operations. It has engaged in proprietary trading in Binance's various markets, including its markets for digital asset derivatives, serving as the main market maker for the international platform. Sigma Chain participates in OTC trading, Convert Trading, and One Click Buy Sell services while serving as one of the counterparties to the Binance.US platform. By 2021, at least $190 million was transferred from Zhao entities, including Binance.US, to Sigma Chain, with the entity spending $11 million of Binance.US's funds on a yacht. Binance employees within Sigma Chain have also engaged in manipulative "wash trading" from 2019 through at least June 2022 that inflated Binance.US's trading volume artificially to deceive equity investors.

**III.   Account Creation**

73.     To utilize any of the functionalities on the Binance.com platform, investors must create and fund accounts with Binance.com. Customers must have sufficient assets in their accounts to cover the value of any trading order, plus applicable fees. Once customers have funded their

Binance.com accounts, they can buy, sell, transfer, and store crypto assets on the Binance.com platform.

74.     Binance.com customers may open accounts through the user interface available at www.binance.com, through a mobile application, and by direct connection to Binance.com's matching engines via Binance.com's application programming interface ("API").

75.     Customers can establish and fund Binance.com accounts with fiat currency or crypto assets. There are separate procedures for depositing crypto assets and for depositing fiat currency. To deposit crypto assets, customers are required to transfer crypto assets from their own crypto asset wallets on the blockchain to wallets that Binance.com controls. Binance.com holds these customer crypto assets in omnibus wallets, and it tracks transactions on the Binance.com platform on an internal ledger.

76.     If a customer submits a request to withdraw crypto assets from the Binance.com platform, Binance.com transfers the requested amount of crypto assets from its omnibus wallets to a wallet designated by the customer on the relevant blockchain.

77.     Since at least 2018, customers could fund their accounts and purchase crypto assets with U.S. dollars or other fiat currencies by, among other things, linking credit cards through a third-party processor, or through bank accounts or payment services. It also has corresponding methods of permitting customers to withdraw in fiat.

78.     Until at least 2021, accounts in the name of Binance entities, beneficially owned by Zhao, sent billions of dollars of customer assets to U.S.-based bank accounts in the name of Merit Peak, which transferred to Paxos all of those funds that appear to relate to the issuance of BUSD. The use of Merit Peak as an intermediary to transfer platform customer money to buy BUSD presented an undisclosed counterparty risk for investors.

23

79.     Binance.com clears and settles all trades on the Binance.com platform. After matching a buy and sell order, Binance.com settles the resulting trade by debiting and crediting the accounts associated with each of the counterparties on the internal ledger Binance.com maintains. Customer crypto assets generally stay in Binance.com-controlled omnibus wallets.

80.     Account creation and management on the Binance.US platform functions largely the same as on the Binance.com platform. The main differences are that (1) Binance.com offers certain trading options, such as futures, that are not available through Binance.US, (2) Binance.com allows you to use a debit or credit card for transactions, and (3) Binance.com has six times more cryptocurrencies on its platform.

### IV.  Profit Sources

a.      Fees

81.     The Binance platforms derive their revenue primarily from taking fees for transactions in crypto assets effectuated through the platforms. Transaction fees vary based on the product and the customer's trading volume. For spot trading, Binance.com typically charges between 0.015 percent and 0.2 percent of the nominal value of transactions, depending on various parameters. Binance.com also charges fees for withdrawals and for trading on margin. The fees are generally the same for both platforms.

82.     By 2018, Binance.com had become the world's largest exchange by trading volume with a market cap exceeding $1.3 billion. By 2021, Binance.com's trading volume spiked to $9.58 trillion, remaining the largest crypto asset trading platform in the world. This large trading volume allowed the platform to earn at least $11.6 billion from U.S. customers between 2018 and 2021. By May 2021, Binance.com's monthly revenue earned from derivatives transactions increased to $1.14 billion.

83.     It is estimated that Binance.US makes about $80 million in revenue each year.

84.     In a December 2022 interview, Zhao estimated that transaction revenue accounts for approximately 90 percent of Binance.com's revenue.  A meaningful percentage of that revenue has been and continues to be derived from digital asset derivative transactions entered into by U.S. customers, including customers in Florida.

85.     According to internal documents for the month of August 2020, the Binance.com platform earned $63 million in fees from derivatives transactions and approximately 16% of its accounts were held by customers Binance identified as being located in the United States.

b.     <u>Offer and Sale of Tokens</u>

86.     The offer and sale of BNB was integral in propping up and increasing the value of Binance and its platforms. As the price of BNB rose from consumer investment and demand, Binance and Zhao benefited from the direct increase in the value of their enormous holdings of BNB. To further these profits, Binance and Zhao have consistently led BNB investors to believe that BNB's price is tied to the success of the Binance platforms and the Binance ecosystem.

87.     The offer and sale of BUSD was important to legitimize the platforms. The stable coin would in theory remain pegged to the U.S. dollar and backed by U.S. dollar reserves. It would thereby provide a stable alternative to the high volatility of most cryptocurrencies, which has made crypto investments less suitable for common transactions.

88.     In addition to BNB and BUSD, other tokens like SOL, ADA, MATIC, FIL, ATOM, SAND, MANA, ALGO, AXS, and COTI were actively traded on both Binance platforms, for consideration including U.S. dollars, fiat currencies, or other crypto assets. Having a wide selection of non-Binance tokens allowed Binance to attract more consumers to its platforms and thereby benefit from the fees generated by the resulting transactions. Binance directly offered, sold, and solicited

purchases and transactions for these tokens through its platforms. Binance also promoted these and other tokens on its websites and platforms.[4]

        c.     <u>Offering Programs That Benefit Binance and Investors</u>

89.     Binance also marketed products and programs that would benefit itself by incentivizing consumers to invest their money and tokens with Binance platforms.

90.     For example, the Simple Earn programs were marketed as paying interest to investors who lent their crypto assets to Binance.com for fixed or flexible lengths of time.

91.     BNB Vault is a similar program that is limited to holders of BNB and described on Binance.com as a "BNB yield aggregator" whereby investors can lend their BNB to Binance.com to earn investment returns.

92.     These products sometimes involved staking programs like "Launchpool," a product advertised as rewarding users for staking tokens in connection with new token launches.

93.     Binance.US offered consumers a similar staking program as a superior and easier way to obtain staking rewards than individual staking by pooling the crypto assets of many investors. In exchange for staking with Binance.US the company promises consumers rewards rates of up to 12.00%.

        d.     <u>Allegations of Transfers of Customer Funds</u>

94.     Zhao and Binance also profited from unfettered and rarely scrutinized access to huge customer fund accounts.

---

[4] *See, e.g.*, https://www.binance.com/en/price/solana (offering SOL and a description of the token); https://academy.binance.com/en/articles/what-is-solana-sol#Closing-Thoughts (discussing and promoting SOL through the Binance Academy website).

95.     The SEC has alleged that Zhao and Guangying Chen received billions of dollars of customer funds.[5] Zhao received the funds via an intermediary holding company called Key Vision Development Limited. An analysis of bank statements of Binance and Zhao's companies suggests that $12 billion was sent to Zhao and $162 million to a company controlled by Chen. The SEC alleges that most of these funds are now in offshore accounts.

96.     Other unexplained transfers of customer funds include bank records showing Prime Trust, a custodian firm based in Nevada, who was holding Binance.US customer funds, moved $650 million in wire transfers to the Binance.US account during Q1 2021. It is not clear after review "why the transfers were made or whether the money belonged to Binance.US customers."[6]

**V.   Binance Offered and Sold Unregistered Securities**

97.     For years now, Binance.com and Binance.US have violated federal and state securities laws by illegally conducting unregistered offers and sales of securities to U.S. investors.

98.     Both platforms allowed consumers to participate in the offer and sale of tokens like BNB, BUSD, SOL, ADA, MATIC, FIL, ATOM, SAND, MANA, ALGO, AXS, and COTI. On the Binance.com platform, consumers could participate in the offer and sale of investment programs like "BNB Vault", and "Simple Earn". On the Binance.US platform, consumers could participate in the offer and sale of a staking-as-a-service program ("Staking Program").

99.     No exemption from registration applied or applies for these public offerings of securities. Neither platform ever registered any of their offers and sales of the tokens listed above or their investment programs with the SEC, the State of Florida, or any other state's analogous state agency.

---

[5]     https://www.coindesk.com/policy/2023/06/08/binance-redirected-12b-to-firms-controlled-by-ceo-changpeng-zhao-sec-says/.

[6]     https://www.kitco.com/news/2023-02-17/Regulators-now-directly-targeting-Binance-and-their-U-S-partners-and-affiliates.html.

a.     BNB

100.     BNB is an ERC-20 token that Binance issued on the Ethereum blockchain. Each BNB token is effectively identical to every other BNB token, and the price of all BNB tokens increases or decreases together. In June 2017, Binance began issuing BNB—which was called "Binance Coin" until February 2022—in an ICO explicitly meant to fund the launch of the Binance.com platform.

101.     BNB has traded on the Binance.com platform since its launch in July 2017, and it has traded on the Binance.US platform since its launch in September 2019. BNB is also traded and has also been traded on a wide array of other platforms, including for example Crypto.com, KuCoin, BitGlobal, Coinbase, and FTX. Plaintiff Lewis, for instance, only purchased BNB on Crypto.com.

102.     Binance's BNB ICO was marketed and sold to investors globally, and Binance imposed no restrictions on U.S. investments in BNB or on the ability of BNB investors to immediately resell BNB to U.S. investors.

103.     From the time of the ICO to the present, BNB was offered and sold as an investment contract and, therefore, as a security.

104.     Binance offered and sold BNB as an exchange token, marketing it to investors as an investment in the success of the Binance.com platform itself and touting both the potential returns that investors could achieve from purchasing the token by transacting on the platform and that investors could expect increased demand and price for the token as the platform grew.

105.     As described herein, Binance and Zhao provided and continue to provide essential managerial efforts that affected the success of the Binance enterprise and the value of BNB. Investors reasonably expect to derive profit from these efforts. Binance intends purchasers of BNB to rely on its efforts in managing tasks necessary for the tokens to achieve or retain value and functionality. Binance and Zhao created and support the market for, and price of, BNB tokens—including by controlling or influencing the issuance and availability of BNB tokens, and making determinations

about the concomitant rights and characteristics associated with BNB that effect its value. These include making judgments that directly impact the success and value of BNB, including decisions about how and where to make BNB available, how to deploy funds raised from initial sales/offerings of tokens to increase their value, and how to maintain the ongoing security of the Binance platform.

106.    For example, in a press release from February 15, 2022, Binance touted its decision to merge the functions of the Binance Chain and Binance Smart Chain, which "have merged to become BNB Chain." Binance told its customers that this was done in an effort to increase the potential value of BNB, writing that: "For BNB to reach its true potential, Binance and BSC must set sail on different courses. Today, Binance Chain and Binance Smart Chain (BSC) have become BNB Chain."

107.    Furthermore, whether purchasers invested in BNB that was sold or issued directly from Binance, purchased on the Binance platform, traded OTC, or purchased on another crypto exchange, such purchasers reasonably expected Binance to undertake efforts to enhance the value of the BNB ecosystem. This expectation was fostered and encouraged by Binance itself. In addition, because the finances, profit, and performance of Binance (as well as the finances of Binance's executives) significantly depended on the value of BNB, they took steps, and had incentive to take steps, to maximize the value of the security through their own efforts and activities.

108.    To promote its ICO, Binance issued the Binance Whitepaper to prospective BNB investors globally over the internet. The Binance Whitepaper explained that the purpose of the ICO was to raise money for Binance's team to "build a world-class crypto exchange," but that Binance needed the "help" of ICO "investors." The Binance Whitepaper gave an overview of its proposed new crypto asset platform, touting several competitive advantages the Binance.com platform would supposedly have over other crypto asset platforms due to Zhao and his cohort's supposed entrepreneurial and managerial expertise and control over the trading platform.

109.    The Binance Whitepaper repeatedly referred to ICO participants as "investors," and it lauded the credentials and financial expertise of Zhao and other founding members to create a successful crypto asset platform. Among other things, it highlighted that Zhao had "exchange experience" working on the Tokyo Stock Exchange and that several other "Founding Team" members had experience in the securities industry. It further touted that Binance's "team has decades of combined experience building and maintaining world class financial systems that shape the economy. We understand how these systems are built from the ground up."

110.    The Binance Whitepaper concluded, "We know this will be an ultra competitive space. There are probably hundreds, if not thousands of teams wanting, planning or doing exchanges. Competition will be fierce. But in this age, this is a common risk in any decent concept/startup or mature company. The question is: given our team, track record, experience, industry resources and product, do you believe we stand a better chance than the rest of the pack? If yes, then please join our ICO."

111.    During the ICO, Binance created 200 million BNB on the Ethereum blockchain and stated publicly that it would never issue more BNB. Binance offered 100 million of the 200 million BNB in the ICO at approximately $0.15 per coin, and Binance structured the ICO in phases that involved increasing BNB prices with each phase (effectively offering a sale discount and potential immediate resale profit to early BNB investors). In less than a month, Binance had sold all 100 million BNB tokens during the ICO's first phase at $0.15.

112.    In the Binance Whitepaper, Binance also stated that it would reserve 40 percent of all BNB tokens, or 80 million BNB, for its "Founding Team" and 10 percent, or 20 million BNB, for "Angel investors" who purchased BNB prior to the ICO. For the Founding Team's BNB allocation of 80 million BNB, Binance established a "vesting plan" that permitted the release of 20 percent of

the 80 million BNB allocation, or 16 million BNB, during the ICO that was unrestricted at the time of issuance, and another 20 percent every year for four years.

113.     Further, the Binance Whitepaper stated that Binance would "destroy," or burn, half of the BNB over time by using Binance.com's profits with respect to the Binance.com platform to repurchase and then destroy BNB. Binance subsequently announced plans to accelerate the BNB burn rate. In pledging to use Binance.com's profits to decrease the supply of BNB over time, Binance gave BNB investors a reasonable expectation of profits because lower supply tends to increase price, similar to how a stock issuer uses profits to provide dividends to investors or to execute stock buybacks to increase the ownership stake of remaining shareholders. In other words, in stating that it would use the profits from the platform to effectively support the price of BNB, Binance further tied its success to BNB's success as well.

114.     Indeed, on July 9, 2019, Zhao described Binance's planned BNB burn in an interview posted on YouTube, stating that a "benefit we promised in the Whitepaper is every quarter we will use 20 percent of our profits to buy back [BNB] at the market value … we will buy back and destroy those. We will destroy up to 100 million Binance coins. Basically half of all available coins … Financially that works the same way as a dividend economically."

115.     Binance raised approximately $15 million through its ICO by selling BNB to about 20,000 investors globally. Approximately 32 U.S.-based investors purchased at least 504,000 BNB tokens during the ICO.

116.     Binance pooled the proceeds of its BNB ICO to develop the Binance.com platform—as it stated publicly it would. The Binance Whitepaper explained to BNB investors that funds raised by the ICO were to build the Binance.com platform. It provided the following fund allocation: (1) 35 percent "to build the Binance platform"; (2) 50 percent for "Binance branding and marketing,"

including to make Binance "popular among investors"; and (3) 15 percent in "reserve" for emergencies.

117.     In public comments after the ICO was completed, Zhao noted the benefits of the ICO process to include brand recognition while "getting investment at the same time."

118.     Since the ICO, Binance has encouraged the Binance.com and Binance.US platforms' customers to buy BNB by offering a 25 percent discount when investors use BNB to purchase a crypto asset. (This discount was 50 percent in the first year after the BNB ICO.) Accordingly, Binance creates additional financial incentives to buy BNB, thereby increasing demand for BNB, and its value. The trading discounts that Binance offered BNB purchasers further tie BNB's success, and thus BNB purchasers' profits, to Binance's success.

119.     Binance has continued to tout the investment potential of BNB over time, and has continued to tell investors after the ICO that Binance's efforts to make the Binance platforms more profitable will increase BNB's value.

120.     For example, in an interview broadcasted globally on YouTube.com on October 10, 2018, Binance.com's Chief Growth Officer stated, "By having people invest in BNB token, they're even more interested in the success [of the Binance.com platform] . . . By holding BNB, you are effectively holding an influential share of the crypto project."

121.     In an interview broadcasted globally on YouTube.com on January 10, 2020, Binance.com's Managing Director stated, "Recently we launched lending, we launched staking, we launched futures, all of those new businesses contribute to the value of BNB."

122.     In an internal Binance town hall on December 17, 2020, Zhao stated, "[M]ost [use cases for BNB] are still early stage … [the Binance.com platform] is [a] relatively big driving force for [BNB] value … For anything we are significantly involved in we'll push BNB as much as we can. We're also incentivizing the ecosystem … we have the Binance smart chain fund which we pledge

$100 million we've given out … 20-30 grants already each one of them maybe about $100K or $50K um just for developers to come up with new use cases." Zhao also stated, "I believe 100% that BNB will outpace BTC [bitcoin] … if I didn't believe that I would just hold BTC … I'm fully bullish that BNB will outrun BTC."

123.    In an interview with Forbes on July 29, 2021, then Binance.US CEO Brian Brooks stated, "[W]e have learned a lot from the BNB coin (the Binance token) about the power of coupling incentives inside of a smart contract with fungibility. Think about what the Binance token is—it represents the right to receive discounts on our trading fees, which people use it for, a lot. But increasingly, people are choosing to hold the token, rather than spend it for the discount because they found that the increased value of the token as the company grows, exceeds the financial value of the discounts. And so it gets our customers to act a little bit more like owners— people who want the company to succeed; their interests are aligned with that of the company."

124.    Binance has additionally worked to increase demand for BNB by seeking to create additional ways in which BNB can be used—thereby further increasing demand for the token and its value. For example, Binance launched a $7.5 billion "venture capital arm" called "Binance Labs." Binance Labs has invested more than $500 million in grants to individuals and entities developing applications for Binance blockchains, including BNB-related applications. And in October 2022, Binance announced that Binance Labs was investing in seven new projects that, as a Binance founder described, "will grow further and positively impact the BNB Chain and the broader crypto ecosystem."

125.    While Binance.com initially launched BNB on its own platform, it has also sought to make BNB available for trading on other platforms that, like the Binance platforms, tend to attract investors in crypto assets. On June 28, 2017, Zhao explained, "Our current intention is to focus on building a successful exchange platform first. The coin will be valuable if the exchange [] has high trading volume, naturally people will want to buy and use the coin to pay for fees, which creates

circulation and liquidity. We won't be aggressively asking other exchanges to list the coin on their exchange. But if they want to, we won't (can't) stop it. We will happily support them, as it is good for us to have it trading on other exchanges as well." As of March 30, 2023, BNB was traded on more than 100 crypto asset trading platforms, Crypto.com, KuCoin, BitGlobal, Coinbase, and FTX. Plaintiff Lewis, for instance, only purchased BNB on Crypto.com.

126.    In addition, since at least 2019, Binance has offered and sold BNB to employees in the United States and elsewhere by offering to pay salaries in BNB.

127.    Publicly reminding investors what the economic reality made plain—that the Binance entities and their employees' fortunes with respect to BNB were tied to BNB investors' fortunes— Binance has frequently touted the popularity of Binance.com's program of offering BNB as employee compensation. For example, in a February 11, 2019 interview, Zhao stated, "Almost all [employees] take some comp in BNB. Many take 100% in BNB. They know what we do, and how we do it, literally, from inside out. And it is an easy decision for them to make."

128.    Between 2019 and 2022, at least 37 U.S.-based Binance.com employees received over $3.89 million worth of BNB as salary. Binance.com did not place any restriction on these employees' ability to resell their BNB tokens to any person, in whatever amounts they wished.

129.    Binance has also offered and sold BNB to recruit new employees to work with Binance.com or Binance.US. For example, when Zhao hired Binance.US's first CEO, she received 50,000 BNB as an "Incentive Bonus."

130.    Further, in internal town halls, Zhao frequently touted Binance.com's Employee Stock Token Options Plan ("ESTOP"), which granted high performing employees BNB, essentially equivalent to employee stock options, as the best way for employees to profit from the growth of the Binance.com platform. He has also encouraged employees to hold BNB to share in Binance.com's profits, noting that it would correlate closely to the company's long-term financial growth.

b.      BUSD

131.    BUSD is an ERC-20 token issued on the Ethereum blockchain.

132.    From September 2019 through June 2023, Binance offered and sold BUSD to U.S. investors on both Binance platforms as part of a profit-earning scheme within the Binance ecosystem, touting returns for investors from simply buying BUSD or deploying it in Binance profit-generating programs. BUSD is also offered and sold and has been offered and sold on other crypto platforms, such as Crypto.com or FTX.

133.    Since its inception, BUSD has been offered and sold as an investment contract and, therefore, as a security.

134.    Pursuant to a September 5, 2019 "Stablecoin as a Service Agreement" ("BUSD Agreement") between Binance (Switzerland) AG, a Binance affiliate, and Paxos, the parties agreed to "build and manage the platform on which BUSD can be issued and redeemed" in exchange for one U.S. Dollar and to maintain reserves supporting redemptions. Binance's affiliate agreed to "list, market, and promote BUSD" to investors. Binance has since marketed BUSD as a so-called "stablecoin"—purportedly backed with cash (and cash equivalent) reserves and redeemable on a 1:1 basis for U.S. dollars—that allows investors to participate in various profit-making schemes available through the Binance ecosystem. Paxos agreed to invest the BUSD reserves (essentially, proceeds from investors' BUSD purchases) in profit-generating opportunities for the benefit of both Paxos and Binance. Paxos and Binance agreed that they would evenly split the net interest revenue earned on the reserves underlying BUSD.

135.    In February 2023, over $16 billion worth of BUSD were in circulation. Approximately 90 percent of outstanding BUSD at that time was held in wallets controlled by Binance, most of which was BUSD deposited by investors and held in Binance omnibus wallets.

136.     On February 21, 2023, NYDFS—which regulates Paxos as a limited purpose New York trust company and authorized it to offer BUSD subject to anti-money laundering, anti-fraud, and consumer protection laws—directed Paxos to stop minting BUSD "as a result of several unresolved issues related to [Paxos's] oversight of its relationship with Binance."

137.     Through February 2023, investors in the U.S. and elsewhere could purchase BUSD from Paxos. After the NYDFS order, Paxos announced it would stop issuing new BUSD tokens, but that the stablecoin will remain "fully supported" and "redeemable" by Paxos through "at least" February 2024.[7] With no more BUSD being issued, the June 2023 BUSD circulation is $4.5 billion.

138.     BUSD purchasers invested in a common enterprise with each other and with Binance—the BUSD ecosystem through which BUSD holders and Binance could and did earn returns through various forms of capital deployment. The proceeds from investor purchases of BUSD were purportedly pooled in reserves, and Binance earned 50 percent of the investment returns on those pooled assets (which increased as more investors purchased BUSD). Binance then used at least a portion of those returns to enable and promote the Binance ecosystem that gave BUSD its profit potential.

139.     Binance has, from the outset, marketed BUSD's profit-earning potential and referred to the various "APYs" (annual percentage yield) that investors may earn with respect to their BUSD holdings. The BUSD profit opportunities promoted by Binance include the "Binance Earn" programs, as well as margin and futures products.

140.     For instance, investors were offered a "BUSD Reward Program" that promised interest payments to BUSD investors merely for holding BUSD on the Ethereum blockchain. Binance explained to investors that it would "rank all crypto addresses that hold BUSD based on the average daily amount of BUSD held within 30 days. After that, we distribute a set amount of BUSD according

---

[7] https://paxos.com/2023/02/13/paxos-will-halt-minting-new-busd-tokens/.

to the percentage of the crypto addresses' holdings relative to the total market cap of BUSD." Binance continued: "In effect, the BUSD Reward Program allows you to earn additional funds on top of what you already earn from DeFi." In other words, while investors' profits with respect to Binance's crypto asset security BNB came in the form of price appreciation, BUSD investors' expectation of profits came from the potential for direct, interest-like payments made by Binance, in part from the proceeds of deploying BUSD investors' capital.

141.    Binance touted and promoted these profit-making opportunities. For example, in a September 2020 article posted on to the website, Binance celebrated BUSD hitting a $1 billion market cap "in just 261 days, the fastest-ever for a stablecoin." A subsequent Binance blog post touted "various earning opportunities for holding BUSD in Binance," including "Binance Flexible Savings, through which you can earn a bonus BUSD at a 2%-5% APY" and "an auto-deposit function, which automatically transfers BUSD from your spot wallet to Flexible Savings, making it possible for you to earn even if you forget to proactively save," a "Binance Launchpool" where a user's "BUSD deposit will get you a share of the free tokens from the offerings that launch on the platform and include BUSD in their yield options," and "DeFi staking offerings" that "can give you around 20%-30% APY."

c.    Other Tokens Offered on Binance Platforms

142.     In addition to BNB and BUSD, other tokens like SOL, ADA, MATIC, FIL, ATOM, SAND, MANA, ALGO, AXS, and COTI were actively offered, sold, and traded on both Binance platforms.

143.    These tokens are offered and sold as investment contracts and, therefore, as securities.

144.    Consumers purchase the token expecting their value to increase. Any increase in the value of these tokens is contingent on further investment and promotion by others. These tokens, therefore, are "securities" under the *Howey* test.

145.     Investors reasonably expected to derive profits from these crypto-related securities—which were offered for purchase or sale through Binance—through the increase in the tokens' value based on the efforts of others, including the promotors, sponsors, inventors, issuers, and/or other third parties that provide essential managerial efforts that affected the success and value of the securities. The market for, and price of, these tokens also depended on efforts and determinations of third parties about how or where the tokens could be traded, how to deploy funds raised from initial sales/offerings of tokens, and other judgments that directly impact the value of the tokens. These are classic securities.

d.     Binance's BNB Vault and Simple Earn Programs

146.     The BNB Vault and Simple Earn programs were other securities offered on the Binance.com platform.

147.     Binance has regularly marketed the Simple Earn and BNB Vault programs as profit-making opportunities to investors in the United States and elsewhere.

148.     With Simple Earn, investors would earn interest for lending their crypto assets to Binance.com for fixed or flexible lengths of time. The interest paid depends on the crypto asset lent and the duration of the loan. For instance, investors who lent a particular crypto asset through Simple Earn as of April 24, 2023 were promised profits of 18.9%.

149.     Binance.com determines the Simple Earn rate for each of its offerings at its discretion, taking into account various "factors which are carefully designed to ensure that rewards paid to users are sustainable and competitive."

150.     According to Binance, it may pool assets loaned through Simple Earn and use its managerial expertise to deploy them "for a variety of purposes," including on-chain staking, loans, or for operational purposes by other Binance business units.

151. Throughout the spring of 2020, Binance tweeted that it was offering a 15% APR for participants in the BUSD-specific Simple Earn product, and 10% in the Simple Earn product for another crypto asset.

152. With BNB Vault, investors can lend their BNB to Binance.com to earn investment returns. This program was described on Binance.com as a "BNB yield aggregator."

153. In November 2020, Binance announced the BNB Vault launch: "#Binance Launches BNB Vault – Earn Daily Income from the $BNB Ecosystem."

154. Binance.com states on its website that BNB "deposited" in BNB Vault will be "flexibly allocated in different products to help users maximize potential rewards." These products include Simple Earn and the staking program Launchpool. Like Simple Earn, Binance has offered varying APR returns for BNB Vault investors.

155. One tweet from Binance touted the profit potential of BNB Vault: "Just one click can increase how much you earn with your #BNB. BNB Vault combines the multiple income benefits of #Binance Smart Chain, Launchpool, Savings, #DeFi Staking, and more through just one interface." A second tweet linked to a Binance.com page with a heading "Introducing BNB Vault: One-Click Earning for Your BNB Holdings."

156. In both the Simple Earn and BNB Vault programs, Binance pools the crypto assets lent by investors and uses those assets to generate revenue that was used to pay returns to investors in Simple Earn and BNB Vault. Investors share pro rata the benefits of their pooled investments in the Simple Earn and BNB Vault programs.

157. Binance exercises discretion and uses its entrepreneurial expertise in managing both programs, including identifying liquidity needs, negotiating with Launchpool issuers, choosing terms, holding and controlling the invested assets, and generating revenue, through its operation of the Binance.com platform to pay the Simple Earn and BNB Vault investors. Binance intended investors

to believe that their investments in these crypto-related securities would achieve value from the efforts of others, including the Binance entities that provided essential managerial efforts that affected the success of the investments.

158.    From October 2019 through October 2022, at least 3,200 and as many as 16,500 U.S. investors have participated in the Simple Earn investment programs, and at least 1,400 U.S. investors have participated in the BNB Vault program.

159.    Since the inception of each, Simple Earn and BNB Vault have been offered and sold on the Binance.com platform as investment contracts and, therefore, as securities.

      e.    <u>Binance.US's Staking Program</u>

160.    In or around February 2020, investors were able to participate in the Binance.US Staking Program. Binance marketed the program to the public as a way to earn "passive income" through the efforts of Binance. While, in theory, any individual can seek profit through their own staking efforts, the Binance.US Staking Program was promised as a superior and much easier way to obtain staking rewards by, among other things, pooling the crypto assets of a large number of investors.

161.    Binance.US's Staking Program capitalizes on the reward structure of the "Proof of Stake" consensus mechanism used by some blockchains to reach agreement about which transactions are valid, to update the blockchain accordingly, and to reward participants with additional crypto assets. A blockchain using the Proof of Stake consensus mechanism selects a "validator" from a pool of node operators who have agreed to certain requirements necessary to maintain the blockchain and construct new blocks.

162.    To be considered for selection into the pool, a potential validator must commit, or "stake," a set amount of the blockchain's native asset. These staked assets are held as collateral in the protocol to incentivize validators to perform required functions. A "correction penalty" is deducted,

or "slashed," from the staked assets of validators who underperform. Conversely, validators earn rewards in the form of additional amounts of the native asset by timely voting on proposed blocks, proposing new blocks, and participating in related consensus activities.

163.    To create a new block, the protocol chooses a validator from among those that have staked. The more one stakes, the more likely one is to be selected as a validator and receive the maximum staking reward. The most successful staking operations maximize the chances of being selected by staking a large number of assets and minimizing server downtime.

164.    Individuals can stake assets on their own, but this requires considerable technical know-how. Accordingly, Binance.US markets its Staking Program as a way for investors to rely on and profit from Binance.US's technical expertise and knowhow, industry relationships, and infrastructure to reap the benefits of staking as a passive investment opportunity. Binance.US also touts the advantages its staking programs offer over staking independently. These advantages include instant reward accrual, shorter holding periods, low (or no) upfront deposits or staking minimums, compensation for slashing penalties, regularly scheduled payouts at certain rates, and an easy-to-use interface that requires "just a few clicks" to reap passive income.

165.    As Binance.US explains on its website:

> Independent cryptocurrency staking can be a daunting process for most individuals. In addition to meeting hardware requirements that may vary from asset to asset, users may also need to install and run their own nodes. That's where Binance.US Staking comes in. With a user-friendly interface and industry-leading uptime across nodes, Staking is the destination of choice for customers looking to earn rewards on their assets.

166.    Binance.US publishes on its website the list of staking-eligible crypto assets (which has changed over time), and the annualized percentage yield (or reward rate) offered to investors with respect to each asset. The web-based interface and mobile app for the Binance.US platform also allows users to designate the tokens that they want to stake in the program.

167. The Staking Program's terms have evolved over time, but Binance.US's marketing has consistently focused on the competitive yield it offers, touting a wide range of assets that users can earn profits by staking. Users are also told that the stated APY is purportedly calculated based on factors such as "Network conditions," "Staking configuration," and "Supply and demand." Binance.US's "Terms of Use" further state that the quoted APY "is an estimate only and not guaranteed," and is determined (and may change) in BAM's "sole and absolute discretion." Binance.US also states that it will deduct a commission from the returns that Binance.US earns on staking, before paying investors. Binance.US determines how and when investors' tokens will be staked, and how and when rewards, if any, will be distributed.

168. Binance.US also markets its Staking Program as a way to avoid minimum staking requirements imposed under certain blockchain protocols and to maintain liquidity. For example, Binance.US notes that individual investors who wish to independently stake on the Ethereum 2.0 Proof of Stake consensus would need a minimum of 32 ETH (nearly $60,000 at recent values) and agree to long lock-up periods to become a validator. By pooling investor assets to launch Binance-controlled validators, Binance.US allows investors to participate with a minimum of just 0.0001 ETH (less than $2).

169. Binance.US has engaged in the unregistered offer and sale of its Staking Program as an investment contract, and thus, as a security.

170. Participation in Binance.US's Staking Program requires the investment of money in the form of crypto assets. Investors risk loss if Binance.US fails to perform as a validator, is assessed slashing penalties for which it cannot make investors whole, or if assets are otherwise lost if Binance.US fails to detect or manage hacking and other risks as it is executing its staking strategy, over which Binance.US retains absolute discretion. Investors also face risk of loss if the staked crypto assets

significantly decrease in market value while staked because Binance.US will not allow users to sell or withdraw crypto assets while they are staked.

171.   For each staking-eligible crypto asset that is a part of the Staking Program, Binance.US, directly or through affiliates or other third parties, pools investor assets in a common "staking pool" in which investors "combine their staking power and share the rewards proportionally to their contributions to the pool." Moreover, for as long as the investors choose to stake their tokens, investors receive payouts from Binance.US that are distributed to them pro rata. In addition, the larger the pool of assets for staking for each particular staking-eligible crypto asset, the higher the likelihood of obtaining rewards, which inures to the benefit of all investors in that particular asset, as well as Binance.US, such as, for example, in the form of fees from the Staking Program. Binance.US does not segregate or separately manage any crypto assets that ostensibly belong to any particular investor's account as part of the Staking Program. Instead, all assets of the same type tendered into the Staking Program are pooled together.

172.   Finally, as alleged above, Binance has consistently promoted the Binance.US Staking Program in a way that fuels reasonable expectations of profits from Binance and Binance.US's efforts. Binance marketed the program as an investment to "earn" payouts or "yield" and claimed it would work to provide immediate, reliable, and predictable profitability on that investment. Investors in the Staking Program rely on Binance and Binance.US's pooling of the invested tokens and efforts in successfully validating transaction blocks on the relevant blockchains.

173.   Binance intended investors to believe that their investments in this program would achieve and maintain value from the efforts of others, including the Binance entities that provided essential managerial efforts that affect the success of the investments.

f.     Other Binance Entities

174.    Binance Services and Binance IE were part of the Binance network of companies that helped run and facilitate the Binance platforms. They played an integral role in offering, selling, and promoting unregistered securities to the masses.

## VI.   Targeting U.S. Customers

175.    Binance purposefully grew, maintained, and simultaneously concealed its U.S. customer base while also failing to implement an effective AML program that is required of financial institutions to detect and prevent terrorist financing or other criminal activity, among other things. One component of this failure to implement an effective AML program is Binance's ongoing lack of effective KYC procedures or a Customer Identification Program ("CIP") that would enable it to identify its customers, whether from the United States or elsewhere. Further, as of at least May 2022, Binance had not filed a single suspicious activity report ("SAR") in the United States despite having filed such reports in other jurisdictions.

176.    For approximately the first two years of its operations, Binance did not take any steps to limit or restrict the ability of U.S. customers to trade on the platform, with an estimated 1.47 million U.S.-based investors on the international platform through KYC verification.

a.     Binance Concocts a Plan to Solicit U.S. Customers While Avoiding U.S. Regulation

177.    To avoid the application of U.S. law, Binance set up a façade, purporting to segregate U.S. customers into a separate entity with strict compliance measures in place, while simultaneously knowing and actively facilitating U.S. customers' unregulated use of the main Binance.com international platform, putting the safety of billions of dollars of U.S. investor assets at risk.

178.    Beginning no later than July 2019 and continuing through the present, Binance, under Zhao's direction and control and with Lim's willful and substantial assistance, has solicited and accepted orders, accepted property to margin, and operated a facility for the trading of futures,

options, swaps, and leveraged retail commodity transactions involving digital assets that are commodities including bitcoin (BTC), ether (ETH), and litecoin (LTC) for persons in the United States.

179.    Forbes first broke the story on October 29, 2020, writing:

> The 2018 document details plans for a yet-unnamed U.S. company dubbed the "Tai Chi entity," in an allusion to the Chinese martial art whose approach is built around the principle of "yield and overcome," or using an opponent's own weight against him. While Binance appears to have gone out of its way to submit to U.S. regulations by establishing a compliant subsidiary, Binance.US, an ulterior motive is now apparent. Unlike its creator Binance, Binance.US, which is open to American investors, does not allow highly leveraged crypto-derivatives trading, which is regulated in the U.S.

> The leaked Tai Chi document, a slideshow believed to have been seen by senior Binance executives, is a strategic plan to execute a bait and switch. While the then-unnamed entity set up operations in the United States to distract regulators with feigned interest in compliance, measures would be put in place to move revenue in the form of licensing fees and more to the parent company, Binance. All the while, potential customers would be taught how to evade geographic restrictions while technological work-arounds were put in place.

180.    Binance.US is in fact everything that the article alleged – a shell set up to feign compliance with U.S. laws and distract from reality.

181.    Zhao, Lim, and other members of Binance's senior management have failed to properly supervise Binance's activities and, indeed, have actively facilitated violations of U.S. law, including by assisting and instructing customers located in the United States to evade the compliance controls Binance purported to implement to prevent and detect violations of U.S. law. Binance and its officers, employees, and agents have instructed U.S. customers to use virtual private networks ("VPNs") to obscure their location; allowed customers that had not submitted proof of their identity and location to continue to trade on the platform long after announcing such conduct was prohibited; and directed VIP customers with ultimate beneficial owners, key employees who control trading decisions, trading algorithms, and other assets all located in the United States to open Binance.com accounts under the name of newly incorporated shell companies to evade Binance's compliance

controls. As Binance.com's CCO explained, "[o]n the surface we cannot be seen to have US users[,] but in reality, we should get them through other creative means."

    b.   Binance Begins to Erect Barriers to U.S. Residents That It Knows Will Be Ineffective

182.    Even after Binance began to purportedly restrict access to the Binance.com platform from certain jurisdictions in mid-2019, it left open a loophole for customers to sign up, deposit assets, trade, and make withdrawals without submitting to any KYC procedures as long as the customer withdrew less than the value of two BTC in one day. Binance has referred to this loophole by various labels, including "email registration," and "tier 1" customers. The two BTC withdrawal limit was effectively meaningless—the notional value of two BTC in July 2019 was more than $22,000 and in March 2021 was more than $100,000.

183.    Even before Binance made any attempts to restrict access to the Binance.com platform by U.S. customers, Lim privately explained to Zhao that the two-BTC loophole would continue to allow U.S. customers to access the platform. In February 2019, Lim chatted to Zhao: "a huge number" of Binance's "TIER 1 [meaning customers trading via the two-BTC loophole] could be U.S. citizens in reality. They have to get smarter and VPN through non-U.S. IP." And Zhao stated during a management meeting in June 2019 that the "under 2 BTC users is [sic] a very large portion of our volume, so we don't want to lose that," although he also understood that due to "very clear precedents," Binance's policy of allowing "those two BTCs without KYC, this is definitely not possible in the United States."

184.    In February 2019, Zhao and Binance orchestrated the development of two U.S. corporate entities: BAM Management and Binance.US. Zhao, from the beginning, has been a beneficial owner of BAM Management, directly or indirectly owning between 81% and 100% of its equity. Binance.US is a subsidiary of BAM Management which operates the Binance.US platform.

185.     In June 2019, Binance announced a "partnership" with Binance.US to launch the Binance.US platform to insulate Binance from past and future liability related to U.S. oversight bodies by having a domestic entity that ostensibly was "regulatory compliant." Zhao provided $500,000 in funding for Binance.US with subsequent cash infusions, including through Merit Peak. As of July 2020, Zhao had contributed $16 million to finance the new U.S. platform.

186.     Around the same time as the launch of Binance.US in June 2019, Binance.com updated its Terms of Use to state for the first time that "Binance is unable to provide services to any U.S. person." Binance also announced that "[a]fter 90 days, effective on 2019/09/12, users who are not in accordance with Binance.com's Terms of Use will continue to have access to their wallets and funds, but will no longer be able to trade or deposit on Binance.com." Binance was careful not to explicitly link the purported banning of U.S. investors on the international platform with the inception of the new domestic platform. In the wake of the two announcements, internal Binance.com guidelines advised employees that "[o]n the US launch, it is important to NOT link it to the .COM IP blocking [of U.S. investors]. That would suggest both that Binance is aware of previous violation and that BAM and .COM are alter egos of each other coordinating the work."

187.     In September 2019, Binance claimed it had begun to geographically block customers based on their internet protocol ("IP") address. In reality, Binance.com simply added a pop-up window on its website that appeared when customers attempted to log in from an IP address associated with the United States. The pop-up did not block customers from logging in to their account, depositing assets, or trading on the platform, it just asked them to self-certify that they were not a U.S. person before accessing the platform by clicking a button on the pop-up.

188.     Notwithstanding the pop-up compliance control, Binance knew that U.S. customers continued to comprise a substantial proportion of Binance's customer base even after September 2019 because, among other reasons, Binance's internal reporting told them so. According to periodic

revenue reports prepared for and sent to Zhao every month, as of January 2020 approximately 19.9% of Binance.com's customers were located in the U.S., and as of June 2020—about a year after Binance.com amended its Terms of Use as alleged above—approximately 17.8% of Binance.com's customers were located in the U.S.

189.    In keeping with Binance and Zhao's ethos of prioritizing profits over legal compliance, they knowingly allowed the two BTC loophole to persist. In an October 2020 chat between Lim and a Binance colleague, Lim explained:

> [Because you attended a telephone conference on which Zhao participated] then you will also know that as a company, we are probably not going to remove no kyc (email registration) because its too painful . . . i think cz understands that there is risk in doing so, but I believe this is something which concerns our firm and its survivability. If Binance forces mandatory KYC, then [competing digital asset exchanges] will be VERY VERY happy.

190.    Binance senior management, including Zhao, continued to be aware of and discuss the two BTC loophole. For example, in a March 2021 Signal message group that included multiple senior managers, Zhao asked: "Who was in the 2BTC limit meeting last time?"

191.    And on August 20, 2021, Binance announced that "all Binance users are required to verify their accounts," meaning that all new customers would be required to complete "Intermediate Verification" and provide a government issued identification evidencing their geographic location. Binance also announced that existing customers that had not yet completed Intermediate Verification would have their account changed to "withdrawal only" status by October 19, 2021. Binance did not limit the ability of unverified customers to deposit funds and trade on the Binance.com platform by October 19, 2021 as represented. In February 2022, Binance testified that the identities of approximately only 30–40% of Binance.com customers had been verified though KYC documentation.

192.    Binance has been aware that its compliance controls have been ineffective. As Lim— at the time Binance.com's CCO—recognized in an October 2020 chat with other compliance

personnel, Binance.com's compliance environment has amounted to "email sending and no action . . . for media pickup . . . I guess you can say its 'fo sho.'"

193.    Zhao's strategy of refusing to implement effective compliance controls was widely known within Binance. In a January 2019 chat between Lim and a senior member of the compliance team discussing their plan to "clean up" the presence of U.S. customers on the Binance.com platform, Lim explained: "Cz doesn't wanna do us kyc on .com." In June 2019, Lim acknowledged the necessity to engage in "the international circumvention of KYC," and reiterated in February 2020 that Binance had a financial incentive to avoid subjecting customers to meaningful KYC procedures, as Zhao believed that if Binance's compliance controls were "too stringent" then "[n]o users will come."

194.    Despite their awareness of Binance's compliance failures, Zhao, Lim, and others acting on behalf of Binance publicly represented that Binance.com platform had effective compliance controls. For example, in an August 14, 2019, letter sent on Binance.com letterhead, Lim assured a state financial regulator in the United States that:

> [O]ur [compliance] program provides for AML/CFT controls to ensure the safe and legitimate use of our platforms Binance screens all its customers prior to the establishment of a business relations or undertaking a transaction against OFAC, EU, UK and Hong Kong sanctions Binance performs customer due diligence (CDD) anytime the company establishes a customer relationship with all customers engaged in crypto-fiat activity, where there is suspicion of money laundering or terrorism financing . . . .

195.    Four months later, in an internal December 2019 message to a colleague, Lim admitted that ".com doesn't even do AML namescreening/sanctions screening."

196.    Binance also intentionally tried to hide the scope of its compliance program's ineffectiveness from its business partners. For example, in or around October 2020, Binance underwent a compliance audit to satisfy a request from Paxos. But according to Lim, Binance purposely engaged a compliance auditor that would "just do a half assed individual sub audit on geo[fencing]" to "buy us more time." As part of this audit, the Binance.com employee who held the

title of Money Laundering Reporting Officer ("MLRO") lamented that she "need[ed] to write a fake annual MLRO report to Binance board of directors wtf." Lim, who was aware that Binance did not have a board of directors, nevertheless assured her, "yea its fine I can get mgmt. to sign" off on the fake report. Around the same time as the referenced "half assed" compliance audit, in November 2020 the MLRO exclaimed to Lim in a chat, "I HAZ NO CONFIDENCE IN OUR GEOFENCING."

197.    Internally, Binance officers, employees, and agents have acknowledged that the Binance.com platform has facilitated potentially illegal activities. For example, in February 2019, after receiving information "regarding HAMAS transactions" on Binance, Lim explained to a colleague that terrorists usually send "small sums" as "large sums constitute money laundering." Lim's colleague replied: "can barely buy an AK47 with 600 bucks." And with regard to certain Binance customers, including customers from Russia, Lim acknowledged in a February 2020 chat: "Like come on. They are here for crime." Binance's MLRO agreed that "we see the bad, but we close 2 eyes."

198.    Lim's internal discussions with compliance colleagues illustrate that Binance has tolerated customers' use of the Binance.com platform to facilitate "illicit activity." For example, in July 2020, a Binance.com employee wrote to Lim and another colleague asking if a customer whose recent transactions "were very closely associated with illicit activity" and "over 5m USD worth of his transactions were indirectly sourced from questionable services" should be off-boarded or if it was in the class of cases "where we would want to advise the user that they can make a new account." Lim chatted in response:

> Can let him know to be careful with his flow of funds, especially from darknet like hydra
> He can come back with a new account
> But this current one has to go, it's tainted

199.    Lim's instruction to allow a customer "very closely associated with illicit activity" to open a new account and continue trading on the platform is consistent with Zhao's business strategy,

which has counseled against off-boarding customers even if they presented regulatory risk. For example, in a September 2020 chat Lim explained to Binance employees that they

> Don't need to be so strict.
> Offboarding = bad in cz's eyes.

200.    Binance's corporate communications strategy has attempted to publicly portray that Binance has not targeted the United States at the same time Binance executives acknowledge behind closed doors that the opposite is true. For example, on June 9, 2019, around the time Zhao and Binance hatched their secret plot to retain U.S. customers even after the launch of Binance.US, Binance.com's Chief Financial Officer stated during a meeting with senior management including Zhao:

> [S]ort of, the messaging, I think would develop it as we go along is rather than saying we're blocking the US, is that we're preparing to launch Binance US. So, we would never admit it publicly or privately anywhere that we serve U.S. customers in the first place because we don't. So, it just so happens we have a website and people sign up and we have no control over [access by U.S. customers]. [B]ut we will never admit that we openly serve U.S. clients. That's why the PR messaging piece is very, very critical

201.    Zhao agreed that Binance's "PR messaging" was critical, explaining in a meeting the next day that "we need to, we need to finesse the message a little bit And the message is never about Binance blocking U.S. users, because our public stance is we never had any U.S. users. So, we never targeted the U.S. We never had U.S. users." But during the June 9, 2019 meeting, Zhao himself stated that "20% to 30% of our traffic comes from the US," and Binance.com's "July [2019 Financial] Reporting Package," which was emailed directly to Zhao, attributes approximately 22% of Binance.com's revenue for June 2019 to U.S. customers.

c.    Binance Knowingly Ignored United States Regulatory Requirements

202.    Defendants have been aware of the regulatory regime that applies to U.S. financial institutions such as FCMs, and exchanges such as DCMs and SEFs, but have made deliberate, strategic decisions to evade federal law.

203.     Internal messages among Zhao, Lim, and other Binance senior managers document that Binance was aware of the applicability of U.S. regulatory and legal requirements since its early days. For example, in October 2018, Lim wrote to Zhao:

> Cz I know it's a pain in the ass but its my duty to constantly remind you
> 1. We have made no mention of sanctions/or support of sanctions on our platform already (done, cleaned up)
> 2. Are we going to proceed to block sanction countries ip addresses (we currently have users from sanction countries on .com)
> Or do you want to adopt a clearer strategy after we engaged and finalised our USA strategy?
> Downside risk is if fincen or ofac has concrete evidence we have sanction users, they might try to investigate or blow it up big on worldstage

204.     Two months later, in a December 2018 chat, Lim acknowledged that Binance was operating "in the USA" and advised his colleagues that "there is no fking way in hell I am signing off as the cco for the ofac shit." In that same chat, Lim recognized that Binance's customer support was "teaching ppl how to circumvent sanctions." And Lim stated in an October 2019 chat: "the ofac regulation clearly states U.S. persons, doing biz with OFAC is wrong," but clarified that Zhao desired to place competitive advantage over compliance: "thing is [Zhao] will only agree to block U.S. on .com once U.S. exchange has gotten all [money transmitter licenses] (to match [a U.S.-based digital asset exchange])."

205.     In December 2019, approximately three months after Binance began offering quarterly futures and perpetual contracts, Lim wrote to a colleague in a chat:

> 1. We still have U.S. users on our platform (regulatory risk) 2. We do not perform Worldcheck on .com (sanctions risk) 3. We do not perform [transaction monitoring] on .com (sanctions risk).

206.     Lim has displayed a nuanced understanding of applicable regulatory requirements and the potential individual liability that may accompany a failure to comply with U.S. law. For example, in October 2020 Lim chatted to a colleague:

> US users = CFTC = civil case can pay fine and settle
> no kyc = BSA act [sic] = criminal case have to go [to] jail

207.     Zhao has also been keenly aware of U.S. laws that apply to Binance's activities. For

example, Zhao explained during a June 9, 2019 management meeting:

> [T]here are a bunch of laws in the U.S. that prevent Americans from having any kind
> of transaction with any terrorist, and then in order to achieve that, if you serve U.S. or
> U.S. sanctioned countries there are about 28 sanctioned countries in the U.S. you
> would need to submit all relevant documents for review [but that is not] very suitable
> for our company structure to do so. So, we don't want to do that and it is very simple
> if you don't want to do that: you can't have American users. Honestly it is not
> reasonable for the U.S. to do this
> . . . .
> [ U.S. regulators] can't make a special case for us. We are already doing a lot of things
> that are obviously not in line with the United States.

208.     Zhao has kept information reflecting Binance's U.S. customer base secret even from

certain senior managers. For example, in a March 2019 discussion regarding the circulation of data

that categorized Binance users by geographic location, Zhao said "Let me see it first then, and not

distribute it, especially guys who have to deal with U.S. regulators." And in an August 2020 chat, Zhao

instructed a Binance employee that transaction volume data concerning U.S. API customers should

not be published to a group; rather, such data should be sent only to Zhao.

d.   Binance Has Guided United States Customers to Evade Its Compliance Controls Through
the Use of VPNs and Other Creative Means

209.     Binance implemented IP address-based compliance controls that collect a customer's

IP address and compare it to the list of countries Binance has purported to "restrict" from the

Binance.com platform. At least as of September 2019, the list of "restricted" jurisdictions included the

United States. Nonetheless, Binance's IP address-based compliance controls, sometimes called

"geofencing," have not been effective at preventing customers from "restricted" jurisdictions

including the United States from accessing and trading on the Binance.com platform.

210.     One reason Binance's IP address-based compliance controls have not been effective

is that Binance has instructed U.S. customers to evade such controls by using VPNs to conceal their

true location. VPNs have the effect of masking an internet user's true IP address. VPN use by

customers to access and trade on the Binance.com platform has been an open secret, and Binance has consistently been aware of and encouraged the use of VPNs by U.S. customers.

211.    At least as early as April 2019, Binance published a guide on the "Binance Academy" section of the Binance.com website titled "A Beginner's Guide to VPNs." Binance's VPN guide explained to Binance customers that "[i]f you want to be private about the websites you visit – and your location – you should use a VPN." Binance's VPN guide also hints: "you might want to use a VPN to unlock sites that are restricted in your country."

212.    Binance's senior management, including Zhao, knew the Binance VPN guide was used to teach U.S. customers to circumvent Binance's IP address-based compliance controls. In a March 2019 chat, Lim explained to his colleagues that "CZ wants people to have a way to know how to vpn to use [a Binance functionality] . . . it's a biz decision." And in an April 2019 conversation between Binance.com's Chief Financial Officer and Lim regarding Zhao's reaction to controls that purported to block customers attempting to access Binance from U.S. -based IP addresses, Lim said: "We are actually pretty explicit about [encouraged VPN use] already – even got a fking guide. Hence CZ is ok with blocking even usa."

213.    Binance senior management, including Lim, have used other workarounds to indirectly instruct Binance customers to evade Binance's IP address-based compliance controls. For example, in a July 8, 2019, conversation regarding customers that ought to have been "restricted" from accessing the Binance.com platform, Lim explained to a subordinate: "they can use vpn but we are not supposed to tell them that . . . it cannot come from us . . . but we can always inform our friends/third parties to post (not under the umbrella of Binance) hahah."

214.    Lim continued his crafty efforts to assist Binance customers in circumventing Binance's compliance controls, as documented in a February 12, 2020 exchange. An employee asked Lim:

> hi Samuel, we are helping [an intermediary] to integrate with us to introduce new users
> and trade liquidity, but find most of their users are from US. Now Binance.com block
> U.S. IP from registration. May I ask whether it is still a hard requirement nowadays?

215.    Lim responded to the employee's question:

> Yes, it still is. Because if US users get on .com
> We become subjected to the following US regulators, fincen ofac and SEC
> . . .
> But as bests as we can
> . . .
> We try to ask our US users to use VPN
> . . .
> or ask them to provide (if there are an entity) non-US documents
> . . .
> On the surface we cannot be seen to have US users but in reality, we should get them
> through other creative means

216.    Binance's use of creative workarounds to its compliance controls is further
documented in a July 17, 2020 chat in which Lim clarified to a colleague:

> No we cannot change their status to non us if they are us
> Thats fraud
> But we can encourage them to be a non kyc account Or use a vpn
> . . .
> Yea can bypass [limitations on non-KYC accounts, such as withdrawal limits], give a
> little hand that you guys can work something out
> please be clear we only do this for our biggest traders/VIPs
> . . .
> this is SPECIAL treatment

217.    Lim also used Binance.US as a laboratory to identify important U.S. customers that
could be prioritized for expedited on-boarding to the Binance.com platform. In a July 15, 2020 chat,
Lim explained to a Binance.com employee that he should first ask a prospective customer "to onboard
with US, then if their volume is really very big we will push hard on .com to accept it on an exceptional
basis . . . CZ will definitely agree to this lol." Lim continued: "but they need to really be doing sick ass
volumes . . . we always have a way for whales." Lim reiterated this procedure in a July 27, 2020 chat,
explaining that "getting on .com" would be "an issue" for a prospective customer with "US beneficial

owners" but that the prospective customer could "of course get on Binance U.S. and then if the volumes are good, we can find a way to backdoor them to .com."

218.    As demonstrated below, Binance apparently enlisted the help of its affiliates and promoters, such as Defendant Ben Armstrong, to not only hype the Binance platform and its unregistered security offerings, but also separately to hype affiliate links for VPN providers to guide their followers to circumvent U.S. regulations and to backdoor them into the international Binance exchange.

e.    Binance Has Directed Its VIP Customers to Evade Compliance Controls, Including Through Submission of "New" KYC Documents

219.    In addition to instructing retail customers located in the United States to use VPNs to avoid IP address-based compliance controls, Binance has also created special policies and procedures to help its VIP customers evade Binance's compliance controls so Binance could continue to access and derive profits from U.S. customers. Binance designed these special policies and procedures to help VIP customers evade both IP address-based compliance controls and KYC documentation-based compliance controls.

220.    In February 2019, Lim and Zhao met in person to discuss how to address the regulatory risk stemming from Binance's U.S. customers that access Binance.com via API. These customers are generally institutional market participants and include VIPs. In advance of their meeting, Lim sent Zhao a numbered list of "Compliance parameters," including that "US API users (identified through IP) will have 2 options. They can remain on main exchange or move over to U.S. exchange," while "US API users (identified through KYC) have to move over to U.S. exchange, they don't have a choice. We will notify them through Email."

221.    Right after meeting with Lim, Zhao sent the compliance parameters to other senior managers, one of whom replied to Zhao that "[US users, with US, non international KYC] is [where] we will get nailed." The senior manager asked Zhao if Binance had to "enforce" the contemplated

block of U.S. API users identified through KYC "in the matching engine? That's the only way to guarantee this doesn't break. [It] is not a hard thing to enforce in the matching engine." Zhao replied: "let's worry about enforcement in a later stage, think we may have to do it by users."

222.     On June 13, 2019, Binance released a press release that "announced its partnership with BAM Trading Services Inc. to begin preparation to launch trading services for users in the United States." While outwardly preparing for the launch of Binance.US, internally, Zhao, Lim, and other key Binance personnel remained focused on retaining U.S. VIP customers, and the liquidity and revenue they supplied, on Binance.com.

223.     In and around June 2019, Zhao, Lim, and other key Binance personnel engaged in a series of strategy sessions concerning the retention of U.S. VIPs on the Binance.com platform. One method discussed was to instruct U.S. VIP customers to submit "new" KYC documentation in connection with a "new" account. This approach would allow VIP customers to continue to trade on Binance.com and maintain their preferential VIP status and benefits that resulted from their historical trading activity on Binance.com. During one meeting that Binance.com recorded, a senior employee proposed Binance.com instruct U.S. customers to submit "new" KYC documentation over social media—but Lim corrected the employee and mandated that such instructions should only occur in secret. In addition, Binance.com's Chief Marketing Officer reported internally that his team had contacted the top 22 U.S. VIP investors and 19 had "already agreed to change KYC, or change their IP."

224.     Binance's plan to instruct U.S. VIP customers to submit "new" KYC documentation was devised by Zhao. During a June 24, 2019 meeting with senior management, Zhao stated: "We do need to let users know that they can change their KYC on Binance.com and continue to use it. But the message, the message needs to be finessed very carefully because whatever we send will be public.

We cannot be held accountable for it." In a meeting the next day, a senior VIP team member and Zhao engaged in the following colloquy:

> VIP team member: We don't tell them explicitly because that's marketing. But they [referring to U.S. VIP customers] understand . . . they know to send [their digital assets] the blockchain, then that's their own control. And then so they send it to themselves, but we just help them expedite. As we speed up the account of the corporate account of the BVI or Cayman entity.
>
> Zhao: Okay, so is this them creating a new account, but we talked about having them change KYC has that ever been done?
>
> . . . .
>
> VIP team member: We quietly mentioned to them that, you know, US, you know, it could be an issue and you know, if they have any offshore entities, maybe they should open another one as well for their offshore entities. That's how, that's how we, that's how we've been telling them. We haven't really sent anything blasting because that's, that's sensitive. That's marketing. I mean, [a U.S.-based compliance consultant] can comment on that.

225.    Binance personnel began assisting U.S. VIP customers in creating "new" accounts using "new" KYC documentation as early as June 2019, and reported directly to Zhao on their efforts. For example, in a Binance.com group chat dated June 12, 2019, a Binance.com employee directed the following message to "@czhao," which is a handle used by Zhao:

> Today our VIP team talked with three VIP8 users, we didn't talk too much details and they all satisfied that we can help them onboarding their new non-US corporate accounts. That's a good start, we'll contact more VIPs tmr.
>
> Zhao responded in the same chat: "cool."

226.    A March 2020 internal Binance.com presentation subsequently conveyed that 159 U.S. VIP investors, making up 70% of all global VIP trading volume, were housed on Binance.com. At some point before October 2020, Binance formalized its processes for instructing U.S. VIP customers on the best methods to evade Binance's compliance controls in a corporate policy titled "VIP Handling." Zhao contributed ideas that were incorporated into the VIP Handling policy. Pursuant to the VIP Handling policy, once a customer service representative "hands the affected user over to

VIP," the VIP team would "[m]ake sure the user has completed his/her new account creation with no U.S. documents allowed." U.S. VIP customers often followed these instructions by submitting "new" KYC documentation associated with a shell company incorporated in a jurisdiction other than the United States, such as the British Virgin Islands, to act as the nominee for the "new" account.

227.    Acting pursuant to the VIP Handling policy, Binance's VIP team would then "coordinate the transfer" of the VIP customer's "Referral Bonuses, VIP level, Withdrawal Limits etc." to the "new" account from the VIP customer's pre-existing account. Thus, if the VIP team followed the VIP Handing policy correctly, from the customer's perspective nothing about their trading on Binance.com would be disrupted—the "new" account would be the same as the old account with the exception of the name of the accountholder.

228.    Recognizing the evasive nature of the procedures and strategies memorialized in the VIP Handling policy, the document required Binance employees to "[m]ake sure to inform user to keep this confidential." In line with the intent to keep any "new account creations" by U.S. VIPs a secret, Zhao instructed during his October 13, 2020 "daily call" that any communications about the "US ban" should be done over the Signal messaging application. Thereafter, Lim circulated Zhao's directive to a senior compliance staff member in a chat, explaining: "we do all U.S. comms via signal as mandated by cz."

229.    Binance.com's VIP Handling policy also established methods for personnel to troubleshoot for U.S. customers that were identified as such through their IP address (as opposed to KYC documentation). For these customers, Binance instructed its personnel to "[i]nform the user that the reason why he/she cant use our www.binance.com is because his/her IP is detected as U.S. IP. If user doesn't get the hint, indicate that IP is the sole reason why he/she can't use .com" [emphasis in original]. Lim flagged a passage in the VIP Handling policy for his colleagues that further explained: "We cannot teach users how to circumvent the controls. If they figure it out on their own, its fine."

230.     Displaying the ecosystem's tone at the top, Zhao helped manage the implementation of Binance's VIP Handling policy. On October 9, 2020, around the time Binance began sending emails to U.S. customers pursuant to the policy, Zhao had the following exchange with an employee who would ultimately become Binance.com's head of institutional sales:

> VIP team member: Hi CZ . . . I went through list of affected API clients, it includes a number of large strategic accounts including [a Chicago-headquartered trading firm] who is currently is a top 5 client and 12% of our volume
>
> Zhao: Give them a heads up to ensure they don't connect from a us Ip. Don't leave anything in writing. They have non us entities. Let's also make sure we don't hit the biggest market makers with that email first. Do you have signal?

231.     At least until August 2021, over two years after Binance.com updated its Terms of Use to "restrict" U.S. customers, Binance.com employees continued to observe customers they had previously identified as U.S. VIPs trading on the platform. In an August 14, 2021 chat, members of the VIP and Compliance teams discussed the issue:

> Compliance employee: We have two corporate clients . . . which were detected as U.S. nexus (US UBOs > 50%). Considering they are big clients, our compliance team wants to further check with you if we need to talk with the clients and give them a period before going offboard. Please advise. Thank you.
>
> VIP team member 1: we've gone through multiple offboarding exercises how is this coming up again?
>
> VIP team member 2: I guess because they're a big client so there were delays here and there previously . . . there are still transactions going on during the month of august hahaha scary indeed.

232.     Binance's efforts to hold Binance.com out as "compliant" while at the same time taking steps to assist customers in submitting "new" KYC documents has continued. For example, on August 5, 2021, Binance posted an announcement to the Binance.com website titled "Updates to API Services" that states:

> To ensure a safe and fair trading environment for all users and remain compliant with the latest industry requirements, Binance is updating its API services to limit new API key creation by accounts that have only completed basic account verification. This update is effective starting 2021-08-09 03:00 (UTC).

For accounts that have not completed intermediate verification, any existing API keys will be changed to "read only" after 2021-08-23 00:00 AM (UTC). Trading functions via relevant API keys will be deactivated. Users can complete intermediate verification to reset API access and resume trading functions.

233. But internal documents confirm that Binance was still up to its old tricks as of August 5, 2021. In a presentation concerning business operations that occurred during the week of August 9 through August 15, 2021, Binance.com personnel noted that they had made progress "Follow[ing] up [with high] value users KYC projuect [sic]."

f. Binance Knowingly Concealed the Presence of United States Customers in Internal Documents and Data and Maintains Its Own Presence in the United States

234. Since at least 2019, Binance has maintained significant ties to the U.S. financial system and economy and has actively solicited customers in the United States through its marketing efforts including on numerous social media applications such as Twitter.

235. Binance.com has employed at least 60 people in the United States, and that number continues to increase. Among these U.S.-based employees are compliance and investigations personnel; personnel involved with Binance.com's private equity arm, known as "Binance Labs"; a key employee who managed the business unit that was responsible for Binance.com's "official crypto wallet," a product Binance has offered called "Trust Wallet"; in-house lawyers; and Binance.com's current "Chief Strategy Officer."

236. Binance has enlisted U.S. residents to act as "Binance Angels" to solicit and interact with U.S. customers. Generally, Binance Angels attempt to recruit new customers to Binance, answer questions from customers and prospective customers, and test new Binance features. In return, Binance Angels receive benefits such as invitations to events and Binance swag.

237. From Binance's early days, Zhao has known that U.S. customers trade on the Binance.com platform. Zhao has personally interacted with Binance's U.S. customers. For example, in 2017, and in connection with Binance's early phase of targeting U.S. customers, Zhao provided

instructions to a U.S. resident with respect to an English-language customer support channel over the Telegram messaging application.

238.    Later, on January 8, 2018, a U.S. trading firm emailed Zhao directly to onboard to Binance.com, identified the owner of the company as a U.S. citizen, and provided the company's owner's U.S. passport and Illinois driver's license to Zhao.

239.    Zhao, Lim, and other Binance senior management have known that U.S. customers trade on Binance.com and have tracked and monitored their activities for multiple purposes. For example, Zhao has received periodic reports concerning the nature and geographic location of Binance's customers as well as the sources of Binance's revenue. These reports contain information about Binance's U.S. customers and the effectiveness of Binance's efforts to capture the U.S. market.

240.    An example of a periodic report that contains information about Binance.com's sources of revenue is titled August [2019] Financial Reporting Package. The August Financial Reporting Package breaks down Binance.com's trading revenue by base asset (with BTC-related transactions comprising 44% of Binance.com's revenue for that month), and trading volume, among other metrics. One slide on the August Financial Reporting Package is titled "Trading Revenue by Country" and displays Binance.com's focus on the geographic sources of its revenue, including the 16% for that month (and 19% for July 2019) attributed to customers located in the U.S.

241.    Zhao wanted U.S. customers, including VIP customers, to transact on Binance.com because it was profitable to retain those customers. Binance has tracked the sources of Binance.com revenues by customers' geographic location, among other analytical methods. Zhao routinely received reporting that unambiguously demonstrated that U.S. customers contributed a substantial amount of Binance.com's revenues. While Binance.com originally expressly tracked revenues derived from U.S. customers and summarized that information in the Binance.com monthly revenue reports, after the CFTC sued Binance rival BitMEX in October 2020 for illegally selling derivatives to U.S. investors

and AML violations, Binance.com changed its internal reports to call U.S. customers "UNKWN," which was thereafter in fact known internally at Binance.com to refer to customers in the United States.

242.     Binance officers, employees, and agents have interacted with U.S.-based institutional customers at Binance-hosted networking and social events in the United States at various times, including an April 2022 party in Las Vegas to which Binance invited its "largest accounts" such as "top heavy weights of hfts, prime brokerage, [and] vcs," and a networking event in Austin, Texas. Binance and Zhao have also participated in numerous digital asset industry conferences in the United States.

243.     Binance has procured professional services from U.S.-based law firms, compliance consultants, and other vendors concerning various aspects of its business operations. For example, Binance relies on the Google suite of products for information management and email services. Binance uses Webex for its internal messaging functionality. Binance leases office space from WeWork that it makes available to its U.S.-based employees and other personnel. Binance has entered into long term contracts with Amazon Web Services, a United States company headquartered in Washington. Among the services Binance purchases from Amazon Web Services that are provided to Binance in the United States is "AWS CloudFront," which according to Amazon Web Services is a "Global content delivery network." Zhao has paid for certain of Binance's Amazon Web Services accounts using his personal credit card.

244.     Binance avails itself of the U.S. legal system to seek protection for its intellectual property. For example, Binance filed trademark applications for "Binance"; "Binance Chain"; and "Binance DEX" with the assistance of U.S. attorneys. These U.S. trademarks remain active.

245.     In 2019, Zhao and Binance.US launched the Binance.US platform, a digital asset spot market trading platform that offers its services to U.S. customers. When he hired Binance.US's first

CEO, Zhao described Binance.com as a pirate ship and explained that he wished for Binance.US to be a navy boat. The Binance.com CCO also revealed, "[W]e ask [U.S. investors] to onboard with US, and then if their volume is really very big . . . we will push hard on .com side to accept it on an exceptional basis . . . we always have a way for whales . . . either we do it, or [a competitor crypto trading platform] does it."

246.   Binance.US is under covert common ownership and control with Binance and Zhao, as the entity continues to operate the Binance.US spot platform. Binance personnel, including Zhao, have dictated Binance.US's corporate strategy, launch, and early operations, including initially managing customer access, arranging currency services with U.S. banks, forcing the platform to sell BNB, and developing the platform's trade clearing and settlement functions. At Zhao's direction, Binance.US's marketing and branding has mirrored that of Binance.com. Binance.US has licensed Binance's trademarks to advertise in the United States. Binance.US has also relied on one of Binance.com's matching engines through a software licensing agreement.

247.   Although Binance and Zhao claim that Binance.US was created as a separate, independent trading platform, both have continued to, directly or indirectly, control the minutiae of Binance.US's operations, such as routine business expenditures and decisions. At least through 2021, Binance held and controlled Binance.US's data offshore without giving Binance.US material access. Through 2023, Binance maintains direct authority over Binance.US's bank accounts and uses them without Binance.US's consent. In June 2020, Binance.com's finance team had upped internal transfers to Binance.US's bank accounts from $10 million per day to $1.5 billion per day without the former Binance.US CEO's knowledge due to her lack of appropriate account access or ability to verify the transfers without asking Binance. In December 2020, Binance.com transferred $17 million from Binance.US's bank accounts to Merit Peak without the CEO's knowledge or approval.

248.    While operating within the United States, Binance.US also significantly failed to satisfy basic safeguards for U.S. securities exchanges such as procedures designed to prevent fraud and manipulation. At least through December 2022, Binance.US employees had little to no oversight of Binance's custody of Binance.US' crypto assets, giving Zhao and Binance free reign over $1.77 billion dollars of U.S. investors' assets and the employees no ability to ensure the platform was fully collateralized. In addition, with weak to non-existent monitoring, and, specifically, no trade surveillance mechanisms utilized until at least February 2022, Binance.US did not protect its users against manipulative trading practices. Moreover, Binance.US made untrue statements of material fact about monitoring and trade volumes to Binance.US customers and equity investors. For example, in a 2021 pitch deck, Binance.US assured equity investors that numerous supposed vendors "ensur[ed] the [platform's] highest level of compliance," despite being aware that Sigma Chain, operated by Binance employees, freely engaged in extensive "wash trading" that artificially inflated the trading volume of the platform. This consistent misrepresentation of monitoring and trade volumes impacted investors' judgment when evaluating investment instruments, allocating risk exposure, deciding whether to engage with the Binance.US platform, and gauging overall liquidity and health of the platform before an equity investment.

g.   The VIP Program

249.    Binance refers to its important customers as VIPs. Binance's VIP customers are often institutional market participants. VIP customers are important to Binance because they provide liquidity to Binance's markets and pay Binance a lot of fees. Binance is aware of its VIPs' identities and geographic locations because Binance monitors its sources of transaction volume and fee-based revenue as a matter of course in conducting its operations.

250.    Binance's VIP program rewards important customers by providing reduced rates for transaction fees and white-glove customer service, as well as exceptions to trading rules including

order messaging limits. Higher status VIPs also receive preferential access to Binance.com's matching engines, among other benefits. Binance categorizes its VIPs into levels one to nine, with VIP 9 being the highest level occupied by the most important Binance customers. A customer's VIP level is determined by, among other things, their 30-day trading volume and BNB holdings. For example, in December 2021, a customer could maintain a VIP 9 level by engaging in "futures trading" volume of 25,000,000,000 (as measured by BUSD) and maintaining a 5,500 BNB balance over a 30-day period.

251.    Binance has relied on a dedicated team of employees and other agents to provide personalized service to its VIP customers. These personnel have been known by various labels including the VIP team, Key Account Managers, and institutional sales representatives.

252.    Another important benefit that Binance has provided its VIP customers is prompt notification of any law enforcement inquiry concerning their account. According to a policy titled "For management of LE requests for information and funds transfer," created by Lim based on directions from Zhao, Binance.com instructed its VIP team to notify a customer "[A]t point of [account] freeze [based on a request from a law enforcement agency] and immediately after the unfreeze [which would occur 24 hours after the account freeze]. VIP team is to contact the user through all available means (text, phone) to inform him/her that his account has been frozen or unfrozen. Do not directly tell the user to run, just tell them their account has been unfrozen and it was investigated by XXX. If the user is a big trader, or a smart one, he/she will get the hint."

253.    Binance officers, employees, and agents have used numerous messaging applications for business communications. In addition to email and internal messaging applications, Binance's personnel have also used at least Telegram, WeChat, and Signal to communicate internally and with Binance customers.

254.    The Signal messaging application allows a user to enable an auto-delete functionality to cover their tracks after communicating about inculpatory matters. Zhao and others acting on behalf

of Binance have used Signal—with its auto-delete functionality enabled—to engage in business communications, even after Binance received document requests from the CFTC and after Binance purportedly distributed document preservation notices to its personnel.

255.    Zhao has communicated over Signal with the auto-delete functionality enabled with numerous Binance officers, employees, and agents for widely varying purposes.  For example, the following Signal text chains or group chats collected from Zhao's telephone were among those set to auto-delete:

    a.   a group chat between Zhao, Binance.com's then-head of institutional sales, and Binance.com's head of "Big Data," which is the operational group responsible for creating and maintaining data and databases including the database that contains customer- and transaction-related information;

    b.   a text chain with a senior member of Binance.com's VIP team;

    c.   a text chain with a compliance consultant who participated in the creation of the strategy concerning the launch of Binance.US and Binance.com's attendant efforts to retain U.S. customers;

    d.   a text chain with an accounting employee who participated in the preparation of Binance.com's monthly revenue reports for Zhao;

    e.   text chains with senior operations personnel; and

    f.   group chats titled "Finance," "HR," "Mkt hr," and "CEO office."

256.    Zhao has also instructed Binance officers, employees, and agents to use Signal to communicate with U.S. customers.  On information and belief, Binance does not have a corporate communications policy and continues to use Signal for business communications.

## VII.   Advertising and Promotion

257.    Because of Zhao's "biz decision" to target U.S. customers for its main international Binance.com platform, Binance's international marketing efforts were also targeted specifically at the United States, and residents of this District.

258.     Each Plaintiff and every class member was exposed to the Binance advertising campaigns and overarching marketing messaging, which influenced their decisions to invest in the unregistered securities offered or sold by Defendants.

259.     Since the launch of the Binance.com platform in 2017, Binance has taken a calculated, phased approach to increase its United States presence despite publicly stating its purported intent to "block" or "restrict" customers located in the United States from accessing the Binance.com platform. Binance's initial phase of strategically targeting the United States focused on soliciting retail customers. In a later phase, Binance increasingly relied on personnel and vendors in the United States and actively cultivated lucrative and commercially important "VIP" customers, including institutional customers, located in the United States.  All the while, Binance, Zhao, and Lim, the Binance.com former CCO, have each known that Binance's solicitation of customers located in the United States subjected Binance to registration and regulatory requirements under U.S. law.  But Binance, Zhao, and Lim have all chosen to ignore those requirements and undermined Binance's ineffective compliance program by taking steps to help customers evade access controls.

260.     In a March 2019 chat, Lim explained to his colleagues that "CZ wants people to have a way to know how to vpn to use [a Binance functionality] . . . it's a biz decision." And in an April 2019 conversation between Binance.com's Chief Financial Officer and Lim regarding Zhao's reaction to controls that purported to block customers attempting to access Binance.com from U.S.-based IP addresses, Lim said: "We are actually pretty explicit about [encouraged VPN use] already – even got a fking guide. Hence CZ is ok with blocking even usa." Binance's decision to prioritize commercial success over compliance with U.S. law has been, as Lim paraphrased Zhao's position on the matter, a "biz decision."

a.      The Affiliate Program

261.    Through its Affiliate Program, Binance paid kickbacks of up to 50% of fees to affiliates who solicited new users through their personal referral links.



262.    To join the Affiliate Program and obtain a referral link, advertisers submit an application during which Binance screens them using some of the following criteria:

**⊖ What are the requirements to be a Binance Affiliate?**

Individual

Social media influencer with 5,000+ followers or subscribers on one or more social media platforms (Youtube, Twitter, Facebook, Instagram)

Crypto Communities

Financial leaders or opinion leaders with a community of 500+ members on one or more community groups (Telegram, Facebook, WeChat, Reddit, QQ, VK)

Business/Organization

User base of 2,000+

Market analysis platform with 5,000+ daily visits

Industry Media Platform

Crypto Fund

Aggregate Trading Platform

263.   The compensation paid to Affiliates includes:

## Earn more affiliate incentives

| | |
|---|---|
| Spot commission | Up to 50% |
| Futures commission | 30% |
| Binance pool commission | 30% |
| Sign-up bonus package | Share up to a $600 new user sign-up bonus package with your community. |
| Minimum requirements | Must have more than 5000 followers on social media or more than 500 members in a trading community. |
| Eligibility | Only eligible users can participate after submitting an application |

**How do I earn a bonus of up to $72,000 every month?**

In addition to earning 30% commission, Affiliates that promote Futures trading can now earn a bonus of up to $72,000 based on the fees paid by their referrals over a period of 1 month. For example, if your referrals generate the equivalent of $15,000 in trading fees over a period of 1 month, then in addition to your standard referral commission, you will receive a bonus of $1,500. The more trading fees generated by referrals, the bigger the bonus you will receive.

264.   Commissions are paid into Affiliate's Binance wallets, and are issued cryptocurrency, including BNB.

265.   Binance offers a Binance Affiliate Rewards Bootcamp for aspiring crypto influencers, which also includes sign-up bonuses, BUSD rewards, and extra commissions.

## Discover our Binance Affiliate Rewards Bootcamp

Watch our video to learn more about the program



### Do you have what it takes to become a crypto influencer?

Through a 7-class series, we'll help transform you into a top-performing Binance Affiliate. And as you progress through each class, you'll unlock exclusive Affiliate rewards and benefits, including extra commission, BUSD rewards and sign-up bonuses.

Join Now

## Course Curriculum

With each class, get one step closer to becoming a crypto influencer



**Class 1: What does it mean to become a crypto influencer**

Discover all the incentives you'll unlock as a Binance influencer

**Class 2: Introduction to Binance Trading Products**

Learn how to use and promote commission-generating Binance features

**Class 3: How to create quality and compelling content**

Master the art of crypto content creation for different social channels

**Class 4: User-generated content for Non-trading Binance Products**

Learn how to generate UGC content for Binance non-trading products

**Class 5: How to effectively attract and invite new users**

Learn techniques to garner more sign-ups with your referral link

**Class 6: How to transform your invitees into active users**

Learn how to encourage your invitees to use the Binance platform

**Class 7: Tips and tricks from a top Affiliate**

Get top insights and tips from an experienced Binance affiliate

266.    To access all seven crypto influencer classes, users must enroll in the exclusivity pathway, which obligates them to promote Binance for a three-month period.

> ⊖ **What is the exclusivity pathway?**
>
> In order to access all seven class videos, users must agree to promote Binance for a three-month period. If you do not want to go through the exclusivity pathway, you will only have access to class one, two, and four with fewer reward options. Moreover, the maximum reward will only be 500 BUSD.

267.    Affiliate payments were substantial. In October 2019, a Binance Twitter post referenced a then-all-time-high affiliate payment of 1146.82 BTC (~$10.5 million USD).



b.   <u>Defendant Ben Armstrong</u>

268.   Ben Armstrong, who goes by "BitBoy Crypto" online, is a Youtuber, podcaster, creator of bitboycrypto.com and "crypto enthusiast."

1.   *Ben Armstrong Partnered with Binance to Promote Its Platform.*

269.   In or around early 2022, Mr. Armstrong became a Binance Affiliate, wherein Armstrong earned kickbacks and commissions by promoting Binance, the Binance platforms, and soliciting individuals to click through links on his website to register for Binance services.

270.   Mr. Armstrong promoted Binance across his media platforms and directed his followers to Binance platforms through his affiliate link. These promotions emphasize the perks of the platforms as well as the discounts available through the link. However, Defendant Armstrong has hidden the substantial kickbacks he stood to gain from successful solicitations— referral incentives that could last through the lifetime of a customers' use of Binance platforms.

271.   The overarching objective of the partnership was for Mr. Armstrong, through a series of promotions and media posts, to help Binance successfully solicit or attempt to solicit investors in Binance's crypto-related securities from Florida and nationwide.

272.   On information and belief, in exchange for his services, Mr. Armstrong received substantial kickbacks he stood to gain from successful solicitations— referral incentives that could last through the lifetime of a customers' use of Binance platforms.

2.   *Mr. Armstrong Engaged in a Sustained and Aggressive Promotion and Advertising Campaign for Binance.*

273.   Mr. Armstrong, as he has been exposed for doing numerous times, has also taken to hiding his extensive participation in affiliate marketing with Binance. His bitboycrypto.com webpage used to contain dozens of links to crypto exchanges and products, but within the last year he has wiped the referral page of his website.

274.    On or about May 2022, Mr. Armstrong was promoting affiliate links to Binance.com and Binance.US, through the domain https://bitboycrypto.com/deals/, encouraging his followers to purchase crypto securities through the Binance platforms:



275.    That same domain as of March 31, 2023 had been scrubbed:



276.     Mr. Armstrong still has promotions of Binance on his website. For example, at https://bitboycrypto.com/news/most-profitable-large-cap-altcoin-polkadots-new-roadmap/,     he describes it as "one of the most trusted exchanges on the market."



277.     On another page, https://bitboycrypto.com/news/this-will-determine-bitcoins-price-action-veefriends-at-toys-r-us/, he likewise promotes using Binance to buy Bitcoin:



278.    He promotes Binance.US on another page, https://bitboycrypto.com/news/bitcoin-

cant-be-stopped-sega-jumps-into-crypto-gaming/:



279.    On another page, he promotes Binance as "the best place to buy bitcoin for yourself,"

https://bitboycrypto.com/news/michael-saylor-buys-more-bitcoin-utahs-vote-for-crypto/.



280.     Mr. Armstrong also problematically advertised VPNs like his affiliate link to "VPN unlimited" shown below,[8] right next to crypto exchanges like Binance and Binance.US, to help Binance further its goal of enabling U.S. investors to trade on the international Binance exchange, aiding Binance in its effort to circumvent U.S. regulations. These crypto exchanges are subject to strict KYC rules and geofencing customer limitations, which, as explained above, can be bypassed by such VPNs.



281.     On information and belief, Mr. Armstrong made other promotions on his social media platforms and his website that have since been removed.

       3.     *Mr. Armstrong Had Financial Incentives to Induce Class Members to Invest in Binance and to Trust the Platform.*

282.     Mr. Armstrong had every incentive to be an effective promoter of Binance to continue the relationship and continue receiving payment for his services.

---

[8] The domain: https://bitboycrypto.com/deals/ on the Wayback Machine as of May 19, 2022 at 22:45:54.

283.     Moreover, the structure of the Binance Affiliate Program increased Mr. Armstrong's immediate and long-term compensation based on the success that Mr. Armstrong had in influencing consumers to make investments on the Binance platforms.

### 4.   *The Promotions Were Deceptive and Unlawful.*

284.     Mr. Armstrong and Binance launched a commercial campaign designed to make Binance appear to be the most stable platform for would-be crypto investors. As a regular commenter and enthusiast of cryptocurrency, Mr. Armstrong's promotions implicitly and intentionally downplayed that he was shilling and promoting Binance and were designed to appear as unbiased opinions.

285.     Mr. Armstrong made deceptive statements in his promotions, including statements like "The best place to buy Polkadot is on Binance, one of the most trusted exchanges on the market," while at the same time benefiting from others' adoption of the platform.

### 5.   *Mr. Armstrong Knew or Should Have Known He Was Soliciting or Assisting Binance to Solicit Investments in Unregistered Securities and/or that He Was Aiding and Abetting Binance's Fraud and/or Conversion.*

286.     Given Mr. Armstrong's personal/professional relationships in the crypto space, his investment experience, including substantial experience with investments in crypto, and resources to obtain outside advisors, he knew or should have known of potential concerns about Binance selling unregistered crypto securities and/or that he was aiding and abetting Binance's fraud and/or conversion. When Mr. Armstrong engaged in the promotions, the legal risks of promoting investments in cryptocurrency trading platforms were well known. Through his social media promotions, Mr. Armstrong personally participated in and aided Binance in making the sale of unregistered securities.

6.   *The Promotions Were Directed at Plaintiffs in Florida, and Customers Nationwide.*

287.    Mr. Armstrong's promotions were published on public social media accounts accessible to plaintiffs nationwide, including in Florida.

288.    Mr. Armstrong has nearly five million followers across platforms and his content is widely promoted.

289.    U.S. customers, including in this District, saw those promotions, clicked on his Affiliate links, and registered with Binance as a result.

c.   Traditional Advertisements

290.    Binance also engaged in traditional advertisements, including on television and in social media.

291.    For example, Defendant Jimmy Butler partnered with Binance to promote the Binance platforms through these channels and received substantial payments for doing so. U.S. customers, including in customers in Florida, saw those advertisements or promotions prior to signing up with Binance.

d.   Defendant Jimmy Butler

292.    Jimmy Butler is an American professional basketball player for the NBA's Miami Heat. This multi-time NBA All-Star is one of the most famous players in the league, having led the Heat to the NBA Finals twice in the last four years.

1.   *Jimmy Butler Partnered with Binance to Promote Its Platform.*

293.    In or around early 2022, Binance partnered with Mr. Butler to provide Binance with spokesperson and marketing services. Those services included posting on social media, promoting his Binance exclusive NFT collection, and appearing in commercial advertising, among other activities.

294.     The overarching objective of the partnership was for Mr. Butler, through a series of promotions and media posts, to help Binance successfully solicit or attempt to solicit investors in Binance's crypto-related securities from Florida and nationwide.

295.     On information and belief, in exchange for his services, Mr. Butler received a substantial total compensation package which likely included compensation in the form of digital assets transmitted through the Binance platforms.

       2.     *Mr. Butler Engaged in a Sustained and Aggressive Promotion and Advertising Campaign Controlled by Binance.*

296.     On or about February 2, 2022, Binance, in collaboration with Mr. Butler, launched the "Trust Yourself" social media campaign. Binance, in its own words, "launched a global consumer empowerment campaign that partnered with a group of VIPs, known for their honesty and independence, to remind consumers of their financial freedom."[9] The campaign intended to preempt and undercut the Super Bowl advertising campaigns of competitor crypto exchanges like FTX. The campaign also promoted the Binance platforms as a safer alternative to Binance competitors.

297.     In one video advertisement posted to Binance's Twitter account, on February 2, 2022, Mr. Butler warns consumers of the big-name celebrity crypto endorsements they may hear on "February 13," the date of the Super Bowl, and states, "Binance and I are here to tell you, trust yourself and of course do your own research." The irony should not be lost that such statements are being made on behalf of a crypto exchange.

---

[9] https://www.binance.com/en/blog/community/binance-unites-j-balvin-jimmy-butler-and-valentina-shevchenko-to-take-on-big-game-crypto-ads-invites-fans-to-sound-the-cryptocelebalert-and-trust-themselves-to-learn-crypto-421499824684903392.



298.    On or about February 7, 2022 and February 13, 2022, Mr. Butler continued his Binance

campaign telling his fans across two different posts to his Twitter page that if they see a celebrity

crypto endorsement "during the game [the Super Bowl] go to cryptocelebalert.com and sound the

alarm and while you're there learn the basics of cryto." "[V]iewers are encouraged to sound Binance's

#CryptoCelebAlert at CryptoCelebAlert.com to claim one of 2,222 POAP NFTs featuring Jimmy

Butler. More importantly, they can access an easy-to-read crypto primer to better understand the basics of crypto."[10]



299.     Binance also paid Mr. Butler to appear in an advertisement mocking the celebrity endorsements put out by Binance competitors. Mr. Butler lent his celebrity and credibility to the Binance platform and promoted the platform to his followers through the social media post. Mr. Butler's NFT tie-ins drove traffic to Binance websites targeting his audience and followers comprised of American professional sports fans.

---

[10] *Id.*



3.   *Mr. Butler Had Financial Incentives to Induce Class Members to Invest in Binance and to Trust the Platform.*

300.   Mr. Butler had every incentive to be an effective promoter of Binance to continue the relationship and continue receiving payment for his services. The more success he had in soliciting consumers to open Binance accounts or invest in Binance's products, the more he stood to gain financially. Additionally, because a substantial amount of a major athlete's overall income is derived from promotional activities, demonstrating an ability and reputation as a successful promotor translates into financial benefit in the form of future promotional contracts.

4. *The Promotions Were Deceptive and Unlawful.*

301.     Mr. Butler and Binance launched a commercial campaign designed to bring cryptocurrency and investing on the Binance platform to the masses.

302.     Binance and the VIPs like Mr. Butler knew that these advertisements targeted consumers unfamiliar with crypto and Binance. Defendant Zhao was quoted in a February 9, 2022 Binance blog post about the "Trust Yourself" campaign, saying, "Many people are interested in blockchain-based products, like crypto, but relatively few know where to start when it comes to educating themselves on these new technologies. In addition to product and brand awareness, we need to help people understand the basics of crypto and be able to make more informed investment decisions."[11] Mr. Butler's commercials implicitly and intentionally downplayed that he was promoting Binance.

303.     Mr. Butler made deceptive statements in his promotions, including statements like "When it comes to crypto, don't call me . . . it doesn't matter what the big names say about crypto," while at the same time promoting free Binance NFTs and promoting Binance as an alternative platform for getting started and learning more about crypto using the resources provided by Binance.

5. *Mr. Butler Knew or Should Have Known He Was Soliciting or Assisting Binance to Solicit Investments in Unregistered Securities and/or that He Was Aiding and Abetting Binance's Fraud and/or Conversion.*

304.     Given Mr. Butler's investment experience and vast resources to obtain outside advisors, he knew or should have known of potential concerns about Binance selling unregistered crypto securities and/or that he was aiding and abetting Binance's fraud and/or conversion. When Mr. Butler engaged in the promotions, the legal risks of promoting investments in cryptocurrency trading platforms were well known. Through his social media promotions, NFT collection, and other

---

[11] *Id.*

advertising activities, Mr. Butler personally participated in and aided Binance in making the sale of unregistered securities.

      6.   *The Promotions Were Directed at Plaintiffs in Florida, and Customers Nationwide.*

305.    Mr. Butler's promotions were published on public social media accounts accessible to plaintiffs nationwide, including in Florida.

306.    Mr. Butler plays for a Florida-based team and, moreover, is a nationally known and famous professional basketball player, who has considerable influence on basketball fans nationwide and has a wide social media following. This influence allowed him to direct his unlawful promotions towards plaintiffs in Florida and nationwide.

307.    By hiring Mr. Butler as spokesperson, promotor, and face of the company, Binance was targeting the people of Florida, in particular, with solicitations to invest in Binance's products. While Mr. Butler enjoys significant celebrity across the country (particularly among basketball fans), his fame and influence in Florida is exponentially higher and broader due to his association with Miami and his legendary status in the minds of many Floridians, as Binance would have known and intended when Binance hired him.

## VIII.  The SEC's Consistent Approach to Cryptocurrency

308.    The SEC's stance on cryptocurrency has been clear and consistent from the beginning.

309.    The Securities and Exchange Acts are intended to apply to a broad range of securities. As such, the definitions of "security" in Section 2(a)(1) of the Securities Act of 1933 (Securities Act), 15 U.S. C. 77b(a)(1), and Section 3(a)(10) of the Securities Exchange Act of 1934 (Exchange Act), 15 U.S. C. 78c(a)(10), include not only conventional securities, such as "stock[s]" and "bond[s]," but also the more general term "investment contract."

310.    Along these lines, in *Reves v. Ernst & Young*, the Supreme Court stated that:

      The fundamental purpose undergirding the Securities Acts is "to eliminate serious abuses in a largely unregulated securities market." *United Housing Foundation, Inc. v.*

*Forman*, 421 U.S. 837, 421 U.S. 849 (1975). **In defining the scope of the market that it wished to regulate, Congress painted with a broad brush. It recognized the virtually limitless scope of human ingenuity, especially in the creation of "countless and variable schemes devised by those who seek the use of the money of others on the promise of profits,"** *SEC v. W.J. Howey Co.*, 328 U.S. 293, 328 U.S. 299 (1946), and determined that the best way to achieve its goal of protecting investors was "to define 'the term "security" in sufficiently broad and general terms so as to include within that definition the many types of instruments that in our commercial world fall within the ordinary concept of a security."' . . . Congress therefore did not attempt precisely to cabin the scope of the Securities Acts . . . Rather, it enacted a definition of "security" sufficiently broad to encompass virtually any instrument that might be sold as an investment.

*Reves v. Ernst & Young*, 494 U.S. 56, 60-61 (1990) (emphasis added).

311.     Crafted to contemplate not only known securities arrangements at the time, but also any prospective instruments created by those who seek the use of others' money on the promise of profits, the definition of "security" is broad, sweeping, and designed to be flexible to capture new instruments that share the common characteristics of stocks and bonds. As Supreme Court Justice (and former SEC Commissioner (1935) and Chair (1936-37)) William O. Douglas opined in *Superintendent of Insurance v. Bankers Life and Casualty Co.*:

> We believe that section 10(b) and Rule 10b-5 prohibit all fraudulent schemes in connection with the purchase or sale of securities, whether the artifices employed involve a garden type variety fraud, or present a unique form of deception. Novel or atypical methods should not provide immunity from the securities laws.

312.     The *Howey* Test provides that an investment contract exists if there is an "investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others."[12] The *Howey* Test is the principal method used by the SEC to determine if a given cryptocurrency is a security.

313.     The SEC has used multiple distribution channels to share its message and concerns regarding crypto, digital trading platforms, initial coin offerings, and other digital asset products and

---

[12] *Id.*

services over the past decade. The SEC first made investors aware of the dangers of investing in cryptocurrency in 2013 when the Office of Investor Education and Advocacy issued an Investor Alert on "Ponzi Schemes Using Virtual Currencies."[13] A year later, the same office issued an Investor Alert on "Bitcoin and Other Virtual Currency-Related Investments."[14]

314.    In 2017, the Commission took the rare step of releasing a Section 21(a) Report of Investigation that looked at the facts and circumstances of The DAO, which offered and sold approximately 1.15 billion DAO Tokens in exchange for a total of approximately 12 million Ether ("ETH") over a one-month period in 2016.[15] The SEC applied the *Howey* Test to the DAO tokens and concluded they were securities under the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act"). While The DAO, and DAO tokens, were no longer operational at the time due to a high-profile hack that resulted in the theft of most DAO tokens, the Commission chose to release the report so as "to advise those who would use a Decentralized Autonomous Organization ("DAO Entity"), or other distributed ledger or blockchain-enabled means for capital raising, to take appropriate steps to ensure compliance with the U.S. federal securities laws."[16]

315.    In 2019, the SEC released a "Framework for 'Investment Contract' Analysis of Digital Assets" which provided additional details on when a digital asset has the characteristics of an investment contract and "whether offers and sales of a digital asset are securities transactions."[17]

---

[13] https://www.sec.gov/investor/alerts/ia_virtualcurrencies.pdf (accessed June 27, 2023).

[14] https://www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/%20investor-alerts/investor-39 (accessed June 27, 2023).

[15] https://www.sec.gov/litigation/investreport/34-81207.pdf (accessed June 27, 2023).

[16] https://www.sec.gov/litigation/investreport/34-81207.pdf (accessed June 27, 2023).

[17]    https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets (accessed June 27, 2023).

316.     As stated by Chair Gensler, "crypto security issuers need to register the offer and sale of their investment contracts or meet the requirements for an exemption." The SEC has "provided years of guidance to market participants on what does or does not constitute a crypto asset security."[18]

317.     In addition, the SEC has publicized its position on cryptocurrency in countless enforcement actions,[19] multiple speeches,[20] Congressional testimony,[21] and several official SEC statements[22] and proclamations.[23] Chair Gensler has spoken frequently about the perils and illegality of crypto lending platforms and decentralized finance,[24] warning that their failure to register with the SEC may violate U.S. securities laws.[25] In one interview, Gensler said:

> The law is clear, it's not about waving a wand. Congress spoke about this in 1934 . . . When a [digital] platform has securities on it, it is an exchange, and it's a question of whether they're registered or they're operating outside of the law and I'll leave it at that.[26]

318.     On September 8, 2022, Chair Gensler gave a speech reflecting on the flexibility of the securities laws and the SEC's consistency in applying these laws to cryptocurrency.[27] Gensler noted

---

[18] https://www.sec.gov/news/speech/gensler-remarks-piper-sandler-060823.

[19] https://www.sec.gov/spotlight/cybersecurity-enforcement-actions (accessed June 27, 2023).

[20] https://www.sec.gov/news/speech/gensler-aspen-security-forum-2021-08-03 (accessed June 27, 2023).

[21] https://www.sec.gov/news/testimony/gensler-2021-05-26 (accessed June 27, 2023).

[22] https://www.sec.gov/news/public-statement/statement-clayton-2017-12-11 (accessed June 27, 2023).

[23] https://www.sec.gov/news/public-statement/enforcement-tm-statement-potentially-unlawful-online-platforms-trading (accessed June 27, 2023).

[24] https://www.theblock.co/post/113416/gensler-speech-crypto-defi-lending-sec (accessed June 27, 2023).

[25] https://ca.finance.yahoo.com/news/crypto-platforms-dont-register-with-sec-outside-the-law-gensler- 164215740.html (accessed June 27, 2023).

[26] https://www.theblock.co/post/113416/gensler-speech-crypto-defi-lending-sec (accessed June 27, 2023).

[27] https://www.sec.gov/news/speech/gensler-sec-speaks-090822#_ftnref3 (accessed June 27, 2023).

that of the 10,000 different cryptocurrencies in the market, "the vast majority are securities," a position that was also held by his predecessor, Jay Clayton.[28] Gensler went on to note that the SEC has spoken with a "pretty clear voice" when it comes to cryptocurrency "through the DAO Report, the Munchee Order, and dozens of Enforcement actions, all voted on by the Commission" and that "[n]ot liking the message isn't the same thing as not receiving it."[29]

319.    On June 8, 2023, Chair Gensler spoke at the Global Exchange & Fintech Conference. He stated that: "As I've said numerous times, the vast majority of crypto tokens meet the investment contract test. Not liking the message isn't the same thing as not receiving it."[30] Gensler went on to state:

> It doesn't matter what kind of assets investors put into a lending or staking-as-a-service platform—cash, gold, bitcoin, or anything else. It's what the intermediary says that they are going to do with the assets that determines what protections are provided by the law. Customers invest their assets with the platform, which then onlends them or pools and stakes them, in each case promising a return. These are classic securities, irrespective of whether crypto is involved.[31]

320.    The judicial record supports Chair Gensler's assertions. The SEC has taken over 100 crypto-related enforcement actions and has not lost a single case.[32]

321.    Below are summaries of five cases that will help inform this litigation.

---

[28] *Id.*

[29] *Id.*

[30] https://www.sec.gov/news/speech/gensler-remarks-piper-sandler-060823 (accessed June 27, 2023).

[31] *Id.*

[32] https://www.cornerstone.com/wp-content/uploads/2022/01/SEC-Cryptocurrency-Enforcement-2021-Update.pdf (accessed June 27, 2023).

a.      SEC v. KIK

322.    In Kik[33], the SEC's complaint[34], filed in the U.S. District Court for the Southern District of New York on June 4, 2019, alleged that Kik sold digital asset securities to U.S. investors without registering their offer and sale as required by the U.S. securities laws. Kik argued that the SEC's lawsuit against it should be considered "void for vagueness."[35]

323.    The court granted the SEC's motion for summary judgment on September 30, 2020, finding that undisputed facts established that Kik's sales of "Kin" tokens were sales of investment contracts (and therefore of securities) and that Kik violated the federal securities laws when it conducted an unregistered offering of securities that did not qualify for any exemption from registration requirements. The court further found that Kik's private and public token sales were a single integrated offering.

b.      SEC v. Telegram

324.    In Telegram,[36] the SEC filed a complaint[37] on October 11, 2019, alleging that the company had raised capital to finance its business by selling approximately 2.9 billion "Grams" to 171 initial purchasers worldwide. The SEC sought to preliminarily enjoin Telegram from delivering the

---

[33] https://www.sec.gov/news/press-release/2020-262 (accessed June 27, 2023).

[34] https://www.sec.gov/news/press-release/2019-87 (accessed June 27, 2023).

[35] https://www.financemagnates.com/cryptocurrency/news/sec-seeks-to-block-kik-subpoenas-refutes-void-for-vagueness-claim/ (accessed June 27, 2023).

[36] https://www.sec.gov/news/press-release/2020-146 (accessed June 27, 2023).

[37] https://www.sec.gov/news/press-release/2019-212 (accessed June 27, 2023).

Grams it sold, which the SEC alleged were securities that had been offered and sold in violation of the registration requirements of the federal securities laws.

325.     Telegram argued[38] that the SEC has "engaged in improper 'regulation by enforcement' in this nascent area of the law, failed to provide clear guidance and fair notice of its views as to what conduct constitutes a violation of the federal securities laws, and has now adopted an ad hoc legal position that is contrary to judicial precedent and the publicly expressed views of its own high-ranking officials."

326.     On March 24, 2020, the U.S. District Court for the Southern District of New York issued a preliminary injunction[39] barring the delivery of Grams and finding that the SEC had shown a substantial likelihood of proving that Telegram's sales were part of a larger scheme to distribute the Grams to the secondary public market unlawfully.

327.     Without admitting or denying the allegations in the SEC's complaint, the defendants consented to the entry of a final judgment enjoining them from violating the registration provisions of Sections 5(a) and 5(c) of the Securities Act of 1933. The judgment ordered the defendants to disgorge, on a joint and several basis, $1,224,000,000.00 in ill-gotten gains from the sale of Grams, with credit for the amounts Telegram pays back to initial purchasers of Grams. It also ordered Telegram Group Inc. to pay a civil penalty of $18,500,000. For the next three years, Telegram is further required to give notice to the SEC staff before participating in the issuance of any digital assets.

---

[38] https://www.financemagnates.com/cryptocurrency/news/sec-vs-telegram-will-gram-tokens-ever-be-distributed/ (accessed June 27, 2023).

[39] https://www.gtlaw.com/en/insights/2020/4/sec-v-telegram--a-groundbreaking-decision-in-cryptocurrency-enforcement (accessed June 27, 2023).

c.      SEC v. BlockFi

328.    In BlockFi Lending LLC, the first SEC case ever involving a crypto-lending program, on February 22, 2022, the SEC charged BlockFi [40] with failing to register the offers and sales of its retail crypto-lending product and also charged BlockFi with violating the registration provisions of the Investment Company Act of 1940.

329.    BlockFi argued for "increased regulatory clarity" but lost.[41]

330.    To settle the SEC's charges, BlockFi agreed to pay a $50 million penalty, cease its unregistered offers and sales of the lending product, BlockFi Interest Accounts (BIAs), and bring its business within the provisions of the Investment Company Act within 60 days. BlockFi's parent company also announced that it intends to register under the Securities Act of 1933 the offer and sale of a new lending product. In parallel actions, BlockFi agreed to pay an additional $50 million in fines to 32 states to settle similar charges.

d.      SEC Wells Notice to Coinbase

331.    In 2021, Coinbase began marketing a cryptocurrency lending product called Lend. The Lend program purported to allow some Coinbase customers to "earn interest on select assets on Coinbase, starting with 4% APY on USD Coin (USDC)."[42] According to Coinbase, its lawyers reached out to the SEC to discuss its Lend product, at which point SEC staff instead served Coinbase with a *Wells* Notice, informing Coinbase of their intention to seek approval from the SEC Commissioners to file a civil enforcement action against Coinbase for violating the federal securities laws.

---

[40] https://lnkd.in/d-Xy45ec (accessed June 27, 2023).

[41] https://blockfi.com/pioneering-regulatory-clarity (accessed June 27, 2023).

[42]    https://www.coinbase.com/blog/the-sec-has-told-us-it-wants-to-sue-us-over-lend-we-have-no-idea-why (accessed June 27, 2023).

332.     According to Coinbase, the SEC issued the Wells Notice because of Coinbase's failure to file a registration statement with the SEC for the offering of its Lend product, which the SEC believed was a security.[43]

333.     The two cases that Coinbase claims the SEC cites as support for its *Wells* Notice are *SEC v. Howey* and *Reves v. Ernst & Young*. *Reves* addressed the question of whether a product is a "note" and hence a security (applying the so-called "Family Resemblance Test").

334.     Under the Lend program, Coinbase customers were clearly investing "money" at Coinbase and placing their faith in Coinbase to generate a profit for them. Lend investors would have no say in how Coinbase runs the Lend program and Coinbase was not going to permit Lend investors to participant in Lend-related decisions. Given these facts, Lend was clearly an investment contract.

335.     Under *Reves*, Lend may have also been a "note" and hence a security. Although the term "note" is included in the statutory definition of a security, case law has determined that not every "note" is a security. The definition specifically excludes notes with a term of less than nine months and courts have carved out a range of exemptions over the years for commercial paper-type notes such as purchase money loans and privately negotiated bank loans. To reconcile these varying cases, the U.S. Supreme Court in *Reves* established the "family resemblance test," to determine whether a note is a security.

336.     Per the "family resemblance test," a presumption that a note is a security can only be rebutted if the note bears a resemblance to one of the enumerated categories on a judicially developed list of exceptions, as follows: 1) a note delivered in consumer financing; 2) a note secured by a mortgage on a home; 3) a short-term note secured by a lien on a small business or some of its assets; 4) a note evidencing a character loan to a bank customer; 5) a short-term note secured by an

---

[43] *Id.*

assignment of accounts receivable; 6) a note which simply formalizes an open-account debt incurred in the ordinary course of business (such as a trade payable for office supplies); and 7) a note evidencing loans by commercial banks for current operations.

337.   The "family resemblance" analysis requires:

- A consideration of the motivation of the seller and buyer (e.g. is the seller looking for investment and the buyer looking for profit?);

- The plan of distribution of the note (e.g. is the product being marketed as an investment?);

- The expectation of the creditor/investor (e.g. would the investing public reasonably expect the application of the securities laws to the product); and

- The presence of an alternative regulation (e.g. will the product be registered as a banking product and the offered registered as a bank?).

338.   Applying the family resemblance test to Lend reveals the presence of a note. First, Coinbase likened the Lend program to that of a savings account, where the Lend customer is looking for a profitable investment and Coinbase is looking for investors. Second, Coinbase marketed the Lend program as an investment. Third, investors would expect that securities regulation applies. Fourth, Coinbase is not a bank, so their so-called savings account falls under no other regulatory jurisdiction and protection.

339.   Given the clear facts of the case, Coinbase decided to cancel the Lend program.[44]

e.   SEC v. Binance

340.   In Binance, the SEC filed a complaint on June 5, 2023, in the United States District Court for the District of Columbia against several of the Binance entities including Binance.com, U.S.-based affiliates, and the founder Zhao. The SEC alleges that Binance.com and the other defendants violated thirteen securities laws, including selling various unregistered securities and a staking-as-a-

---

[44]   https://www.theverge.com/2021/9/20/22684169/coinbase-crypto-lend-feature-discontinued-sec-lawsuit-threats (accessed June 27, 2023).

service program; operating an unregistered exchange, broker-dealer, and clearing agency across interstate lines; covertly controlling Binance.US to evade U.S. securities laws; secretly allowing U.S. high-value traders to remain on the international platform; and commingling billions of U.S. assets with Zhao-owned entities. The SEC seeks a preliminary injunction to, among other relief, freeze and repatriate defendants' U.S. assets. The SEC also seeks to permanently enjoin defendants from directly or indirectly violating the Exchange and Securities Acts, disgorge illegal gains, and award civil damages.

     f.    <u>SEC v. Coinbase</u>

341.    Coinbase, the SEC filed a complaint[45] on June 6, 2023, in the United States District Court for the Southern District of New York against Coinbase and Coinbase Global. The SEC alleges that the Coinbase entities have violated multiple securities laws, including making billions of dollars from selling various unregistered securities and a staking-as-a-service program; and operating an unregistered exchange, broker-dealer, and clearing agency across interstate lines. The SEC seeks to permanently enjoin defendants from directly or indirectly violating the Exchange and Securities Acts, disgorge illegal gains, and award civil damages. "Coinbase was fully aware of the applicability of the federal securities laws to its business activities, but deliberately refused to follow them," stated Gurbir S. Grewal, Director of the SEC's Division of Enforcement.[46]

## **CLASS ACTION ALLEGATIONS**

342.    As detailed below in the individual counts, Plaintiffs bring this lawsuit on behalf of themselves and all others similarly situated, pursuant to Rule 23(a), (b)(2), (b)(3), and/or (c)(4) of the Federal Rules of Civil Procedure.

---

[45] https://www.sec.gov/litigation/complaints/2023/comp-pr2023-102.pdf.
[46] https://www.sec.gov/news/press-release/2023-102.

### I.  Class Definitions

343.  Plaintiffs seek to represent the following Global Class, if the Court finds Florida's securities statutes apply to all members of that class, and alternatively the following Nationwide Class, if the Court finds Florida's securities statutes apply to all members of that class. Further in the alternative, Plaintiffs Vazquez and Vongdara seek to represent the following Florida Subclass, Plaintiff Sizemore seeks to represent the following California Subclass, and Plaintiff Lewis seeks to represent the following Colorado Subclass (collectively, the "Classes"):

> **(1) <u>Global Class</u>:** All persons and entities who, within the applicable limitations period, A) purchased, held, and/or sold the cryptocurrency tokens BNB and/or BUSD on any platform, B) purchased, held, and/or sold SOL, ADA, MATIC, FIL, ATOM, SAND, MANA, ALGO, AXS, or COTI on Binance.US or Binance.com, or C) participated in the programs BNB Vault, Simple Earn, and/or any staking program through Binance.US or Binance.com.

> **(2) <u>Nationwide Class</u>:** All persons or entities in the United States who, within the applicable limitations period, A) purchased, held, and/or sold the cryptocurrency tokens BNB and/or BUSD on any platform, B) purchased, held, and/or sold SOL, ADA, MATIC, FIL, ATOM, SAND, MANA, ALGO, AXS, or COTI on Binance.US or Binance.com, or C) participated in the programs BNB Vault, Simple Earn, and/or any staking program through Binance.US or Binance.com.

**<u>In the alternative:</u>**

> **(3) <u>Florida Subclass</u>:** All persons or entities in the state of Florida who, within the applicable limitations period, A) purchased, held, and/or sold the cryptocurrency tokens BNB and/or BUSD on any platform, B) purchased, held, and/or sold SOL, ADA, MATIC, FIL, ATOM, SAND, MANA, ALGO, AXS, or COTI on

Binance.US or Binance.com, or C) participated in the programs BNB Vault, Simple Earn, and/or any staking program through Binance.US or Binance.com.

(4) **California Subclass:** All persons or entities in the state of California who, within the applicable limitations period, A) purchased, held, and/or sold the cryptocurrency tokens BNB and/or BUSD on any platform, B) purchased, held, and/or sold SOL, ADA, MATIC, FIL, ATOM, SAND, MANA, ALGO, AXS, or COTI on Binance.US or Binance.com, or C) participated in the programs BNB Vault, Simple Earn, and/or any staking program through Binance.US or Binance.com.

(5) **Colorado Subclass:** All persons or entities in the state of Colorado who, within the applicable limitations period, A) purchased, held, and/or sold the cryptocurrency tokens BNB and/or BUSD on any platform, B) purchased, held, and/or sold SOL, ADA, MATIC, FIL, ATOM, SAND, MANA, ALGO, AXS, or COTI on Binance.US or Binance.com, or C) participated in the programs BNB Vault, Simple Earn, and/or any staking program through Binance.US or Binance.com.

344. Excluded from the Classes are Defendants and their officers, directors, affiliates, legal representatives, and employees, the Binance entities and their officers, directors, affiliates, legal representatives, and employees, any governmental entities, any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

345. Plaintiffs reserve the right to modify or amend the definition of the proposed Classes, or to include additional classes or subclasses, before or after the Court determines whether such certification is appropriate as discovery progresses.

## II.   Numerosity

346.    The Classes are comprised of thousands, if not millions, of consumers globally, to whom Binance offered and/or sold unregistered securities. Moreover, thousands, if not millions, of consumers worldwide have executed trades on the Binance platform and purchased unregistered securities within the applicable limitations period. Membership in the Classes are thus so numerous that joinder of all members is impracticable. The precise number of class members is currently unknown to Plaintiffs but is easily identifiable through other means, such as through Binance's corporate records or self-identification.

## III.   Commonality/Predominance

347.    This action involves common questions of law and fact, which predominate over any questions affecting individual class members. These common legal and factual questions include, but are not limited to, the following:

(a)   whether Defendants offered and sold unregistered securities under applicable law;

(b)   whether Defendants' participation and/or actions in Binance's offerings and sales of unregistered securities violate the provisions of applicable securities law.

(c)   the type and measure of damages suffered by Plaintiffs and the Classes.

(a)   whether Defendants' practices violate state consumer protection statutes;

(b)   whether Plaintiffs and members of the Classes have sustained monetary loss and the proper measure of that loss;

(c)   whether Plaintiffs and members of the Classes are entitled to injunctive relief;

(d)   whether Plaintiffs and members of the Classes are entitled to declaratory relief; and

(e)   whether Plaintiffs and members of the Classes are entitled to consequential damages, punitive damages, statutory damages, disgorgement, and/or other legal or equitable appropriate remedies as a result of Defendants' conduct.

## IV.  Typicality

348.    Plaintiffs' claims are typical of the claims of the members of the Classes because all members were injured through the uniform misconduct described above, namely that Plaintiffs and all class members were offered and/or sold Binance's unregistered securities because of Defendants' actions and/or participation in the offering and sale of these unregistered securities, and Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all such members. Further, there are no defenses available to any Defendant that are unique to Plaintiffs.

## V.  Adequacy of Representation

349.    Plaintiffs will fairly and adequately protect the interests of the members of the Classes. Plaintiffs have retained counsel experienced in complex consumer class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no adverse or antagonistic interests to those of the Classes. Plaintiffs anticipate no difficulty in the management of this litigation as a class action. To prosecute this case, Plaintiffs have chosen the undersigned law firms, which have the financial and legal resources to meet the substantial costs and legal issues associated with this type of consumer class litigation.

## VI.  Requirements of Fed. R. Civ. P. 23(b)(3)

350.    The questions of law or fact common to Plaintiffs' and each Class member's claims predominate over any questions of law or fact affecting only individual members of the Classes. All claims by Plaintiffs and the unnamed members of the Classes are based on the common course of conduct by Defendants (1) in marketing, offering, and/or selling unregistered securities, and/or (2) in receiving secret undisclosed compensation for their promotion of the Binance platform.

351.    Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

352.     As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the Classes as is in the case at bar, common questions will be held to predominate over individual questions.

**VII.   Superiority**

353.     A class action is superior to individual actions for the proposed Classes, in part because of the non-exhaustive factors listed below:

(a)  Joinder of all members of the Classes would create extreme hardship and inconvenience for the affected customers as they reside nationwide and throughout the state;

(b)  Individual claims by members of the Classes are impracticable because the costs to pursue individual claims exceed the value of what any one Class member has at stake. As a result, individual Class members have no interest in prosecuting and controlling separate actions;

(c)  There are no known individual members of the Classes who are interested in individually controlling the prosecution of separate actions;

(d)  The interests of justice will be well served by resolving the common disputes of potential members of the Classes in one forum;

(e)  Individual suits would not be cost effective or economically maintainable as individual actions; and

(f)  The action is manageable as a class action.

**VIII.   Requirements of Fed. R. Civ. P. 23(b)(2)**

354.     Defendants have acted and refused to act on grounds generally applicable to the Classes by engaging in a common course of conduct of offering and/or selling, and/or aiding and

abetting the offering and/or selling of unregistered securities, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

355.     Defendants have acted and refused to act on grounds generally applicable to the Classes by engaging in a common course of conduct of uniformly identical and uniform misrepresentations and omissions in receiving secret undisclosed compensation for their promotion of the Binance platforms, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

## IX.   Requirements of Fed. R. Civ. P. 23(c)(4)

356.     As it is clear that one of the predominant issues regarding Defendants' liability is whether the assets Defendants offered and/or sold are unregistered securities, utilizing Rule 23(c)(4) to certify the Classes for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

357.     As it is clear that another predominant issue regarding Defendants' liability is whether they have violated state consumer protection and securities laws in making identical and uniform misrepresentations and omissions regarding the functionality of the Binance platforms, and/or in receiving secret undisclosed compensation for their promotion of the Binance platforms, utilizing Rule 23(c)(4) to certify the Classes for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

## X.   Nature of Notice to the Proposed Class.

358.     The names and addresses of all Members of the Classes are contained in the business records maintained by Binance and are readily available to Binance. The Members of the Classes are readily and objectively identifiable. Plaintiffs contemplate that notice will be provided to Members by e-mail, mail, and published notice.

<u>**COUNT ONE**</u>

**Violations of the Florida Statute Section 517.07,**
**The Florida Securities and Investor Protection Act**
*(Plaintiffs individually and on behalf of the Global Class, alternatively,*
*Plaintiffs individually and on behalf of the Nationwide Class, alternatively,*
*Plaintiffs Vazquez and Vongdara individually and on behalf of the Florida Subclass)*

359.   Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–358 above, as if fully set forth herein.

360.   Section 517.07(1), Fla. Stat., provides that it is unlawful and a violation for any person to sell or offer to sell a security within the State of Florida unless the security is exempt under Fla. Stat. § 517.051, is sold in a transaction exempt under Fla. Stat. § 517.061, is a federally covered security, or is registered pursuant to Ch. 517, Fla. Stat.

361.   Section 517.211 extends liability to any "director, officer, partner, or agent of or for the seller, if the director, officer, partner, or agent has personally participated or aided in making the sale, is jointly and severally liable to the purchaser in an action for rescission, if the purchaser still owns the security, or for damages, if the purchaser has sold the security."

362.   The BNB, BUSD, SOL, ADA, MATIC, FIL, ATOM, SAND, MANA, ALGO, AXS, and COTI tokens, and the BNB Vault and/or Simple Earn offered and sold to Plaintiffs and Class members are each a security pursuant to Fla. Stat. § 517.021(22)(a).

363.   The securities sold and offered for sale to Plaintiffs and class members were not:

    a.   exempt from registration under Fla. Stat. § 517.051;

    b.   a federal covered security;

    c.   registered with the Office of Financial Regulations (OFR); or

    d.   sold in a transaction exempt under Fla. Stat. § 517.061.

364.   Binance sold and offered to sell the unregistered securities to Plaintiffs and Class members. Binance's sale and offer to sell the unregistered securities is a violation of Fla. Stat. § 517.07.

365.     Defendants Zhao, Butler, Armstrong and/or Paxos are directors, officers, partners, and/or agents of Binance pursuant to Fla. Stat. § 517.211.

366.     Binance, with Defendants Zhao, Butler, Armstrong and/or Paxos' material assistance and personal participation, offered and sold the unregistered BNB, BUSD, SOL, ADA, MATIC, FIL, ATOM, SAND, MANA, ALGO, AXS, and COTI tokens, and the BNB Vault and/or Simple Earn securities to Plaintiffs and the members of the Classes. As a result of this assistance, Defendants Zhao, Butler, Armstrong and/or Paxos violated Fla. Stat. § 517.07 *et seq.* and Plaintiffs and members of the Classes sustained damages as herein described.

## COUNT TWO

### For Violations of the Florida Deceptive and Unfair Trade Practices Act, § 501.201, Florida Statutes, *et seq.*
*(Plaintiffs individually and on behalf of the Global Class, alternatively,
Plaintiffs individually and on behalf of the Nationwide Class, alternatively,
Plaintiffs Vazquez and Vongdara individually and on behalf of the Florida Subclass)*

367.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–358 above, as if fully set forth herein.

368.     This cause of action is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act, section 501.201, Fla. Stat., *et seq.* ("FDUTPA"). The stated purpose of the FDUTPA is to "protect the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202(2), Fla. Stat.

369.     Plaintiffs and members of the Classes are consumers as defined by section 501.203, Fla. Stat. Defendants are engaged in trade or commerce within the meaning of the FDUTPA, in that they are engaged in advertising, soliciting, providing, offering, or distributing, whether by sale or otherwise, a good or service, or any property whether tangible or intangible.

370.     Florida Statute section 501.204(1) declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

371.     Defendants' unfair and deceptive practices as described herein were consumer-oriented and are objectively materially likely to mislead – and have materially misled – consumers acting reasonably in the circumstances.

372.     Defendants have violated the FDUTPA by engaging in the unfair and deceptive practices as described herein, which offend public policies and are immoral, unethical, unscrupulous and injurious to consumers.

373.     Plaintiffs and consumers in the Classes have been aggrieved in the amount of their lost investments by Defendants' unfair and deceptive practices and acts, as more fully described herein.

374.     The harm suffered by Plaintiffs and consumers in the Classes was directly and proximately caused by the deceptive and unfair practices of Defendants, as more fully described herein.

375.     Pursuant to sections 501.211(2) and 501.2105, Fla. Stat., Plaintiffs and consumers in the Classes make claims for actual damages, attorneys' fees and costs.

376.     Defendants still utilize many of the deceptive acts and practices described above. Plaintiffs and the other consumers in the Classes have suffered and will continue to suffer irreparable harm if Defendants continue to engage in such deceptive, unfair, and unreasonable practices. Section 501.211(1) entitles Plaintiffs and the Classes to obtain both declaratory or injunctive relief to put an end to Defendants' unfair and deceptive scheme.

## COUNT THREE

### Violations of the California Securities Law (CSL)
### Cal. Corp. Code §§ 25110 *et seq.*
*(Plaintiff Sizemore individually and on behalf of the California Subclass)*

377.     Plaintiff Sizemore repeats and re-alleges the allegations contained in paragraphs 1–358 above, as if fully set forth herein.

378.     The BNB, BUSD, SOL, ADA, MATIC, FIL, ATOM, SAND, MANA, ALGO, AXS, and COTI tokens, and the BNB Vault and/or Simple Earn are securities within the meaning of the California Corporations Code.

379.     California Corp. Code § 25110 prohibits the offer or sale of any security unless the security has been first qualified through registration or exempted. Section 25503 affords a statutory cause of action to victimized investors for violations of Section 25110. Section 25504.1 extends liability under Section 25503 to any person who materially assists in a violation of Section 25110 and makes them jointly and severally liable with any other person liable under Section 25503.

380.     Binance, with Defendants Zhao, Butler, Armstrong and/or Paxos' material assistance, sold and offered to sell the BNB, BUSD, SOL, ADA, MATIC, FIL, ATOM, SAND, MANA, ALGO, AXS, and COTI tokens, and the BNB Vault and/or Simple Earn securities to Plaintiff and Class members. Binance offered and sold these securities even though the securities were not properly registered or qualified for offer or sale either with any federal or California regulator.

381.     Defendants Zhao, Butler, Armstrong and/or Paxos materially assisted Binance in the offering and selling of the unregistered BNB, BUSD, SOL, ADA, MATIC, FIL, ATOM, SAND,

MANA, ALGO, AXS, and COTI tokens, and the BNB Vault and/or Simple Earn securities in California in violation of Section 25503.[47]

382.     As a result, Binance and Defendants Zhao, Butler, Armstrong and/or Paxos have violated Sections 25110 and 25503 of the California Corporations Code.

383.     California Corp. Code § 25210(b) provides: "No person shall . . . effect any transaction in, or induce or attempt to induce the purchase or sale of, any security in [California] unless [the] broker-dealer and agent have complied with any rules as the commissioner may adopt for the qualification and employment of those agents."

384.     Defendants Zhao, Butler, Armstrong and/or Paxos breached Section 25210(b) by encouraging Binance to offer and sell the BNB, BUSD, SOL, ADA, MATIC, FIL, ATOM, SAND, MANA, ALGO, AXS, and COTI tokens, and the BNB Vault and/or Simple Earn securities to Plaintiff and Class members in California even though Binance was not licensed under the California Corp. Code.

385.     California Corp. Code § 25401 prohibits fraud in the offer or sale of securities by any person in California. Section 25501 affords a statutory cause of action to victimized investors for violations of Section 25401. Section 25504.1 extends liability under Section 25503 to any person who materially assists in a violation of Section 25401 with the intent to deceive or defraud and makes them jointly and severally liable with any other person liable under Section 25503.

386.     Binance, with with Defendants Zhao, Butler, Armstrong and/or Paxos' material assistance, offered and sold the BNB, BUSD, SOL, ADA, MATIC, FIL, ATOM, SAND, MANA, ALGO, AXS, and COTI tokens, and the BNB Vault and/or Simple Earn securities to Plaintiff and

---

[47] Plaintiffs contend that secondary liability for materially assisting a strict liability violation of the qualification requirements of Section 25110 does not require proof that Defendants Zhao, Butler, Armstrong and/or Paxos intended "to deceive or defraud." However, Plaintiffs in the alternative contend that even if so, Defendants' knowledge of and participation in Binance's non-compliance with the CSL establishes their intent to deceive investors regarding the unregistered.

Class members in California by means of written and/or oral communications consisting of untrue statements of a material fact and/or omitting to state a material fact necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading.

387.     As a result of their actions, Defendants, separately or together, caused a false statement or omission to be made in connection with the offer and sale of the BNB, BUSD, SOL, ADA, MATIC, FIL, ATOM, SAND, MANA, ALGO, AXS, and COTI tokens, and the BNB Vault and/or Simple Earn securities to Plaintiff and Class members in California.

388.     Defendants, separately or together, had knowledge of the falsity or misleading nature of a statement or omission made in connection with the offer or sale of these unregistered securities, or were negligent in failing to investigate and discover the falsity of the statement or omission. Defendants, separately or together, were aware that a fact being misrepresented or omitted was material to Plaintiff's and Class members' decision to invest in the Binance securities.

389.     Binance and Defendants Zhao, Butler, Armstrong and/or Paxos are accordingly joint and severally liable to Plaintiff and members of the Class for rescissionary damages under Section 25504.1.

390.     Plaintiff and members of the Class hereby conditionally tender their Binance securities in accordance with Cal. Corp. Code § 25503.

## COUNT FOUR

**For Violations of the Unfair Competition Law Business & Professions Code (UCL) § 17200, *et seq.***
*(In the alternative, Plaintiff Sizemore individually and on behalf of the California Subclass)*

391.     Plaintiff repeats and re-alleges the allegations contained in paragraphs 1–358 above, as if fully set forth herein.

392.     California's Unfair Competition Law, Business & Professions Code §§ 17200 *et seq.* (the "UCL") prohibits acts of unlawful and unfair competition, including any "unlawful, unfair or

fraudulent business act or practice," any "unfair, deceptive, untrue or misleading advertising" and any act prohibited by § 17500.

393.    Defendants engaged in unlawful acts, namely, the misrepresentations and omissions made to Plaintiff and Class Members and the offer and sale of the unregistered securities. As more fully described above, Defendants made numerous misrepresentations and omissions to Plaintiff and Class Members about the Binance platform to drive consumers to invest in the unregistered Binance securities offerings and to utilize the Binance platforms for cryptocurrency trading, misleading customers into believing that cryptocurrency assets held on the platforms were safe and were not being invested in unregistered securities. Defendants' practices described herein are likely to mislead—and clearly have misled—consumers acting reasonably under the circumstances to invest in Binance.

394.    Defendants' actions as alleged above also constitute unfair competition in that the actions offend public policy and are unethical, oppressive, and unscrupulous, and are substantially injurious to the public, and a violation of the Code.

395.    Defendants' unlawful practices were a proximate cause of the injuries to Plaintiff and Class Members and caused and continues to cause substantial injury to Plaintiff and the Class Members.

396.    By reason of the foregoing, Defendants should be required to pay restitution to Plaintiff and Class Members.

## COUNT FIVE

### Violations of the Colorado Securities Act,
### Section 11-51-101 *et seq*
*(In the alternative, Plaintiff Lewis individually and on behalf of the Colorado Subclass)*

397.    Plaintiff repeats and re-alleges the allegations contained in paragraphs 1–358 above, as if fully set forth herein.

398.     The purpose of the Colorado Securities Act is "to protect investors and maintain public confidence in securities markets while avoiding unreasonable burdens on participants in capital markets. Colo. Rev. Stat. § 11-51-101(2).

399.     Section 11-51-301 provides that it is "unlawful for any person to offer to sell or sell any security in Colorado unless it is registered pursuant to article 51, it is a security or transaction exempt under section 11-51-307, 11-51-308, 11-51-308.5, or 11-51-309, or is a federally covered security.

400.     The BNB, BUSD, SOL, ADA, MATIC, FIL, ATOM, SAND, MANA, ALGO, AXS, and COTI tokens, and the BNB Vault and/or Simple Earn offered and sold to Plaintiff and Class members are each a security pursuant to § 11-51-201(17).

401.     The securities sold and offered for sale to Plaintiffs and class members were not registered as required, nor were they federally covered securities or exempt from registration.

402.     Binance sold and offered to sell the unregistered securities to Plaintiff and Class members. Binance's sale and offer to sell the unregistered securities is a violation of the Colorado Securities Act.

403.     Section 11-51-501 prohibits fraud "in connection with the offer, sale, or purchase of any security, directly or indirectly." Section 11-51-604(4) provides a statutory cause of action to victimized investors for violations of Section 11-51-501. Section 11-51-604(5)(c) extends liability under Section 11-51-604(4) to any person who "gives substantial assistance to such conduct" and holds them "jointly and severally liable."

404.     Binance, with with Defendants Zhao, Butler, Armstrong and/or Paxos' material assistance, offered and sold the BNB, BUSD, SOL, ADA, MATIC, FIL, ATOM, SAND, MANA, ALGO, AXS, and COTI tokens, and the BNB Vault and/or Simple Earn securities to Plaintiff and Class members in Colorado by means of written and/or oral communications consisting of untrue

statements of a material fact and/or omitting to state a material fact necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading.

405.     As a result of their actions, Defendants, separately or together, caused a false statement or omission to be made in connection with the offer and sale of the BNB, BUSD, SOL, ADA, MATIC, FIL, ATOM, SAND, MANA, ALGO, AXS, and COTI tokens, and the BNB Vault and/or Simple Earn securities to Plaintiff and Class members in Colorado.

406.     Defendants, separately or together, had knowledge of the falsity or misleading nature of a statement or omission made in connection with the offer or sale of these unregistered securities, or were negligent in failing to investigate and discover the falsity of the statement or omission. Defendants, separately or together, were aware that a fact being misrepresented or omitted was material to Plaintiff's and Class members' decision to invest in the Binance securities.

407.     Binance and Defendants Zhao, Butler, Armstrong and/or Paxos are accordingly joint and severally liable to Plaintiff and members of the Class for rescissionary damages under Section 11-51-604(5)(c).

## COUNT SIX

### For Violations of the Colorado Consumer Protection Act (CCPA), § 6-1-101 *et se q*, C.R.A
*(In the alternative, Plaintiff Lewis individually and on behalf of the Colorado Subclass)*

408.     Plaintiff repeats and re-alleges the allegations contained in paragraphs 1–358 above, as if fully set forth herein.

409.     The Colorado Consumer Protection Act prohibits deceptive trade practices as set forth in section 6-1-105, C.R.S. (2009).

410.     As a result of Defendants' actions as described above, Defendants have engaged in one or more deceptive trade practices, in violation of the Colorado Consumer Protection Act.

411.     Defendants are "person[s]" under the CCPA. *See* Colo. Stat. § 6-1-102(6).

412.    Defendants' actions significantly impacts the public as all investors have been aggrieved in the amount of their lost investments by Defendants' unfair and deceptive practices and acts, as more fully described herein.

413.    As a result of Plaintiff's and Class members' lost investments, Plaintiff and Class members have suffered injury in fact to a legally protected interest.

414.    The harm suffered by Plaintiff and consumers in the Class was directly and proximately caused by Defendants' deceptive trade practices, as more fully described herein.

415.    Pursuant to section 6-1-113 of the CCPA, Plaintiff and consumers in the Class make claims for actual damages, attorneys' fees and costs.

## COUNT SEVEN

### Civil Conspiracy

*(Plaintiffs individually and on behalf of the Global Class, alternatively,*
*Plaintiffs individually and on behalf of the Nationwide Class, alternatively,*
*Plaintiffs Vazquez and Vongdara individually and on behalf of the Florida Subclass,*
*Plaintiff Sizemore individually and on behalf of the California Subclass, and Plaintiff Lewis individually and on*
*behalf of the Colorado Subclass)*

416.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–358 above, as if fully set forth herein.

417.    Defendants made numerous misrepresentations and omissions to Plaintiffs and Class members about the Binance Platform to induce confidence and to drive consumers to invest in Binance's unregistered securities offerings and to utilize Binance for cryptocurrency trading, misleading customers with the false impression that any cryptocurrency assets held on the Binance Platform were safe and were not being invested in unregistered securities. Defendants knew these statements to be false.

418.    Binance entered into one or more agreements with the other Defendants with the purpose of making these misrepresentations and/or omissions to induce Plaintiffs and consumers to

invest in the BNB, BUSD, SOL, ADA, MATIC, FIL, ATOM, SAND, MANA, ALGO, AXS, and COTI tokens, and the BNB Vault and/or Simple Earn unregistered securities and/or use the Binance platforms. Defendants each stood to benefit financially from assisting with this fraud as each would receive the financial and other benefits described hereinabove.

419.    Defendants engaged in unlawful acts, namely, the misrepresentations and omissions made to Plaintiffs and Class members and the sale of unregistered securities, as further described above.

420.    Defendants' conspiracy substantially assisted or encouraged the wrongdoing conducted by Binance; further, Defendants had knowledge of such fraud and/or wrongdoing, because of their experience and relationship with Binance, as described above and as such, knew that the representations made to Plaintiffs and Class members were deceitful and fraudulent. Defendants also knew that the material misrepresentations and omissions made to Plaintiffs and Class members relating to the Binance platform and the Binance securities would result in injury to Plaintiffs and the Class members.

421.    Binance's conspiracy with Defendants caused damages to Plaintiffs and Class members in the amount of their lost investments.

## COUNT EIGHT

### Conversion
*(Plaintiffs individually and on behalf of the Global Class, alternatively,*
*Plaintiffs individually and on behalf of the Nationwide Class, alternatively,*
*Plaintiffs Vazquez and Vongdara individually and on behalf of the Florida Subclass and*
*Plaintiff Sizemore individually and on behalf of the California Subclass, and Plaintiff Lewis individually and on*
*behalf of the Colorado Subclass)*

422.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1–358 as if fully set forth herein.

423.    Plaintiffs and Class members deposited and/or maintained funds and assets in their Binance accounts. Plaintiffs' and Class members' funds and assets were personal property. Plaintiffs

and Class members each had a possessory interest in the specific, identifiable assets and/or funds that they invested in the Binance platform(s).

424.     Binance substantially interfered with Plaintiffs' and Class members' funds and/or assets by knowingly and/or intentionally taking possession of this property to use for purposes not authorized by Plaintiffs and Class members, spending the funds and/or assets in the accounts for items not authorized pursuant to their agreements, and/or refusing to return the funds and/or assets despite the demands from Plaintiffs and Class members. Plaintiffs and Class members did not consent to the use of their assets and/or funds by Binance, as alleged above.

425.     Plaintiff and Class members have been harmed by being denied access to and/or possession of their assets and funds.

426.     Binance's conduct was a substantial factor in causing the harm alleged herein to Plaintiff and Class members.

## COUNT NINE

### Aiding and Abetting Conversion
*(Plaintiffs individually and on behalf of the Global Class, alternatively,*
*Plaintiffs individually and on behalf of the Nationwide Class, alternatively,*
*Plaintiffs Vazquez and Vongdara individually and on behalf of the Florida Subclass and*
*Plaintiff Sizemore individually and on behalf of the California Subclass, and Plaintiff Lewis individually and on*
*behalf of the Colorado Subclass)*

427.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1–358 as if fully set forth herein.

428.     The funds deposited by Plaintiffs and Class members into the Binance platform(s) were Plaintiffs' and Class members' personal property. Plaintiffs and Class members each had a possessory interest in the sum of money they invested in the Binance platform(s).

429.     Binance wrongfully interfered with Plaintiffs' possessory interest in a specific, identifiable sum of money.

430.    Defendants Zhao, Butler, Armstrong and/or Paxos, based on their knowledge of Binance's operations obtained through due diligence, ongoing monitoring, and partnership, acquired knowledge of Binance's conversion of Plaintiffs' funds.

431.    Notwithstanding this knowledge, and by reason of the conduct described herein, Defendants Zhao, Butler, Armstrong and/or Paxos substantially aided, abetted, and/or participated with Binance in the conversion of funds that belonged to Plaintiffs.

432.    Defendants Zhao, Butler, Armstrong and/or Paxos' actions, in combination with the actions of Binance, are a proximate cause of actual damages to Plaintiffs and Class members. Defendants Zhao, Butler, Armstrong and/or Paxos are jointly and severally liable for participating in the conversion of Plaintiffs' funds.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs pray for a judgment on behalf of themselves and the Classes:

a.    Certifying the Classes as requested herein;

b.    Awarding actual, direct and compensatory damages;

c.    Awarding restitution and disgorgement of revenues if warranted;

d.    Awarding declaratory relief as permitted by law or equity, including declaring the Defendants' practices as set forth herein to be unlawful;

e.    Awarding injunctive relief as permitted by law or equity, including enjoining the Defendants from continuing those unlawful practices as set forth herein, and directing the Defendants to identify, with Court supervision, victims of their conduct and pay them all money they are required to pay;

f.    Awarding statutory and multiple damages, as appropriate;

g.    Awarding attorneys' fees and costs;

h.    Awarding restitutionary damages or disgorgement; and

i.     Providing such further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial as to all claims so triable.

Dated: June 27, 2023

Respectfully submitted,

By: */s/ Adam Moskowitz*
Adam M. Moskowitz
Florida Bar No. 984280
Joseph M. Kaye
Florida Bar No. 117520
Barbara C. Lewis
Florida Bar No. 118114
**THE MOSKOWITZ LAW FIRM, PLLC**
Continental Plaza
3250 Mary Street, Suite 202
Coconut Grove, Florida 33133
Telephone: (305) 740-1423
adam@moskowitz-law.com
joseph@moskowitz-law.com
barbara@moskowitz-law.com

Brooke Alexander
(*Pro Hac Vice*)
**BOIES SCHILLER FLEXNER LLP**
333 Main Street
Armonk, NY 10504
Phone: (914) 749–8200
balexander@bsfllp.com

Stephen Neal Zack
Florida Bar No. 145215
Tyler Ulrich
Florida Bar No. 94705
**BOIES SCHILLER FLEXNER LLP**
100 SE 2nd St., Suite 2800
Miami, FL 33131
Office: 305-539-8400
szack@bsfllp.com
tulrich@bsfllp.com

*Co-Counsel for Plaintiffs and the Class*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the forgoing was filed on June 27, 2023, via the Court's CM/ECF system, which will send notification of such filing to all attorneys of record.

By: */s/ Adam M. Moskowitz*
ADAM M. MOSKOWITZ